## **Composite Exhibit 3**

### **Frontier Position Statements**

| Charge No. | Charging Party | Page(s) |
|---|---|---|
| Charge 541-2016-01704 | Randi Freyer | 1-12 |
| Charge 541-2016-01707 | Shannon Kiedrowski | 13-15 |
| Charge 541-2016-01708 | Erin Zielinski | 16-18 |
| Charge 541-2016-01709 | Brandy Beck | 19-31 |
| Charge 541-2017-01427 | Jo Linda Roby | 32-43 |
| Charge 541-2017-01430 | Stacy Rewitzer (Schiller) | 44-55 |
| Charge 541-2018-00055 | Renee Schwartzkopf | 56-66 |
| Charge 541-2018-00056 | Melissa Hodgkins | 67-75 |
| Charge 541-2018-02436 | Heather Crowe | 76-88 |
| Charge 541-2018-02426 | Trisha Hughes-Draughn | 89-100 |



Littler Mendelson, PC
1900 Sixteenth Street
Suite 800
Denver, CO 80202

Erin A. Webber
303.362.2851 direct
303.629.6200 main
303.362.8427 fax
ewebber@littler.com

July 22, 2016

**VIA ELECTRONIC SUBMISSION**

Todd Chavez
Federal Investigator
U.S. Equal Employment Opportunity Commission
Denver Field Office
303 East 17th Avenue
Suite 410
Denver, CO 80203

Re:     Respondent's Position Statement
        Randi Freyer v. Frontier Airlines, Inc.
        EEOC Charge No. 541-2016-01704

Dear Mr. Chavez:

I am writing on behalf of Respondent Frontier Airlines, Inc. ("Frontier") in response to the Charge of Discrimination filed by Randi Freyer on or about May 6, 2016. In her Charge, Ms. Freyer alleges to have suffered discrimination based on her sex and in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA"). Frontier also acknowledges that Ms. Freyer contends the company violated the Colorado Fair Employment Practices Act and the Colorado Workplace Accommodation for Nursing Mothers Act ("WANMA"). However, Frontier understands that the Equal Employment Opportunity Commission ("EEOC") does not have jurisdiction over these state law claims. Accordingly, it has refined its response to address Ms. Freyer's federal law claim under Title VII. To the extent the EEOC believes it has jurisdiction to investigate the state law allegations referenced in the Charge, particularly with respect to the WANMA, Frontier respectfully requests the opportunity to supplement this position statement to address these matters.[1]

---

[1] This position statement is based on Frontier's understanding of Ms. Freyer's allegations to the best of its knowledge and recollection as of the date of this document. Frontier expressly reserves the right to amend, supplement or correct this Position Statement, if necessary. In addition, this Position Statement and the accompanying exhibits, which contain confidential personnel, medical and business information, are subject to the exceptions to the disclosure requirements of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7). All information provided herein, including this Position Statement, is provided solely in cooperation with the EEOC's fact-finding efforts. Frontier reserves all objections to the admissibility at any hearing, trial, or other proceeding of any of the information or documents provided to the EEOC.

littler.com

Page 1

**EXHIBIT 3**

Todd Chavez
July 22, 2016
Page 2

## I. INTRODUCTION

Frontier denies any allegation that it discriminated against Ms. Freyer in violation of Title VII, as amended by the PDA, or any other law. In fact, as detailed below, Frontier treated Ms. Freyer, all pregnant pilots, and those pilots wishing to express breast milk upon their return to work: lawfully; in compliance with the collectively bargained agreement governing relevant terms and conditions of a Frontier pilot's employment; in accordance with its standard practices; and, most importantly, consistent with the manner in which it accommodates all pilots (both male and female) who are similar in their ability to work or not work.

Indeed, upon close scrutiny of the Charge, it becomes clear that Ms. Freyer demands that Frontier treat her, pregnant pilots and those pilots seeking to express breast milk upon their return to flight more favorably than all other pilots and federal law. For example, Ms. Freyer takes issue with the fact that her leave of absence in connection with her pregnancy and the birth of her child was unpaid. Under the terms of the Frontier Airline Pilots Association's ("FAPA") Collective Bargaining Agreement ("CBA"), all medical leaves of absence are unpaid. Moreover, it is indisputable that Title VII, the Family and Medical Leave Act ("FMLA") and Americans with Disabilities Act ("ADA") do not require a leave of absence to be paid.

In her Charge, Ms. Freyer further contends that the fact she was not offered a temporary reassignment to light duty as an accommodation for her pregnancy or desire to express breast milk upon her return to work is further evidence of discrimination. More specifically, in her Charge, Ms. Freyer contends that she should have been offered the opportunity to be temporarily reassigned to a desk job at Frontier's corporate headquarters or a ground position at the airport. This argument falls flat because Frontier does not provide temporary light duty assignment at its corporate headquarters or at the airport as an accommodation to any pilot unable to fly for medical reasons. Any allegation that the company has done so in the past has no basis in fact. To be clear, Frontier has no obligation under the CBA to provide this type of accommodation to pilots (male or female) who are unable to fly due to: (a) an on-the-job injury; (b) a non-work related injury; or, (c) any other medical condition or disability. Put another way, Frontier treated Ms. Freyer the same as all other pilots.

Finally, Ms. Freyer's allegations are further undermined by the fact that in May 2016, Frontier granted her the very accommodation she requested: an extended leave of absence until December 5, 2016, i.e., one year after the birth of her daughter. As Ms. Freyer notes in her Charge, it was important to her that her child be breast fed for one full year after birth. Accordingly, Ms. Freyer requested a leave of absence up to and including December 5, 2016, which is her daughter's one year birthday. The contemporaneous communication surrounding Ms. Freyer's accommodation request demonstrates that this was her preferred accommodation, i.e., not to return to work and be accommodated there, but to remain home with her daughter. Frontier granted Ms. Freyer the extended leave of absence. Therefore, it is unclear what damages Ms. Freyer has suffered, given Frontier has provided her with exactly what she requested.

Todd Chavez
July 22, 2016
Page 3

In summary, Frontier believes that this Position Statement and the evidence submitted herewith demonstrate that it has acted lawfully at all times. Accordingly, it respectfully requests that the EEOC issue a no probable cause finding with respect to Ms. Freyer's Charge.

## II.   FACTUAL BACKGROUND

### A.   General Information Relating To Ms. Freyer's Employment

On or about September 3, 2013, Ms. Freyer began her employment with Frontier as a pilot in the position of First Officer, in which she remains as of the date of this Position Statement. Exhibit A (Personnel File). As a First Officer, Ms. Freyer is generally "responsible for ensuring safe and timely flight operations in accordance with all Company policies and Federal Aviation Regulations (FAR)." Exhibit B (First Officer Job Description). The job description's emphasis on safety is consistent with the fact that while Frontier prides itself on being an ultra-low cost carrier, the company views its primary mission to be ensuring the safety of its customers and employees. Thus, while serving more than 40 cities in the United States, Mexico, and Jamaica on over 275 daily flights, Frontier never loses sight that its principal responsibility is to ensure passengers and employees are safely delivered to their destination.

Upon her acceptance of employment as a First Officer, Ms. Freyer voluntarily joined FAPA, the union that represents Frontier pilots and is responsible for promoting the interests of its members. See Charge at p. 2, ¶3. Importantly, FAPA and Frontier negotiated a CBA, which is the contract that sets forth the terms of employment and working conditions for Frontier pilots. The CBA specifically addresses, among other things, seniority, scheduling, staffing adjustments, leaves of absence, and medical standards. Exhibit C (Relevant Provisions of FAPA CBA). Accordingly, its provisions are material to an assessment of Ms. Freyer's allegations.

In her Charge, Ms. Freyer contends she was discriminated against in violation of Title VII in connection with two separate, discrete time periods: (a) her pregnancy in 2013 and her return to work following the birth of her first child; and, (b) her pregnancy in 2015 and anticipated return to work following the birth of her second child. Critically, after Ms. Freyer had her second child on December 5, 2015, in accordance with the terms of the CBA, she was provided a 120 day leave of absence from the birth of her child, i.e., up to and including April 3, 2016. Id. at §9.H.4. Before returning to work, Ms. Freyer requested an extension of her leave until December 5, 2016 to allow her to breast feed her daughter until her first birthday. Exhibit D (March 31, 2016 E-mail). Indeed, in her request for an accommodation for additional leave time, Ms. Freyer made clear that her preferred accommodation was to take additional unpaid leave, rather than be accommodated to express breast milk at work:

- "If I'm eligible to request a medical LOA for these reasons, then I would like to request such a leave until my lil lady turns 1, December 5 of this year."

- "The bottom line is that I'd like to seek leave, under either FMLA, extended maternity leave, or medical LOA (or some combination), until December 5, 2016 when Avery will be one."

*Id.* On or around May 25, 2016, Frontier granted Ms. Freyer this additional leave of absence. Exhibit E (June 2013 E-mails Acknowledging Leave of Absence Approved); and, Exhibit F (Leave of Absence Records).[2] Thus, as of the date of this position statement, Ms. Freyer remains employed by Frontier, but is on a leave of absence until December 2016.

## B. Ms. Freyer's Allegations With Respect To Her First Pregnancy And Subsequent Return To Work Are Time Barred

In order to maintain a claim under Title VII, a plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). Ms. Freyer filed her Charge on May 6, 2016 and 300 days prior to that is July 11, 2015, rendering any claim based on events before this date untimely as a matter of law. *Id.* Accordingly, Ms. Freyer's allegations relating to her first pregnancy and her subsequent return to work are time barred.

More specifically, in her Charge, Ms. Freyer takes issue with the fact that in early 2014, when she was 32 weeks pregnant with her first child and unable to fly, she was required to begin her maternity leave rather than have the opportunity to be temporarily reassigned to a light duty position. Charge at p. 4, ¶¶17-19. This leave began on March 6, 2014 and ran through early April 2014, at which time her first child was born. Id. at p. 5, ¶20. Therefore, there can be no doubt that these allegations are time-barred, as they are well before the July 11, 2015 cut-off imposed by Title VII and enforced by the EEOC. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (finding that repeated occurrences of the same discriminatory employment action, like the failure to provide an accommodation, can be challenged only if "an act contributing to the claim occurs within the [charge] filing period").

In addition, the Charge improperly takes aim at Frontier's purported failure to accommodate Ms. Freyer upon her return to work in February 2015, after her ten (10) month leave of absence following the birth of her first child. Before assessing the lack of legal merit on this issue, it is important to note that Ms. Freyer's allegations are inherently contradictory, perhaps in an attempt to confuse and mislead the EEOC. For example, in her introduction, she admits that she returned to work "in or around February 2015." Charge at p. 1. Then, in the purported "fact" section of the Charge, Ms. Freyer claims that she was only on a medical leave of absence "until December 2014." Id. at ¶ 20. A few paragraphs later Ms. Freyer claims she "returned to work in January 2015." Id. at ¶ 24. To review, within the Charge, she claims to have returned to work in December 2014, January 2015, and February 2015. This

---

[2] This Exhibit includes medical information, which is confidential. Accordingly, Frontier has not submitted it via the electronic portal, but instead, will deliver it via e-mail.

Todd Chavez
July 22, 2016
Page 5

inconsistency on the most basic of issues should not be overlooked by the EEOC, as it is patent evidence that Ms. Freyer's allegations lack credibility.

Notwithstanding the foregoing, Ms. Freyer actually returned to work in February 2015, when her first child was approximately 10 months old. The Charge claims that it is "important" to Ms. Freyer that she be able to breastfeed her children for one year. Because Ms. Freyer's first born turned one in April 2015, to the extent she requested an accommodation with respect to expressing breast milk at work, and Frontier does not admit that she did, the request was only up to and including April 2015. Thus, once again, because the allegations relate to events before the 300 days prior to when Ms. Freyer filed her Charge – i.e., prior to July 11, 2015 – any claim based on these events is untimely as a matter of law. 42 U.S.C. § 2000e-5(e)(1); see also Morgan, 536 U.S. at 117.

This last point is critical. As described above in Section II.A, after Ms. Freyer had her second child on December 5, 2015, she requested an extension of her medical leave of absence until December 5, 2016, which Frontier granted. This means that as of the date of this position statement, Ms. Freyer remains out on leave and unable to establish a timely claim with respect to any failure to accommodate her desire to express milk upon to a return to work. Indeed, when she does return to work, her daughter will be one, thereby eliminating Ms. Freyer's concerns of being unable to feed her via breast milk until her child's first birthday. For this reason, Frontier respectfully states that Ms. Freyer cannot assert and has no standing to claim a violation of Title VII in connection with Frontier's purported failure to adequately accommodate her desire to express breast milk during work hours.

In summary, there can be no doubt that all of Ms. Freyer's allegations with respect to her first pregnancy and return to work are untimely as a matter of law. See Charge at pp. 4-6, ¶¶17-31. Therefore, Frontier respectfully requests that the EEOC inform Ms. Freyer that under Title VII, the United States Supreme Court's case law interpreting the same and the EEOC's directive to enforce the laws as written, these allegations are time barred.

## C.   Ms. Freyer's Allegations With Respect To Her Second Pregnancy Lacks Factual And Legal Merit

In her Charge, with respect to her second pregnancy, Ms. Freyer takes issue with the fact that when her pregnancy rendered her unable to fly, she was required to take an unpaid leave of absence, rather than be: (a) reassigned to a temporary light duty position until the birth of her child; or, (b) paid for her time away from work.

### 1.   All Medical Leaves Of Absence Provided To Pilots Are Unpaid

As an initial matter, the terms and conditions of the leaves of absence policies about which Ms. Freyer complains are set forth in the CBA. That is, they were collectively bargained for by FAPA and on behalf of Ms. Freyer, who voluntarily agreed to be a part of the union. This cannot be lost, as the Charge consistently refers to the leaves of absence policies to which Ms.

Case 1:21-mc-00191-DDD-SKC Document 2-3 Filed 09/30/21 USDC Colorado Page 7 of 101

Todd Chavez
July 22, 2016
Page 6

Freyer is subject to as "Frontier's policies." *See e.g.* Charge at ¶¶ 5, 6, 22, 33 (referring to "Frontier's policies"). This is misleading because it fails to inform the EEOC that Ms. Freyer's interests were represented by FAPA and accounted for in the determination of the scope of these policies.

That aside, Ms. Freyer takes issue with the fact that she was not provided a paid leave of absence. Charge at ¶¶ 5, 7, 34. The CBA does not provide for a paid leave of absence for pilots unable to fly due to any type medical condition. *See generally* Ex. C. As set forth in the CBA, Frontier provides pilots with the following types of medical leave: (a) Family and Medical Leave of Absence; (b) Maternity Leave of Absence; and, (c) Medical Leave of Absence. *See* Ex. C at Section 9 (Leaves of Absence).[3] Nowhere in the CBA does it provide that a pilot shall be paid in connection with any of the foregoing leaves of absence, other than to the extent the pilot wishes to be paid from accrued sick leave or vacation time. Accordingly, the fact Frontier does not pay pregnant pilots on a leave of absence in connection with their pregnancy or birth of a child cannot be deemed discriminatory where, as here, the company does not pay any pilot (male or female) on a leave of absence for non-pregnancy related medical conditions. *See Young v. UPS*, 135 S. Ct. 1338, 1343-44 (2015). In summary, this renders any assertion that Frontier pay Ms. Freyer for her time away from work for pregnancy-related medical conditions contrary to the mandates of Title VII. *Id.* (only requiring an employer to treat "women affected by pregnancy ... the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work") (quoting 42 U.S.C. § 2000e(k)) (emphasis added).

### 2. Frontier Does Not Provide The Temporary Light Duty Assignment That Ms. Freyer Sought As An Accommodation To Any Pilots Unable To Fly For Any Reason

In her Charge, Ms. Freyer also takes issue with the fact that Frontier failed to provide her with the opportunity to be reassigned to a temporary light duty position to accommodate her inability to fly in the third trimester of her 2015 pregnancy. Charge at p. 6, ¶¶ 6, 10, 33, 35, 49. Under the Maternity Leave of Absence policy set forth in the CBA, "[a]fter the 32nd week of pregnancy, or whenever such Pilot's doctor will not provide the required medical authorization, whichever comes first, the Pilot will request Maternity Leave." Ex. C at § 9.H. Notably, in her Charge, Ms. Freyer does not claim that she should have been permitted to fly after her 32nd week of pregnancy, but instead, simply claims she could have continued working in a temporary light duty assignment. Charge at pp. 1, 6, ¶¶ 33, 35 (uniformly stating she would have been able to "continue working in a reassigned capacity").[4]

---

[3] Notably, Frontier pilots are eligible for workers' compensation, as well as long term and short term disability benefits in connection with qualifying conditions. In fact, in her Charge, Ms. Freyer's acknowledges she received disability benefits after the birth of her first child. Charge at p. 5, ¶20.

[4] The Federal Aviation Administration's regulations prohibit a person who holds a current medical certificate from acting as a pilot when she knows or has reason to know of any medical condition that would make the person unable to meet the requirements for the medical certificate necessary for the

Page 6

Case 1:21-mc-00191-DDD-SKC   Document 2-3   Filed 09/30/21   USDC Colorado   Page 8 of 101

The CBA does not require and Frontier's standard practices do not provide for the provision of a temporary light duty assignment at Frontier's corporate office or at the airport to any pilot (male or female) unable to fly due to: (a) an on-the-job injury; (b) a non-work related injury; or, (c) any other medical condition or disability. Put another way, there are no policies or procedures in place at Frontier addressing the provision of temporary light duty assignment at issue in the charge, i.e., the provision of a "desk job" at corporate headquarters or a "ground position" at the airport. *See e.g.* Charge at p. 6, ¶33 (claiming she "would have been able to work until the end of [her] pregnancy had I had the option of being temporarily reassigned to a ground position"), p. 8, ¶49 (referencing a "desk job position at headquarters"). Moreover, contrary to the allegations in the Charge, during the relevant time period, Frontier did not provide a temporary light duty assignment at Frontier's corporate office (or at the airport) to any pilot unable to fly for any reason. *Compare* Charge at p. 8, ¶49 (claiming that Ms. Freyer is "aware of one [female] line pilot who was provided with a desk job position at headquarters when she was unable to fly because of certain medical reasons"). Given the foregoing, the only conclusion that can be reached is that Ms. Freyer demands that the EEOC insist she be treated more favorably than other pilots. There is no support in the relevant law, including the EEOC's guidance interpreting the same.

First, according the EEOC Enforcement Guidance on Pregnancy Discrimination and Related Issues, in enacting the PDA:

> Congress sought to make clear that 'pregnant women who are able to work must be permitted to work on the same conditions as other employees; and, when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working.' The PDA requires [only] that pregnant employees be treated the same as non-pregnant employees who are similar in their ability or inability to work.

*Id.* (EEOC Notice No. 915.003) (June 25, 2015) (Overview of Statutory Protections) (emphasis added). Pursuant to the foregoing, because Frontier does not provide temporary light duty assignment to pilots at Frontier's corporate office or at the airport, the fact that Frontier did not provide Ms. Freyer this accommodation is not evidence of discrimination under the PDA.

Further, in *Young v. UPS*, the United States Supreme Court held that to succeed on a claim that the denial of an accommodation constitutes disparate treatment under the PDA, the plaintiff must show, among other things, "that she sought [an] accommodation, that the

---

pilot operation. 14 C.F.R. § 61.53. Given the medical risks associated with flying during pregnancy, including premature labor, and the inherent risk to the safety of flight operations in the event of a medical emergency to a pilot, the CBA identifies that a pregnant pilot will no longer be eligible to fly a plane at 32 weeks of pregnancy. In her Charge, Ms. Freyer does not dispute the legitimate business and safety reasons behind this decision, which was collectively bargained for and agreed to by her union.

Todd Chavez
July 22, 2016
Page 8

employer did not accommodate her, and that the employer did accommodate others 'similar in their ability or inability to work.'" 135 S. Ct. at 1354 (emphasis added). Here, Ms. Freyer cannot establish that she was denied an accommodation provided to other pilots and accordingly, cannot set forth a *prima facie* case of discrimination.

Finally, when providing guidance with respect to an employer's obligation to provide a reasonable accommodation under the ADA, the EEOC has stated:

> The principle that the ADA does not require employers to create positions as a form of reasonable accommodation applies equally to the creation of a light duty position.

EEOC Enforcement Guidance: Workers' Compensation and the ADA (EEOC Notice No. 915.002) (June 6, 2000) (emphasis added). This provides more support for Frontier's actions, because according to the EEOC Guidance, the company was under no obligation to create a temporary light duty position or light duty program at Frontier's corporate offices or at the airport for Ms. Freyer or others similarly situated.

In summary, when Frontier did not offer Ms. Freyer the option of a temporary light duty assignment, it treated her the same as non-pregnant pilots who are similar in their ability to work or not work. Therefore, the company met and is meeting the letter and spirit of the law.[5]

---

[5] In its requests for information, the EEOC seeks information on the pregnant pilots who were "placed on unpaid maternity leave following the 32nd week of pregnancy." Frontier will provide this information on pilots who, in accordance with terms of the CBA, were determined to be unable to fly at week 32 of their pregnancy. This information is provided for July 11, 2015 to the present, which for the reasons set forth in Section II.B is the relevant time period. 42 U.S.C. § 2000e-5(e)(1) (requiring a charge of discrimination to be filed within 300 days of the alleged unlawful employment practice). If the EEOC has legal authority supporting its request for and inference that it has a right to information from January 1, 2014 through July 10, 2015, which is outside the relevant time period as set forth in Title VII, Frontier respectfully requests the opportunity to review such authority. Upon provision of such information by the EEOC, Frontier reserves the right to reconsider its decision on whether to provide such information.

Subject to and without waiving the foregoing, Frontier states that during the relevant time period, Andrea Martinez was the only other pregnant pilot who, in accordance with the CBA, was determined to be unable to fly at week 32 of her pregnancy. Ms. Martinez began her leave of absence on November 17, 2015 and returned to work on May 4, 2016. Recently, Ms. Martinez voluntarily resigned her position with Frontier to pursue a career opportunity with another airline.

Todd Chavez
July 22, 2016
Page 9

## D.    Frontier's Provision Of An Extended Leave Of Absence To Ms. Freyer Undercuts The Remaining Allegations In Her Charge

In another futile attempt to demonstrate that Frontier discriminated against her, Ms. Freyer contends that because the Maternity Leave of Absence policy is "limited" to "120 days of unpaid maternity leave," it further evidences a violation of Title VII. *See e.g.* Charge at ¶52 (claiming "the limitation to 120 days of unpaid maternity leave" is discriminatory). On this issue, the Charge states:

> I would prefer to take more than the maximum 120 days of unpaid maternity leave so that I can continue breastfeeding, but I am not permitted to do so under Frontier policies. Frontier's policies also prohibit me from seeking unpaid medical leave for a longer period by demonstrating medical necessity as a result of lactation.

Charge at p.5, ¶ 22. There can be no dispute that Frontier granted Ms. Freyer an extended leave of absence for the exact duration she requested, December 5, 2015 through December 5, 2016, and in connection with a purported medical condition related to lactation. Ex. E. Thus, this allegation is without factual support. It is inarguable Ms. Freyer was provided more than 120 days of leave.

In addition, this claim lacks legal merit. There is no federal law that requires Frontier to provide a paid maternity leave of absence or even that it administer a Maternity Leave of Absence policy. Rather, Frontier is required only to follow the FMLA, which is to say it must ensure eligible employees are allowed "to take job-protected, unpaid leave for up to a total of 12 workweeks within any 12 months." 29 C.F.R. § 825.100(a). Frontier more than met this federal mandate. Specifically, the CBA has a separate leave of absence policy addressing the FMLA, which Ms. Freyer exhausted. Ex. C at §9.F. Thus, the fact that the Maternity Leave of Absence policy exists and affords Ms. Freyer more than 17 weeks of leave after the birth of her child and after she already exhausted her FMLA leave demonstrates just the opposite of unlawful treatment against female pilots. Put another way, the Maternity Leave of Absence policy provides for coverage far in excess of what is required by federal law and demonstrates a good faith attempt to accommodate working mothers.

## E.    Other

Finally, Ms. Freyer appears to take issue with the fact that at the time she filed her Charge on May 6, 2016, Frontier had not provided her a response to her preferred request for the accommodation of an extension of her leave of absence or, in the alternative, information on "what policies" Frontier had in place to allow her to express breast milk during work hours. Charge at ¶¶ 38-47; Ex. D (March 31, 2015 E-mail). As detailed above, Frontier has approved Ms. Freyer's extended leave of absence. However, the company would be remiss if it did not

Todd Chavez
July 22, 2016
Page 10

point out that Ms. Freyer was equally responsible for any delay in Frontier being able to
determine her eligibility for an extension of her leave of absence.

In accordance with the Maternity Leave of Absence policy in the CBA, Ms. Freyer was
granted a leave of absence for 120 days following the date of her daughter's birth. Ex. C at
§9.H.4 ("Maternity Leave shall be granted until the pregnancy ends, and thereafter for a period
not to exceed 120 days after the duration of the pregnancy."). Since Ms. Freyer's daughter was
born on December 5, 2015, she was informed that her leave of absence would extend to April
3, 2016. Ex. D (Dec. 17, 2015 E-mail). That is, contrary to the allegations in the Charge, Ms.
Freyer was not "ordered" to return to work on that day, but instead, simply notified the time
period for which her maternity leave was approved. Charge at p. 6, ¶36.

Mere days before her leave was set to expire, on March 31, 2016, Ms. Freyer contacted
Frontier for the first time to request information on whether she was "eligible" to extend her
leave of absence and if not, then what options were available to her with respect to expressing
milk at work. Ex. D (March 31, 2016). Frontier was unable to determine by the e-mail from
Ms. Freyer whether she had a medical condition that qualified her for a leave of absence under
the CBA. Rather, Frontier needed a certification from a health care provider identifying the
medical condition precluding her return to work. This is consistent with the terms of the CBA.

- Under the Maternity Leave of Absence policy, "[i]f a Pilot is unable to return to Active
  Service within 120 days after the pregnancy ends because of a *certified* medical
  incapacitation, she shall be entitled to receive a Medical Leave of Absence under the
  provisions of this Section."

- Under the Medical Leave of Absence policy, Frontier has the right to "require a Pilot
  who requests a Medical Leave of Absence to first present a reasonably sufficient report
  from the Pilot's health care provider *certifying* the Pilot's need for Medical Leave."

Ex. C at §9.H.15.a, §9.I.2 (emphasis added). In short, Ms. Freyer's belief that she could certify
her own medical incapacitation over e-mail and without input from a health care provider was
misguided; and, her insistence on getting an answer without any medical certification
contributed to any perceived delay. Ultimately, in April 2016, Frontier provided Ms. Freyer with
the requisite medical documentation that needed completion and her doctor returned it in May
2016. Ex. E. Once Frontier had the proper certifications in hand, it was only then able to
evaluate and determine that Ms. Freyer would be granted an extension of her medical leave of
absence.

Finally, the e-mail communication demonstrates that Ms. Freyer was very clear that she
was pursuing an extension of her leave and was only interested in what policies were available
to her if her leave request was denied and she was required to return to work in the spring of
2016. Ex. D at April 20, 2016 E-mail ("If I'm eligible to request a medical LOA for these
reasons, then I would like to request such a leave until my lil lady turns 1, December 5 of this

year [2016].”), April 21, 2016 E-mail (“The bottom line is that I’d like to seek leave, under either FMLA, extended maternity leave, or medical LOA (or some combination), until December 5, 2016 when Avery will be one.”). Therefore, any insinuation that Frontier failed to adequately engage her in discussions with respect to her return to work are meritless, as Frontier was focused on assisting Ms. Freyer in pursuing her primary goal of remaining on a leave of absence.

## III. LEGAL ANALYSIS

In her Charge, Ms. Freyer contends she was discriminated against based on her sex in violation of Title VII, as amended by the PDA. Since she does not offer direct evidence of discrimination on this claim, this allegation of discrimination must be analyzed under the *McDonnell Douglas* burden-shifting framework. A plaintiff alleging that the denial of an accommodation constituted disparate treatment under the PDA establishes a *prima facie* case by showing that: (1) she is a member of a protected class; (2) she sought an accommodation and the employer did not accommodate her; and, (3) the employer did accommodate others similar in their ability or inability to work. *Young*, 135 S. Ct. at 1354. If a plaintiff can make this showing, then the "employer may then seek to justify its refusal to accommodate the plaintiff by relying on legitimate, non-discriminatory reasons for denying her accommodation." *Id.* "If the employer offers an apparently legitimate, non-discriminatory reason for its actions," the burden then shifts back to the plaintiff to "show that that employer’s proffered reasons are in fact pretextual." *Id.*

For the reasons set forth above, with respect to her timely claims of discrimination (and even those that are untimely), Ms. Freyer cannot meet her *prima facie* case because she cannot demonstrate that she sought an accommodation that Frontier did not grant to her, but provided others similar in their ability to work or not work. For example:

- Ms. Freyer complains that she was not afforded the accommodation of a paid leave of absence. Frontier does not provide a paid leave of absence to pilots unable to fly due to any type medical condition. *See* Section II.C.1 above.

- Ms. Freyer also takes issue with the fact that Frontier failed to provide her with the opportunity to be reassigned to a temporary light duty position at Frontier’s corporate office or at the airport to accommodate her inability to fly. Frontier does not provide temporary light duty assignment to any pilot at Frontier’s corporate office or at the airport unable to fly for any reason (e.g., on the job injury, off the job injury, any medical condition or disability). *See* Section II.C.2 above.

Accordingly, Ms. Freyer’s discrimination claim fails at the outset, as she cannot even make it past her *prima facie* case. Indeed, Frontier’s decision to adhere to the provisions of the CBA and to treat Ms. Freyer the same as all other pilots in their ability or inability to work is evidence

Todd Chavez
July 22, 2016
Page 12

that its business decisions were legitimate and non-discriminatory. Accordingly, Ms. Freyer also cannot establish Frontier's decisions were pretextual.

In summary, Ms. Freyer's Title VII allegations are either untimely as a matter of law or without legal merit.

## IV.    CONCLUSION

For the reasons detailed above, Ms. Freyer has not been subject to any form of discrimination. Rather, Frontier has treated her fairly and lawfully at all times. Accordingly, the company respectfully requests that Ms. Freyer's Charge be dismissed with a finding of "no probable cause." Please do not hesitate to contact me if you require any further information.

Sincerely,

Littler Mendelson, P.C.

Erin A. Webber

EAW/AAS



Littler Mendelson, PC
1900 Sixteenth Street
Suite 800
Denver, CO 80202

Erin A. Webber
303.362.2851 direct
303.629.6200 main
303.362.8427 fax
ewebber@littler.com

July 15, 2016

## VIA ELECTRONIC SUBMISSION

Todd Chavez
Federal Investigator
U.S. Equal Employment Opportunity Commission
Denver Field Office
303 East 17th Avenue
Suite 410
Denver, CO 80203

Re:    Respondent's Position Statement
       Shannon Kiedrowski v. Frontier Airlines
       EEOC Charge No. 541-2016-01707

Dear Mr. Chavez:

I am writing on behalf of Respondent Frontier Airlines, Inc. ("Frontier") in response to the Charge of Discrimination filed by Shannon Kiedrowski on or about May 6, 2016. In her Charge, Ms. Kiedrowski alleges to have suffered discrimination based on her sex and in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA"). Frontier also acknowledges that Ms. Kiedrowski contends the company violated the Colorado Fair Employment Practices Act and the Colorado Workplace Accommodation for Nursing Mothers Act ("WANMA"). However, Frontier understands that the Equal Employment Opportunity Commission ("EEOC") does not have jurisdiction over these state law claims. Accordingly, it has refined its response to address Ms. Kiedrowski's federal law claim under Title VII. To the extent the EEOC believes it has jurisdiction to investigate the state law allegations referenced in the Charge, particularly with respect to the WANMA, Frontier respectfully requests the opportunity to supplement this position statement to address these matters.[1]

---

[1] This position statement is based on Frontier's understanding of Ms. Kiedrowski's allegations to the best of its knowledge and recollection as of the date of this document. Frontier expressly reserves the right to amend, supplement or correct this Position Statement, if necessary. In addition, this Position Statement and the accompanying exhibits, which contain confidential personnel, medical and business information, are subject to the exceptions to the disclosure requirements of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7). All information provided herein, including this Position Statement, is provided solely in cooperation with the EEOC's fact-finding efforts. Frontier reserves all objections to the admissibility at any hearing, trial, or other proceeding of any of the information or documents provided to the EEOC.

littler.com

**Ms. Kiedrowski's Claim Is Time Barred**

Frontier denies any allegation that it discriminated against Ms. Kiedrowski in violation of Title VII, as amended by the PDA, or any other law. That said, Ms. Kiedrowski cannot assert a Title VII claim against Frontier because her claim is time barred.

More specifically, in her Charge, Ms. Kiedrowski contends she was discriminated against in violation of the law in connection with:

- Her first pregnancy in 2010 and subsequent return to work in March 2011; and,
- Her second pregnancy in 2013 and subsequent return to work in July 2013.

Charge at pp. 4-5 ¶¶ 18, 20, 22, 23.[2] In order to have a valid discrimination claim, a plaintiff must file a charge of discrimination within 300 days of the alleged unlawful discrimination practice about which she complains. 42 U.S.C. § 2000e-5(e)(1). Ms. Kiedrowski filed her Charge on May 6, 2016 and 300 days prior to that is July 11, 2015, rendering any claim based on events before this date untimely as a matter of law. Even a cursory review of Ms. Kiedrowski's allegations reveal the fundamental flaw in her attempt to bring a claim.

With respect to her 2010 and 2013 pregnancies, Ms. Kiedrowski takes issue with the fact that once she was unable to fly, she was required to take an unpaid leave of absence for the remainder of her pregnancy, rather than being provided paid leave or the option to be reassigned to a temporary light duty position. *See e.g.* Charge at p. 5, ¶ 5. In her Charge, Ms. Kiedrowski concedes that these leaves of absence spanned from approximately: (a) October 2010 through December 2010; and, (b) December 2012 through March 2013. Id. at pp. 4-5 ¶¶ 18, 20, 22, 23. Therefore, there can be no doubt that these allegations are time-barred, as they are well before the July 11, 2015 cut-off imposed by Title VII and enforced by the EEOC. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (finding that repeated occurrences of the same discriminatory employment action, like the failure to provide an accommodation, can be challenged only if "an act contributing to the claim occurs within the [charge] filing period").

As for her allegations that Frontier allegedly failed to accommodate Ms. Kiedrowski upon her return to work in March 2011 and July 2013, these too are untimely. The Charge claims that it is "important" to Ms. Kiedrowski that she be able to breastfeed her children for one year. Ms. Kiedrowski's children turned one in March 2012 and July 2014, respectively. Accordingly, to

---

[2] Charge at p. 4-5 ¶¶ 18 (stating she first became pregnant in March 2010 and went on a leave of absence in or around October 2010, her 32nd week of pregnancy), 20 (stating she gave birth to her first child in December 2010 and returned to work in March 2011), 22 (stating she became pregnant with her second child in June 2012 and went on a leave of absence in or around December 2012, her 30th week of pregnancy), 23 (stating she gave birth to her second child in March 2013 and returned to work in July 2013).

Todd Chavez
July 15, 2016
Page 3

the extent she requested an accommodation with respect to expressing breast milk at work, and Frontier does not admit that she did, the request was only up to and including March 2012 for her first child and July 2014 for her second. Thus, once again, because the allegations relate to events before the 300 days prior to when Ms. Kiedrowski filed her Charge – i.e., prior to July 11, 2015 – any claim based on these events is untimely as a matter of law.  42 U.S.C. § 2000e-5(e)(1); *see also Morgan*, 536 U.S. at 117.

In summary, because even the most generous reading of the Charge demonstrates that all the purported unlawful practices about which Ms. Kiedrowski complains occurred between October 2010 and July 2014, it is inarguable that her entire claim is time barred.  42 U.S.C. § 2000e-5(e)(1); *see also Morgan*, 536 U.S. at 117.  For this reason, Frontier states that Ms. Kiedrowski cannot assert and has no standing to claim a violation of Title VII.  Therefore, Frontier respectfully requests that Ms. Kiedrowski's Charge be dismissed with a finding of "no probable cause" and that she be informed that under Title VII, the United States Supreme Court's case law interpreting the same and the EEOC's directive to enforce the laws as written, these allegations are untimely as a matter of law.

Please do not hesitate to contact me if you require any further information.

Sincerely,

Littler Mendelson, P.C.

Erin Webber/AAS

Erin A. Webber

EAW/AAS

Firmwide:141409743.1 057446.1009



Littler Mendelson, PC
1900 Sixteenth Street
Suite 800
Denver, CO 80202

Erin A. Webber
303.362.2851 direct
303.629.6200 main
303.362.8427 fax
ewebber@littler.com

July 15, 2016

## **VIA ELECTRONIC SUBMISSION**

Todd Chavez
Federal Investigator
U.S. Equal Employment Opportunity Commission
Denver Field Office
303 East 17th Avenue
Suite 410
Denver, CO 80203

Re:     Respondent's Position Statement
        Erin Zielinski v. Frontier Airlines
        EEOC Charge No. 541-2016-01708

Dear Mr. Chavez:

I am writing on behalf of Respondent Frontier Airlines, Inc. ("Frontier") in response to the Charge of Discrimination filed by Erin Zielinski on or about May 6, 2016. In her Charge, Ms. Zielinski alleges to have suffered discrimination based on her sex and in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA"). Frontier also acknowledges that Ms. Zielinski contends the company violated the Colorado Fair Employment Practices Act and the Colorado Workplace Accommodation for Nursing Mothers Act ("WANMA"). However, Frontier understands that the Equal Employment Opportunity Commission ("EEOC") does not have jurisdiction over these state law claims. Accordingly, it has refined its response to address Ms. Zielinski's federal law claim under Title VII. To the extent the EEOC believes it has jurisdiction to investigate the state law allegations referenced in the Charge, particularly with respect to the WANMA, Frontier respectfully requests the opportunity to supplement this position statement to address these matters.[1]

---

[1] This position statement is based on Frontier's understanding of Ms. Zielinski's allegations to the best of its knowledge and recollection as of the date of this document. Frontier expressly reserves the right to amend, supplement or correct this Position Statement, if necessary. In addition, this Position Statement and the accompanying exhibits, which contain confidential personnel, medical and business information, are subject to the exceptions to the disclosure requirements of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7). All information provided herein, including this Position Statement, is provided solely in cooperation with the EEOC's fact-finding efforts. Frontier reserves all objections to the admissibility at any hearing, trial, or other proceeding of any of the information or documents provided to the EEOC.

littler.com

Page 16

Case 1:21-mc-00191-DDD-SKC Document 2-3 Filed 09/30/21 USDC Colorado Page 18 of 101

Todd Chavez
July 15, 2016
Page 2

## Ms. Zielinski's Claim Is Time Barred

Frontier denies any allegation that it discriminated against Ms. Zielinski in violation of Title VII, as amended by the PDA, or any other law. That said, Ms. Zielinski cannot assert a Title VII claim against Frontier because based on the allegations in her Charge, her claim is time barred.

More specifically, in her Charge, Ms. Zielinski contends she was discriminated against in violation of the law in connection with: (a) her pregnancy from October 2013 through July 2014; and, (b) her return to work in November 2014, after giving birth in July 2014. Charge at pp. 4-5, ¶¶ 18, 20.[2] In order to have a valid discrimination claim, a plaintiff must file a charge of discrimination within 300 days of the alleged unlawful discrimination practice about which she complains. 42 U.S.C. § 2000e-5(e)(1). Ms. Zielinski filed her Charge on May 6, 2016 and 300 days prior to that is July 11, 2015, rendering any claim based on events before this date untimely as a matter of law. Therefore, for the reasons set forth below, a review of the allegations set forth in Ms. Zielinski's Charge demonstrate that she cannot bring forward a viable discrimination claim.

First, with respect to her pregnancy, Ms. Zielinski's takes issue with the fact that once her doctor determined she was unable to fly in her 30th week of pregnancy, she was required to take an unpaid leave of absence for the remainder of her pregnancy, rather than being provided paid leave or the option to be reassigned to a temporary light duty position. Charge at pp. 4-5, ¶¶ 19, 21. Ms. Zielinski began this maternity leave in or around April 2014 and her child was born in July 2014. Id. Therefore, there can be no doubt that the allegations related to this April 2014 through July 2014 leave of absence are time-barred, as they are well before the July 11, 2015 cut-off imposed by Title VII and enforced by the EEOC. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (finding that repeated occurrences of the same discriminatory employment action, like the failure to provide an accommodation, can be challenged only if "an act contributing to the claim occurs within the [charge] filing period").

As for her allegations that Frontier allegedly failed to accommodate Ms. Zielinski upon her return to work in November 2014, these too are untimely. In her Charge, Ms. Zielinski admits that she stopped breastfeeding "entirely" in April 2015, when her son was nine (9) months old. Charge at p. 4, ¶20 (stating her son was born in July 2014), p. 7, ¶39 (admitting she stopped breastfeeding when her son was nine (9) months old). Accordingly, to the extent she requested an accommodation with respect to expressing breast milk at work, and for the purpose of this Position Statement Frontier does not admit that she did, the request was only up to and including April 2015. Thus, once again, because the allegations relate to events before the 300 days prior to when Ms. Zielinski filed her Charge – i.e., prior to July 11, 2015 –

---

[2] Charge at pp. 4-5, ¶¶ 18 (stating she became pregnant in October 2013 and because of pregnancy-related complications, went on a leave of absence in or around April 2014, her 30th week of pregnancy), 20 (stating she gave birth in July 2014 and returned to work in November 2014).

Todd Chavez
July 15, 2016
Page 3

any claim based on these events is untimely as a matter of law. 42 U.S.C. § 2000e-5(e)(1); *see also Morgan*, 536 U.S. at 117.

In summary, because even the most generous reading of the Charge demonstrates that all the purported unlawful practices about which Ms. Zielinski complains occurred between April 2014 and April 2015, it is inarguable that her entire claim is time barred. 42 U.S.C. § 2000e-5(e)(1); *see also Morgan*, 536 U.S. at 117. For this reason, Frontier respectfully states that Ms. Zielinski cannot assert and has no standing to claim a violation of Title VII. Therefore, Frontier respectfully requests that Ms. Zielinski's Charge be dismissed with a finding of "no probable cause" and that she be informed that under Title VII, the United States Supreme Court's case law interpreting the same and the EEOC's directive to enforce the laws as written, these allegations are untimely as a matter of law.

Sincerely,

Littler Mendelson, P.C.

Erin A. Webber

EAW/AAS

Firmwide:141416204.1 057446.1009



Littler Mendelson, PC
1900 Sixteenth Street
Suite 800
Denver, CO 80202

Erin A. Webber
303.362.2851 direct
303.629.6200 main
303.362.8427 fax
ewebber@littler.com

July 15, 2016

## **VIA ELECTRONIC SUBMISSION**

Todd Chavez
Federal Investigator
U.S. Equal Employment Opportunity Commission
Denver Field Office
303 East 17th Avenue
Suite 410
Denver, CO 80203

Re:   Respondent's Position Statement
       Brandy Beck v. Frontier Airlines
       EEOC Charge No. 541-2016-01709

Dear Mr. Chavez:

       I am writing on behalf of Respondent Frontier Airlines, Inc. ("Frontier") in response to
the Charge of Discrimination filed by Brandy Beck on or about May 6, 2016. In her Charge, Ms.
Beck alleges to have suffered discrimination based on her sex and in violation of Title VII of the
Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA").
Frontier also acknowledges that Ms. Beck contends the company violated the Colorado Fair
Employment Practices Act and the Colorado Workplace Accommodation for Nursing Mothers Act
("WANMA").    However, Frontier understands that the Equal Employment Opportunity
Commission ("EEOC") does not have jurisdiction over these state law claims. Accordingly, it has
refined its response to address Ms. Beck's federal law claim under Title VII. To the extent the
EEOC believes it has jurisdiction to investigate the state law allegations referenced in the
Charge, particularly with respect to the WANMA, Frontier respectfully requests the opportunity
to supplement this position statement to address these matters.[1]

---

[1] This position statement is based on Frontier's understanding of Ms. Beck's allegations to the best of its
knowledge and recollection as of the date of this document. Frontier expressly reserves the right to
amend, supplement or correct this Position Statement, if necessary. In addition, this Position Statement
and the accompanying exhibits, which contain confidential personnel, medical and business information,
are subject to the exceptions to the disclosure requirements of the Freedom of Information Act ("FOIA"),
5 U.S.C. § 552(b)(7). All information provided herein, including this Position Statement, is provided solely
in cooperation with the EEOC's fact-finding efforts. Frontier reserves all objections to the admissibility at
any hearing, trial, or other proceeding of any of the information or documents provided to the EEOC.

Todd Chavez
July 15, 2016
Page 2

## I.    INTRODUCTION

Frontier denies any allegation that it discriminated against Ms. Beck in violation of Title VII, as amended by the PDA, or any other law. In fact, as detailed below, Frontier treated Ms. Beck, all pregnant pilots, and those pilots wishing to express breast milk upon their return to work: lawfully; in compliance with the collectively bargained agreement governing relevant terms and conditions of a Frontier pilot's employment; in accordance with its standard practices; and, most importantly, consistent with the manner in which it accommodates all pilots (both male and female) who are similar in their ability to work or not work.

Indeed, upon close scrutiny of the Charge, it becomes clear that Ms. Beck demands that Frontier treat her, pregnant pilots and those pilots seeking to express breast milk upon their return to flight more favorably than all other pilots and federal law. For example, Ms. Beck takes issue with the fact that Frontier has not excused her from performing the essential functions of her position as an accommodation to allow her to express breast milk in between flights. She believes that these essential functions should simply be transferred to the pilot scheduled to fly with her. The law is very clear on this point: An employer is not required to allocate or reassign essential functions of a position as an accommodation. Indeed, the United States Courts of Appeals for multiple Circuits have affirmatively held that any request to reassign essential functions of a position is per se unreasonable. Further, Ms. Beck has not and cannot demonstrate that Frontier has excused other pilots from performing essential functions of the position as an accommodation for their medical condition or disability.

As another example, in her Charge, Ms. Beck also takes issue with the fact that Frontier informed her she is not allowed to express breast milk in the aircraft lavatory during flight. Despite her acknowledgement of the company's position, Ms. Beck admits to doing so anyway. Notwithstanding this insubordination, Frontier can establish that by leaving the cockpit for a material period of time – to breastfeed or for any other reason – during flight creates a safety risk and compromises the welfare of passengers and crew members. For this reason, Frontier has not provided any pilot with the accommodation to leave the cockpit for an extended period of time due to any medical condition or disability. Therefore, not only does Frontier have a legitimate, non-discriminatory reason for its decision to deny Ms. Beck the opportunity to compromise flight safety, but she cannot demonstrate Frontier provided this accommodation to other pilots similar in their inability to work for an entire flight.

In summary, Frontier believes that this Position Statement and the evidence submitted herewith demonstrate that it has acted lawfully at all times. Accordingly, it respectfully requests that the EEOC issue a no probable cause finding with respect to Ms. Beck's Charge.

Todd Chavez
July 15, 2016
Page 3

## II.    FACTUAL BACKGROUND

### A.    General Information Relating To Ms. Beck's Employment

On or about November 17, 2003, Ms. Beck began her employment with Frontier as a pilot in the position of First Officer, in which she remains as of the date of this Position Statement. Exhibit A (Personnel File). As a First Officer, Ms. Beck is generally "responsible for ensuring safe and timely flight operations in accordance with all Company policies and Federal Aviation Regulations (FAR)." Exhibit B (First Officer Job Description). The job description's emphasis on safety is consistent with the fact that while Frontier prides itself on being an ultra-low cost carrier, the company views its primary mission to be ensuring the safety of its customers and employees. Thus, while serving more than 40 cities in the United States, Mexico, and Jamaica on over 275 daily flights, Frontier never loses sight that its principal responsibility is to ensure passengers and employees are safely delivered to their destination.

Upon her acceptance of employment as a First Officer, Ms. Beck voluntarily joined the Frontier Airline Pilots Association ("FAPA"), the union that represents Frontier pilots and is responsible for promoting the interests of its members. *See* Charge at p. 2, ¶4. Importantly, FAPA and Frontier negotiated the Collective Bargaining Agreement ("CBA"), which is the contract that sets forth the terms of employment and working conditions for Frontier pilots. The CBA specifically addresses, among other things, seniority, scheduling, staffing adjustments, leaves of absence, and medical standards. Exhibit C (Relevant Provisions of FAPA CBA). Accordingly, its provisions are material to an assessment of Ms. Beck's allegations.

In her Charge, Ms. Beck contends she was discriminated against in violation of Title VII in connection with: (a) her pregnancy in 2010 and her return to work three (3) years after the birth of her first child, in November 2013; and, (b) her pregnancy in 2013 and 2014, as well as her return to work eleven (11) months following the birth of her second child, in May 2014. Critically, as Ms. Beck concedes in her Charge, her extended leaves of absence were in connection with medical conditions resulting from childbirth and not a result of any Frontier policy or practice that inhibited her return to work. *See* Charge at pp. 4-5, ¶20 ("Because of severe childbirth-related complications, I was on medical leave from September 2010 until November 2013."); ¶22 ("I gave birth to my second child on June 13, 2014. Due to childbirth-related complications, I was on medical leave until May 2015.").

### B.    Ms. Beck's Allegations with Respect to Her First Pregnancy In 2010, Her Subsequent Return to Work In 2013 and Her Second Pregnancy Spanning 2013 and 2014 Are All Time-Barred

In order to maintain a claim under Title VII, a plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). Ms. Beck filed her Charge on May 6, 2016 and 300 days prior to that is July 11, 2015, rendering any claim based on events before this date untimely as a matter of

Todd Chavez
July 15, 2016
Page 4

law. *Id.* Accordingly, Ms. Beck's allegations relating to her first pregnancy in 2010, her subsequent return to work in 2013, and her second pregnancy in 2013-2014 are all time barred.

More specifically, in her Charge, Ms. Beck takes issue with the fact that in 2010, when she was 29 weeks pregnant and her doctor stated she was no longer able to safely fly an aircraft, she was required to begin her maternity leave rather than have the opportunity to be temporarily reassigned to a light duty position. Charge at p. 4, ¶18. This leave began in October 2010 and ran through December 2010, at which time her first child was born. Id. at p. 4, ¶¶18, 20. Therefore, there can be no doubt that these allegations are time-barred, as they are well before the July 11, 2015 cut-off imposed by Title VII and enforced by the EEOC. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (finding that repeated occurrences of the same discriminatory employment action, like the failure to provide an accommodation, can be challenged only if "an act contributing to the claim occurs within the [charge] filing period").

Similarly, in her Charge, Ms. Beck also takes issue with but is out of time to assert any claim relating to her pregnancy in 2013 and 2014. Ms. Beck states that when she returned to work in November 2013, she "was already pregnant with [her] second child," who she gave birth to on June 13, 2014. Charge at p. 5, ¶¶21-22. Prior to giving birth to her second child, Ms. Beck's physician determined she was unable to safely fly an aircraft beginning in her 28th week of pregnancy. *See id.* at p. 5, ¶23. Accordingly, she was on a leave of absence from March 2014 until June 2014, when her child was born. Ms. Beck laments that this leave was unpaid and notes that she was not given the opportunity to be reassigned to another position during the time period she was unable to fly. Id. In addition, Ms. Beck alleges that in May 2014, she was "distressed" and "dismayed" by comments purportedly made to her by a Human Resources employee in connection with her pregnancy; and, for which she would like Frontier held responsible and liable. Id. at p. 5, ¶¶24-25. However, because Ms. Beck filed her Charge on May 6, 2016, as a matter of law, she is precluded from seeking a remedy for events on or before July 11, 2015. 42 U.S.C. § 2000e-5(e)(1). Therefore, given the allegations she lodges with respect to her second pregnancy all occurred in 2014, she is barred from bringing forward a claim of discrimination based on these events. Id.; *see also Morgan*, 536 U.S. at 117. This last point is critical because Ms. Beck's allegations with respect to her first pregnancy are also untimely as a matter of law. For this reason, Frontier states that Ms. Beck cannot assert and has no standing to claim a violation of Title VII in connection with any leave of absence taken by a female pilot during her pregnancy.

In addition, the Charge improperly takes aim at the fact that neither the CBA nor a Frontier policy provided her with paid leave of absence for the entire three (3) year period from 2010 to 2013 that she was on a medical leave in connection with the birth of her first child or the eleven (11) months that she was on a leave of absence after giving birth to her second child. Charge at p. 5, ¶20 (complaining she "receive no paid personal leave" during her three (3) year leave of absence from 2010 to 2013), ¶22 (complaining she "received no paid parental leave, although I collected benefits under the Company's long term disability insurance plan"

Page 22

Todd Chavez
July 15, 2016
Page 5

from June 2014 to May 2015). That is, even though Ms. Beck acknowledges receiving long-term disability benefits for the period of time that she was purportedly unable to work, it appears she believes that Frontier's failure to compensate her during this time is additional evidence of discrimination. Without regard for the lack of legal substance of this position, there is no dispute that because the allegations relate to events before the 300 days prior to when she filed her Charge (July 11, 2015) – any such claim is untimely as a matter of law. 42 U.S.C. § 2000e-5(e)(1); *see also Morgan*, 536 U.S. at 117.

In summary, it is inarguable that all of Ms. Beck's allegations with respect to her first pregnancy in 2010, return to work in 2013, and second pregnancy spanning 2013 and 2014 are untimely as a matter of law. Charge at pp. 4-5, ¶¶18-25. Therefore, Frontier respectfully requests that the EEOC inform Ms. Beck that under Title VII, the United States Supreme Court's case law interpreting the same and the EEOC's directive to enforce the laws as written, these allegations are time barred.

## C. Response to Ms. Beck's Allegations with Respect to Her Return to Work After Her Second Pregnancy

Finally, as referenced above, Ms. Beck recounts that after giving birth to her second child in June 2014, "due to child-birth related complications," she remained on a leave of absence until May 2015, i.e., approximately eleven (11) months. Charge at p. 5, ¶22. She contends that upon her return to work, she was subjected to discriminatory treatment because Frontier did not adequately accommodate her purported "need" to express breast milk for her child after her child had already turned one (1) year old.

### 1. Expression of Breast Milk During Flight is a Safety Hazard

As an initial matter, contrary to the allegations in her Charge, when completing the Fitness-for-Duty Certification, Ms. Beck's physician did not state that Ms. Beck had a "medical need" to continue to breastfeed her child. Exhibit D. Rather, the certification stated that "if [Ms. Beck] chooses to continue breastfeeding/pumping/lactation, then pumping should be allowed" at three (3) hour intervals to "reduce the risk of reoccurrence" of clogged milk ducts and mastitis. *Id.* (emphasis added).

The first time Ms. Beck affirmatively alerted Frontier that she had elected to continue to breast feed her child was on July 29, 2015, when her child was thirteen (13) months old. Charge at p. 5, ¶22 (identifying her child was born on June 13, 2015), ¶27 (identifying the first time she "brought [her] need to express breast milk to the attention" of Frontier was on July 29, 2015). *See also* Exhibit E (July 29, 2015 E-mail Communication and Frontier's Initial Response on August 4, 2015). In the July 29, 2015 e-mail communication, Ms. Beck wrote, in material part:

> I'm sending this email to confirm that it is ok to pump in the aircraft lav [sic] when necessary while working, since I am still

Todd Chavez
July 15, 2016
Page 6

> breastfeeding. My fit [sic] for duty letter stated that I have a
> medical need to express breast milk every 3 hours and there are
> times when I need to pump in the aircraft lav [sic] both on the
> ground and in flight. Since I was cleared to go back to work with
> this restriction and I was given no guidance, this has been my
> plan.

Ex. E. Ms. Beck's insinuation that Frontier should have been aware that she intended to
continue breastfeeding is without foundation. Until this e-mail, neither she nor her doctor had
positively alerted Frontier that Ms. Beck had made the decision to continue breastfeeding her
child past June 13, 2015.

That aside, it is shocking that a pilot with Ms. Beck's experience and tenure would
believe that pumping during flight in the aircraft lavatory is a viable option given the safety
issues that inevitably arise when a pilot leaves the cockpit. There can be no argument that
doing so places the welfare of Frontier's passengers, as well as Ms. Beck's colleagues, flying on
the aircraft at risk. For example, there are two (2) pilots on every flight, a Captain and a First
Officer. After terrorist attacks on September 11, 2001, the safety protocols relating to a pilot
leaving the cockpit were strengthened. On an Airbus 319 airplane, in addition to the two (2)
pilots, there are three (3) flight attendants and approximately 150 passengers. If a pilot leaves
the cockpit to use the bathroom – to pump or otherwise:

- The remaining pilot must put on an oxygen mask.

- A flight attendant must go into the cockpit. One reason for this safety measure is
  because the cockpit door is bolted shut and when the second pilot returns from the
  lavatory, another person needs to be in the cockpit to ensure the person seeking reentry
  is the pilot and to open the door, which allows the other pilot to concentrate on flying
  the plane.

- A different flight attendant must take the drink/food cart and go to the front of the
  plane to block access to: (a) the lavatory the pilot is using; and, (b) the cockpit. Again,
  this is another safety measure designed to ensure safety of flight operations.

- This leaves only one (1) flight attendant responsible for 150 passengers, including any
  disruptions by any particular passenger or group of passengers.

This undoubtedly compromises flight safety, as it requires that all flight attendants deviate from
their regular course of duty, places them in a security related role and allows for the passengers
to more significantly outnumber the responsible crewmembers. In addition, in the event of an
explosive/rapid decompression, should Ms. Beck not be present in the cockpit, not able to
quickly don her oxygen mask and not be ready to work with the Captain to address the
emergency situation, flight safety is further compromised. Indeed, for the foregoing reasons,
pilots are only permitted to leave the cockpit for a physiological emergency, which generally

Todd Chavez
July 15, 2016
Page 7

requires their absence to go to the bathroom for a matter of minutes, e.g. five (5) minutes. On average, Ms. Beck concedes that pumping breast milk and properly storing its contents would require a pilot to be absent from the cockpit for no less than 20 minutes and more likely, 30 minutes. *See* Charge at p. 3, ¶12 (claiming that the "15 minutes of time" is an "insufficient length to permit pilots who are breastfeeding to pump milk," thereby supporting a position that a more material amount of time is allegedly needed to do so). Accordingly, Frontier informed Ms. Beck that she was not permitted to pump in the lavatory during flight for the legitimate, non-discriminatory reason that doing so risks flight safety, something Frontier is not willing to compromise. *Young v. UPS*, 135 S. Ct. 1338, 1343-44 (2015) (finding that if an employee can articulate a *prima facie* case of pregnancy discrimination, which Frontier does not concede, an employer successfully meets its burden upon a showing of legitimate, non-discriminatory reasons for its decision to not grant the accommodation requested).

It is worth noting that even though Ms. Beck acknowledges Frontier informed her that expressing breast milk during flight in the aircraft lavatory was prohibited, she admits to doing so without regard to the safety risk that it provided. Charge at pp. 5-6, ¶ 28 (acknowledging Frontier informed her that she was not permitted to pump in the aircraft lavatory), ¶29 (admitting she expressed breast milk "through taking 'physiological needs breaks' during flight in the aircraft lavatory").

Finally, Frontier has never expressly permitted female pilots to pump during flight, in the aircraft lavatory or cockpit. If and when it has come to the Chief Pilot or Human Resources attention, the company has consistently informed the female pilot that compromising flight safety in such a manner is prohibited. Pilots are, however, permitted to pump in the aircraft lavatory upon reaching their destination when the plane is locked into its arrival gate.

## 2. Frontier Allows Nursing Mothers to Work Reduced Hours, A Special Accommodation Not Available To Other Pilots

While Frontier is unwilling to compromise flight safety, it does provide nursing mothers with the opportunity to work a reduced schedule, which is a special accommodation that is not available to other pilots. Specifically, the FAPA CBA requires that at the completion of a monthly bid period, "a Pilot must have a minimum of 70 hours of Pay Credit. At no time shall a Pilot be allowed to Drop below 50 hours of Pay Credit." Ex. C at §5.L.3. If a Pilot drops to 50 hours during any month, the CBA makes clear that the individual must get back up to 70 hours by the end of the month. Id.[2] Frontier allows nursing mothers the accommodation of only having to meet a minimum of 50 hours of Pay Credit and not having to get back up to 70 hours at the end of the month. This allows women returning to work and wanting to breastfeed the

---

[2] Notably, "Pay Credit" is distinct from the number of hours a pilot is set to fly. Ex. C at §23.4. Generally speaking, a pilot gets credit for the number of hours from when the plane pushes back from the gate to when it locks into the gate at its destination. However, there are trips that are incentivized, such that a pilot may get 10 hours of credit for a shorter flight to a less desirable location or additional credit for trips of a longer duration that keep a pilot away from home for a certain number of days.

Todd Chavez
July 15, 2016
Page 8

opportunity to work fewer hours, be on the schedule for fewer days and bid for flights in a manner that allows them to be at home with their child more often. During the relevant time period, each time a nursing pilot has made a request to work a reduced schedule, the Chief Pilot has granted the accommodation for the duration (e.g., weeks, months, etc.) requested by the pilot.

Ms. Beck requested and was granted this accommodation. Notably, in her Charge, Ms. Beck states that other than providing a lactation room at Denver International Airport ("DIA"), it is her understanding that Frontier has "no formal policy on providing accommodations for pilots who are breastfeeding." Charge at p. 3, ¶10. This is an obvious attempt to mislead the EEOC because Ms. Beck is aware that reduced schedule is an informal policy specifically engineered by Frontier for nursing mothers. In fact, on April 26, 2015, Ms. Beck sent an e-mail to the Frontier Leave of Absence group that states:

> Hi I have a doctor's appointment May 6th and I am expecting to
> get cleared to come back to work. I will have the doctor fill out
> the Fitness-for-duty Certification letter. What else will you need
> from me before I start training? I am hoping to come back to the
> reduced schedule of 50 flight hrs that has been grated [sic] to
> nursing moms. I am not sure who I discuss this with - can you
> please point me in the right direction. Thank you very much for
> your help. Have a great day.

Exhibit F (emphasis added). Ms. Beck's attempt to deceive the EEOC should not go unnoticed, as it provides affirmative evidence that she is willing to "cleverly" frame her allegations to purposely mislead a federal agency into believing that Frontier is unwilling to provide reasonable accommodations to her and others similarly situated.

### 3. Ms. Beck's Seniority Allowed Her to Bid For Flight Lines In A Manner That Met Her Nursing Needs

In her Charge, Ms. Beck also complains that during her return to work, she has found it "difficult to express breast milk." Charge at p. 5, ¶29. She does not attribute such difficultly to anything specific, but instead, implies that it is related to the schedule a pilot "may" be forced to fly. In paragraph 12 of her Charge, Ms. Beck generally asserts:

> Pilots at Frontier can work more than 12 hours a day, with flight
> times ranging from one hour to five hours. Frequently, pilots take
> overnight trips of two to five days in length spanning multiple
> cities. Although pilots have breaks of about 45 minutes between
> flights, their pre-and-post flight duties leave only about 15
> minutes of time to attend to personal needs, such as eating meals

Todd Chavez
July 15, 2016
Page 9

> or using the restroom. Additionally, these breaks are insufficient
> in length to permit pilots who are breastfeeding to pump milk.

Id. But, in these general allegations, Ms. Beck fails to acknowledge that as one of the more senior First Officers, she has substantial control over her schedule and can essentially choose the flight lines she would like to fly. That is, she had control over the length of the flights she is scheduled on, the duration of her trips and the time she will have to pump in between flights.

Section 5 of the FAPA CBA governs the scheduling of pilots. Ex. C. "The monthly lines of flying shall be awarded in Domicile to Pilots according to seniority." Id. at §5.6(F)(2), §23.2 (defining "Domicile" to mean, "a geographic location, usually a city served by scheduled Company service, where Pilots are based and the location where Sequences are constructed to start. As of the date of signing this Agreement, the only Domicile is Denver."); §23.4 (defining "Pilot" to mean, "any employee of Frontier Airlines, Inc. covered under this Agreement, whose name appears on the Seniority List."). Seniority is determined pursuant to Section 3 of the CBA. Id. "The seniority of a Pilot shall begin to accrue from the date the Pilot is first placed on the Company payroll as a Pilot, and shall continue to accrue thereafter during all service as a Pilot except as provided for in this Agreement." Id. at §3.1(A)(1). Critically, a pilot continues to accrue seniority while on a Family and Medical Leave of Absence, Maternity Leave of Absence and a Medical Leave of Absence. Id. at §9.4(F)(2), §9.6(H)(6), and §9.7(I)(4). Therefore, given Ms. Beck's seniority began to accrue on or about November 17, 2003, it makes her one of the more senior First Officer's with preferential bidding status. Specifically:

| Month | Beck's Rank | Total # of First Officer Pilots | Month | Beck's Rank | Total # of First Officer Pilots |
|---|---|---|---|---|---|
| Jul-15 | 25 | 315 | Feb-16 | 21 | 263 |
| Aug-15 | 26 | 317 | Mar-16 | 21 | 264 |
| Sep-15 | 24 | 303 | Apr-16 | 19 | 261 |
| Oct-15 | 23 | 303 | May-16 | 19 | 254 |
| Nov-15 | 23 | 286 | Jun-16 | 19 | 249 |
| Dec-15 | 21 | 275 | Jul-16 | 19 | 195 |
| Jan-16 | 21 | 266 | | | |

Accordingly, given Ms. Beck has such high priority in terms of bidding for and being awarded the monthly lines of flying she would like, i.e., making her own schedule, it is unclear why she would commit to a schedule that purported could or did cause her difficulty in expressing breast milk.

In fact, in a separate Charge of Discrimination filed with the EEOC, Shannon Kiedrowski, a fellow Frontier pilot, stated under oath and penalty of perjury that due to her "relatively high

Todd Chavez
July 15, 2016
Page 10

seniority," she (Ms. Kiedrowski) "had the ability to bid for short flights" and could make her schedule to "fly shorter trips or trips with more ground time," which allowed her to have sufficient time to express breast milk in between flights. EEOC Charge No. 541-2016-01707 at p.6, ¶36. There is no reason Ms. Beck could not exercise the same wisdom in selecting her flight lines to ensure that her flight lines allowed her to accommodate a breastfeeding schedule that worked for her. Indeed, her seniority in combination with the approval of her reduced schedule renders her contention that she found it difficult to manage expressing breast milk at appropriate intervals more of a statement of her inability to bid appropriately – or desire to make it an issue – than Frontier's purported failure to accommodate her.

### 4. The Law Is Clear: Frontier Is Not Required To Reassign Essential Functions of Ms. Beck's Position As An Accommodation

Moreover, in her Charge, Ms. Beck inappropriately contends that as an accommodation for her "desire" to continue breastfeeding after her child's first birthday, Frontier should have provided her additional break time in between flights by delegating her "pre and post-flight duties to the other pilot" scheduled to fly with her. Charge at p. 7, ¶40(f). As set forth in the First Officer job description, essential functions of the job include, but are not limited to:

- Thorough completion of appropriate pre- and post-flight inspection, ensuring the airworthy condition of assigned aircraft in accordance with Frontier policy and Federal Aviation Regulations.

- Becoming familiar with existing and forecast departure, arrival, and if applicable, alternate station weather prior to each flight.

- Ensuring that the flight is planned and fueled properly so that it may be conducted safely and in accordance with current policies and regulations.

Ex. B at Essential Functions. An employer is **not** required to allocate or reassign essential functions of a position as an accommodation. Put another way, any request to reassign essential functions of a position is "per se unreasonable." *See e.g. EEOC v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (stating that a reasonable accommodation "does not include removing an 'essential function' from the position, for that is per se unreasonable") (citations omitted); *EEOC. v. LHC Grp., Inc.*, 773 F.3d 688, 698 (5th Cir. 2014) ("The ADA does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so.") (citations omitted); *Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 932 (8th Cir. 2012) (stating "an employer need not reallocate or eliminate the essential job functions of a job to accommodate a disabled employee"); *Lang v. Wal-Mart Stores E., L.P.*, No. 15-1543, 2016 WL 821038, at *6 (1st Cir. Mar. 2, 2016) ("[U]nder the ADA, an employer is not required to accommodate an employee by exempting her from having to discharge an essential job function."). Accordingly, Ms. Beck has no legal support for her position that Frontier's failure to

Todd Chavez
July 15, 2016
Page 11

offer her the opportunity to discharge essential functions of her position and burden her co-pilot with such responsibilities is evidence of discrimination. In fact, it is contrary to the well-settled legal authority in this area. *See also Hill v. Walker*, 737 F.3d 1209, 1217 (8th Cir. 2013) ("Courts have continuously found that employers are not required to assign existing employees or hire new employees to perform [essential] functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability.").

To be clear, during the relevant time period, Frontier has not excused any pilot from essential functions of the position as an accommodation.

### 5. Frontier Has Made Available Places To Express Breast Milk At All Locations, Including Outposts

Finally, any contention that Frontier has not made adequate space available for nursing pilots to express breast milk is inaccurate. *See* Charge at p.4, ¶13. Ms. Beck initially takes issue with the fact that the room designated at DIA "is in most cases far from departure/arrival gates where the airplanes on which I work are located." Id. This is false. In 2015, when Ms. Beck returned to work, the designated room for pilots to express breast milk was located in Concourse A and next to the Chief Pilot's office, which is in close proximity to the gates at which Frontier planes depart and arrive. Further, Frontier has made arrangements at its outposts. It is noteworthy that securing space in these outpost airports is not the same as an employer simply setting aside a location in a store or office complex. Frontier does not own the real estate in an airport and is beholden to locations that are available for use by a third party entity over whom the company has no control.

In conclusion, Ms. Beck's allegations and contentions of discrimination are without factual or legal merit. Indeed, Frontier can demonstrate legitimate, non-discriminatory safety reasons for its decision that pilots are not permitted to nurse in the airplane lavatory during flight. Further, there is no legal basis to support Ms. Beck's contention that Frontier's failure to reassign the essential functions of her position is evidence of a failure to accommodate. Further, it cannot be overlooked that Ms. Beck's seniority allowed her (just like Ms. Kiedrowski) the ability to manage her flight schedule to accommodate her own needs and desires, for breastfeeding and otherwise. Any failure by Ms. Beck to bid her schedule in a manner conducive to express breast milk is not a burden that Frontier should bear. Finally, the EEOC cannot overlook the fact that Frontier has an informal policy that allows nursing mothers to work a reduced schedule as a means to accommodate their return to work while continuing to breastfeed their child. The company also provides adequate facilities at DIA and other outposts for Ms. Beck to express breast milk before and after arriving at their gate.

### III. LEGAL ANALYSIS

In her Charge, Ms. Beck contends she was discriminated against based on her sex in violation of Title VII, as amended by the PDA. Since she does not offer direct evidence of

Case 1:21-mc-00191-DDD-SKC Document 2-3 Filed 09/30/21 USDC Colorado Page 31 of 101

Todd Chavez
July 15, 2016
Page 12

discrimination on this claim, this allegation of discrimination must be analyzed under the *McDonnell Douglas* burden-shifting framework. A plaintiff alleging that the denial of an accommodation constituted disparate treatment under the PDA establishes a *prima facie* case by showing that: (1) she is a member of a protected class; (2) she sought an accommodation and the employer did not accommodate her; and, (3) the employer did accommodate others similar in their ability or inability to work. *Young*, 135 S. Ct. at 1354. If a plaintiff can make this showing, then the "employer may then seek to justify its refusal to accommodate the plaintiff by relying on legitimate, non-discriminatory reasons for denying her accommodation." *Id.* "If the employer offers an apparently legitimate, non-discriminatory reason for its actions," the burden then sifts back to the plaintiff to "show that that employer's proffered reasons are in fact pretextual." *Id.*

For the reasons set forth above, with respect to her timely claims of discrimination, Ms. Beck cannot meet her *prima facie* case because she cannot demonstrate that she sought an accommodation that Frontier did not grant to her, but provided others similar in their ability to work or not work. For example, Ms. Beck takes issue with the fact that Frontier has not excused essential functions of her First Officer position as an accommodation to allow her to express breast milk in between flights. Ms. Beck cannot establish that Frontier provided such an accommodation to any other pilot similar in their inability to work. In addition, as detailed in Section II.C.4 above, it is well-settled that a reasonable accommodation "does not include removing an 'essential function' from [a] position, for that is per se unreasonable." *Ford Motor Co.*, 782 F.3d at 761. *See also LHC Grp., Inc.*, 773 F.3d at 698; *Kallail*, 691 F.3d at 932; *Lang*, No. 15-1543, 2016 WL 821038, at *6; *Hill*, 737 F.3d at 1217. Accordingly, Ms. Beck's discrimination claim fails at the outset, as she cannot even make it past her *prima facie* case.

Further, there can be no dispute that Frontier can exhibit legitimate non-discriminatory business reasons for the decisions that Ms. Beck challenges. For example, the Charge takes issue with the fact that Frontier informed her that she was not permitted to express breast milk in the aircraft lavatory during flight. Notably, Ms. Beck admits that she ignored Frontier's guidance on this issue and pumps during flight whenever she deems it necessary. In doing so, Ms. Beck knowingly compromises the safety of the flight and places Frontier passengers, as well as her fellow crewmembers, at risk. There is no more legitimate, non-discriminatory business reason for denying this purported accommodation than Frontier's, which is an attempt to ensure the safety of a flight. And, there is no evidence that Ms. Beck can establish Frontier's decisions that she takes issue with were pretextual.

In summary, Ms. Beck's Title VII allegations are either untimely as a matter of law or without legal merit.

## IV. CONCLUSION

For the reasons detailed above, Ms. Beck has not been subject to any form of discrimination. Rather, Frontier has treated her fairly and lawfully at all times. Accordingly, the

Page 30

Todd Chavez
July 15, 2016
Page 13

company respectfully requests that Ms. Beck's Charge be dismissed with a finding of "no probable cause." Please do not hesitate to contact me if you require any further information.

Sincerely,

Littler Mendelson, P.C.

Ennwedberams

Erin A. Webber

EAW/AAS

Firmwide:141440085.1 057446.1009



Littler Mendelson, PC
1900 Sixteenth Street
Suite 800
Denver, CO 80202

August 18, 2017

Erin A. Webber
303.362.2851 direct
303.629.6200 main
303.362.8427 fax
ewebber@littler.com

**VIA ELECTRONIC SUBMISSION**

Justin Moore
Federal Investigator
U.S. Equal Employment Opportunity Commission
Denver Field Office
303 East 17th Avenue, Suite 410
Denver, CO 80203

Re:     Respondent's Position Statement
        *Jo Linda Roby v. Frontier Airlines, Inc.*
        EEOC Charge No. 541-2017-01427

Dear Mr. Moore:

        I am writing on behalf of Respondent Frontier Airlines, Inc. ("Frontier") in response to the Charge of Discrimination filed by Jo Linda Roby on or about May 16, 2017. In her Charge, Ms. Roby alleges to have suffered discrimination based on "pregnancy-related disabilities," sex, pregnancy, and "a condition related to [her] pregnancy and childbirth—specifically, lactation," in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA"), the Americans with Disabilities Act ("ADA"), the Colorado Antidiscrimination Act ("CADA"), and the Colorado Pregnant Workers Fairness Act ("PWFA").[1] Ms. Roby further alleges that Frontier violated the Colorado Workplace Accommodations for Nursing Mothers Act ("WANMA") by not providing adequate break time and/or space for expressing breast milk.

        At the outset, as Ms. Roby acknowledges in her Charge, *see* Charge at ¶ 55 n.1, the Equal Employment Opportunity Commission ("EEOC") does not have jurisdiction over WANMA claims. Accordingly, Frontier's response addresses only Ms. Roby's discrimination-based claims

---

[1] On her EEOC Form 5, Ms. Roby additionally checked the box for "Retaliation" where asked to identify the basis of her Charge (in addition to "Sex" and "Disability"). Ms. Roby makes no mention of retaliation in the statement of harm attached to the Form 5, however, and does not address any claim of retaliation substantively. Frontier for that reason has not included a discussion of retaliation in this position statement.

littler.com

Justin Moore
August 18, 2017
Page 2

under Title VII (as amended by the PDA), the ADA, the CADA, and the PWFA.[2]  To the extent
the EEOC believes it has jurisdiction to investigate the allegations referenced in the Charge
regarding WANMA, Frontier respectfully requests the opportunity to supplement this position
statement to address such allegations.[3]

## I.    INTRODUCTION

Frontier denies any allegation that it discriminated against Ms. Roby in violation of Title
VII (as amended by the PDA), the ADA, CADA, the PWFA, or any other law.  In fact, as detailed
below, Frontier treated Ms. Roby, all pregnant flight attendants and those flight attendants
wishing to express breast milk upon their return to work lawfully; in compliance with the
collectively bargained agreement governing relevant terms and conditions of a Frontier flight
attendant's employment; under its standard practices; and, most importantly, consistent with
how it accommodates all flight attendants (both male and female) who are similar in their
ability to work or not work.

Ms. Roby's Charge demands that Frontier treat her, pregnant flight attendants, and
those flight attendants seeking to express breast milk upon their return to work more favorably
than all other flight attendants and as required by federal law.  For example, Ms. Roby takes
issue with the fact that her leave of absence in connection with her pregnancy and the birth of
her child was unpaid.  But under the terms of the collective bargaining agreement Frontier
entered into with the flight attendants' union—of which Ms. Roby is a member—all medical
leaves of absence are unpaid.  Moreover, it is indisputable that Title VII (as amended by the
PDA), the FMLA, and the ADA do not require a leave of absence to be paid.  Thus, were Mr.
Roby paid for her medical leave related to her pregnancy, Frontier would be treating her more
favorably than all other flight attendants operating under the collective bargaining agreement
on leaves of absences.

Likewise, Ms. Roby contends that Frontier's dependability policy is discriminatory against
pregnant flight attendants and flight attendants who take medical leave after giving birth.
However, the dependability policy is applied equally to all flight attendants, whether pregnant or
not, and thus it is not discriminatory.  Frontier's dependability policy fully complies with federal

---

[2] Since CADA claims (inclusive of the PWFA, which amended CADA) are analyzed under the same
framework as Title VII and ADA claims, please allow the analysis in this position statement to also serve
as a legal analysis of CADA pregnancy and disability discrimination claims.  *St. Croix v. Univ. of Colo.
Health Scis., Ctr.*, 166 P.3d 230, 236 (Colo. Ct. App. 2007) (citing *Colo. Civil Rights Comm'n v. Big O
Tires, Inc.*, 940 P.2d 397, 399 (Colo. 1997) (stating Colorado courts "look to federal cases for guidance in
applying" the CADA).

[3] This position statement is based on Frontier's understanding of Ms. Roby's allegations to the best of its
knowledge and recollection as of the date of this document.  Frontier expressly reserves the right to
amend, supplement, or correct this position statement, if necessary.  In addition, this position statement
and the accompanying exhibits, which contain confidential personnel, medical and business information,
are subject to the exceptions to the disclosure requirements of the Freedom of Information Act ("FOIA"),
5 U.S.C. § 552(b)(7).  All information provided herein, including this position statement, is provided solely
in cooperation with the EEOC's fact-finding efforts.  Frontier reserves all objections to the admissibility at
any hearing, trial, or other proceeding of any of the information or documents provided to the EEOC.

Justin Moore
August 18, 2017
Page 3

and Colorado state law in all respects. Again, if Ms. Roby were to be excused from its requirements, then Frontier would be treating her more favorably than all other flight attendants who are similar in their ability to work or not work.

Ms. Roby further contends that the fact she was not offered a temporary reassignment to light duty as an accommodation for her pregnancy or desire to express breast milk upon her return to work is evidence of discrimination. More specifically, Ms. Roby argues that she should have been offered the opportunity to be temporarily reassigned to a job at Frontier's corporate headquarters or a ground position at the airport. Charge at ¶¶ 14, 55(b). This argument falls flat because Frontier does not provide temporary light duty assignments at its corporate headquarters or at the airport as an accommodation to any flight attendant for a medical condition. Moreover, despite Ms. Roby unfounded allegations, Frontier has no obligation under the CBA or any other law or policy to provide this accommodation to flight attendants (male or female) who cannot fly due to: (a) an on-the-job injury; (b) a non-work related injury; or, (c) any other medical condition or disability. Put another way, Frontier treated Ms. Roby the same as all other flight attendants who are similar in their ability to work or not work. *See Wade v. Brennan*, 647 F. App'x 412, 417 (5th Cir. 2016) (denying Title VII claim where complainant "failed to show [temporary reassignment position] was an existing position, so reassignment there would necessarily require [employer] to create a new position for her, which is not a reasonable accommodation").

Ms. Roby also takes issue with the fact that Frontier informed her she may not express breast milk in the aircraft lavatory during flight. Charge at ¶ 44. However, it is beyond question that a flight attendant leaving her duties for a material period of time during flight—to breastfeed or for any other reason—creates a safety risk and compromises the welfare of passengers and crew members. For this reason, Frontier has not provided any flight attendant with the accommodation to stop working while on a flight for an extended period of time due to any medical condition or disability. Not only does Frontier have a legitimate, non-discriminatory reason for its decision to deny Ms. Roby the opportunity to compromise flight safety, but she cannot demonstrate that Frontier provided this accommodation to other flight attendants similar in their ability or inability to work for an entire flight.

In summary, Frontier believes that this position statement and the evidence submitted herewith demonstrate that it has acted lawfully at all times. Accordingly, it respectfully requests that the EEOC issue a no probable cause finding with respect to Ms. Roby's Charge.

## II. FACTUAL BACKGROUND

### A. General Information Relating to Ms. Roby's Employment

In 2004, Ms. Roby began her employment with Frontier as a flight attendant, a position she continues to hold as of the date of this position statement. As a Flight Attendant, Ms. Roby is "essential to maintaining the well-being, safety, security and comfort of [Frontier's] passengers onboard [its] aircraft," and she must "follow established FAA and Frontier guidelines in providing for the comfort and safety of passengers and respond to inflight emergencies and/or security concerns . . . ." Exhibit A (Flight Attendant Job Description). A flight attendant's job description's emphasis on safety is consistent with the fact that, while Frontier

Justin Moore
August 18, 2017
Page 4

prides itself on being an ultra-low cost carrier, the company views its primary mission as ensuring the safety of its customers and employees. Thus, while serving more than 40 cities in the United States, Mexico, and Jamaica on over 275 daily flights, Frontier never loses sight that its principal responsibility is to ensure that passengers and employees are safely delivered to their destination.

Upon her acceptance of employment as a Flight Attendant, Ms. Roby voluntarily joined the Association of Flight Attendants-CWA AFL-CIO ("AFA"), the union that represents Frontier flight attendants and is responsible for promoting the interests of its members. *See* Charge at ¶ 8. Importantly, AFA and Frontier negotiated the Frontier Airlines Flight Attendant Contract ("CBA"), which sets forth the terms of employment and working conditions for Frontier flight attendants. The CBA specifically addresses, among other things, seniority, scheduling, staffing adjustments, leaves of absence, and medical standards. Exhibit B (relevant excerpts of the CBA). Accordingly, its provisions are material to an assessment of Ms. Roby's allegations.

In her Charge, Ms. Roby contends she was discriminated against in violation of Title VII (as amended by the PDA) and the ADA (and, by extension, the CADA and the PWFA) in connection with her pregnancy in 2015 and return to work following the birth of her child. Critically, after Ms. Roby had her child on December 1, 2015, in accordance with the terms of the CBA, she took eighteen weeks of medical leave, *i.e.*, up to and including April 9, 2016. *See* Charge at ¶ 25. She returned to work on April 10, 2016, as a flight attendant and worked for approximately eight months. Ms. Roby then chose to take advantage of a company approved leave of absence ("COLA") from January 2017 through March 6, 2017. Since March 7, 2017, Ms. Roby has each month requested additional medical leave time, an accommodation which Frontier has each month granted. Charge at ¶¶ 26, 32-35, 47. Thus, as of the date of this position statement, Ms. Roby remains employed by Frontier.

## B. Ms. Roby's Allegations with Respect to Discrimination During Her Pregnancy Are All Time-Barred

In order to maintain a claim under Title VII (as amended by the PDA), the CADA, and/or the PWFA, a plaintiff must file a charge of discrimination with the EEOC (or Colorado Civil Rights Division, as applicable) within 300 days of the alleged unlawful employment practice. *See* 42 U.S.C. § 2000e-5(e)(1). (Title VII, requiring charge be filed "within three hundred days after the alleged unlawful employment practice occurred"); 42 U.S.C. § 12117(a) (ADA, adopting "powers, remedies, and procedures" of § 2000e-5); *see Davidson v. America Online, Inc.*, 337 F.3d 1179, 1183 (10th Cir. 2003) ("Title VII [and] the ADA require[] an individual to file a timely administrative claim within 300 days").[4] Ms. Roby filed her Charge on May 16, 2017, rendering any claim based on events transpiring on or before July 20, 2016 (300 days prior) untimely as a

---

[4] The time limits for filing charges under the CADA and the PWFA, which require charges be filed within six months, are even shorter. *See* Colo. Rev. Stat. Ann. § 24-34-403 (West) ("Any charge alleging a violation of this part . . . shall be filed with the commission . . . within six months after the alleged discriminatory or unfair employment practice occurred, and if not so filed, it shall be barred.") (emphasis added). In any event, the PWFA did not become effective until August 10, 2016, rendering any conduct before that inactionable with respect to the PWFA. *See* Colo. Rev. Stat. Ann. § 24-34-402.3 (West).

matter of law. *Id.* Accordingly, Ms. Roby's allegations regarding any purported discrimination during her pregnancy, including points accrued under Frontier's dependability policy, are time-barred.[5]

More specifically, in her Charge, Ms. Roby takes issue with the fact that in September and October of 2015, when she was about 30-weeks pregnant, she missed scheduled trips and accrued 2.5 points under Frontier's dependability policy. *See* Charge at ¶ 24. Ms. Roby accrued these points nearly 10 months before the 300-day deadline for Ms. Roby to challenge an alleged unlawful employment practice. In addition, Ms. Roby challenges Frontier's policy of "requiring immediate notification of pregnancy upon confirmation of the pregnancy by a doctor," Charge at ¶ 55(e), but this purported notification occurred long before the July 20, 2016 deadline and is thus barred. *See* Charge at ¶ 23 ("I disclosed my pregnancy to Frontier around May 2015 . . . .").[6]

Therefore, there can be no doubt that any allegations that occurred before the July 20, 2016 cut-off are time-barred. *See, e.g., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (finding that repeated occurrences of the same discriminatory employment action, like the failure to provide an accommodation, can be challenged only if "an act contributing to the claim occurs within the [charge] filing period"); 42 U.S.C. § 2000e-5(e)(1).

## C.      Response to Ms. Roby's Allegations with Respect to Her Pregnancy and Post-Pregnancy

In her Charge, with respect to her pregnancy and post-pregnancy, Ms. Roby takes issue with the fact that when her pregnancy rendered her unable to fly, she was required to take an unpaid leave of absence, rather than be: (a) reassigned to a temporary light duty position until the birth of her child; or, (b) paid for her time away from work. Each of these claims is unavailing under the law.

### 1.      All Medical Leaves of Absence Provided to Flight Attendants Are Unpaid

As an initial matter, the terms and conditions of the leaves of absence policies about which Ms. Roby complains are set forth in the CBA. They were collectively bargained for by AFA and on behalf of Ms. Roby, who voluntarily agreed to be a part of the union. Though the

---

[5] Likewise, Ms. Roby's allegations regarding any discrimination under the CADA and the PWFA that occurred before November 16, 2016, six months before she filed her charge, are time-barred. *See* Colo. Rev. Stat. Ann. § 24-34-403 (West).

[6] Even were a challenge to this notification requirement not time-barred, many courts hold that non-pregnancy is a valid bona fide occupational qualification in a safety context, such as here for flight attendants. *E.g., Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 204 (1991) (recognizing non-pregnancy may be BFOQ under a "safety exception"); *Richards v. City of Topeka*, 173 F.3d 1247, 1252 (10th Cir. 1999) ("Under the PDA, the City can raise a BFOQ as an affirmative defense," citing 42 U.S.C. § 2000e–2(e)(1) (allowing, under Title VII, an employer to discriminate where a BFOQ "is reasonably necessary to the normal operation of [a defendant's] particular business or enterprise")).

Justin Moore
August 18, 2017
Page 6

Charge consistently refers to the leaves of absence policies (and other policies) to which Ms. Roby is subject to as "Frontier's policies," *e.g.*, Charge at ¶¶ 1, 50, 52 (referring to a number of policies covered under the CBA as "Frontier's policies"), this fails to inform the EEOC that Ms. Roby's interests were represented by AFA and accounted for in the determination of the scope of these policies. Moreover, "[i]t is well-established that Title VII does not require an employer to violate the terms of a collective bargaining agreement," so to the extent Ms. Roby asks Frontier to act in ways contrary to the CBA, these requests must fail. *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 317 (4th Cir. 2008); *see Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 79 (1977) (holding that "the duty to accommodate [does not] require[] [an employer] to take steps inconsistent with [an] otherwise valid [collective bargaining] agreement").

That aside, Ms. Roby takes issue with the fact that she was not provided a paid leave of absence. Charge at ¶¶ 23, 58(b). But the CBA does not provide for a paid leave of absence for flight attendants unable to fly due to any type of medical condition. Under the CBA, Frontier provides flight attendants with the following types of medical leave:

> (a) Family Medical Leave: governed "under the Family Medical Leave Act," which does not provide for paid leave, *id.* at 12(E)(1);
>
> (b) Maternity Leave: "Sick leave must be used, and vacation days may be used, during the maternity leave; otherwise, the leave is without pay," *id.* at 12(F)(3) (emphasis added); and,
>
> (c) Medical Leave: "A Flight Attendant may request an unpaid leave of absence for his/her own illness or injury when he/she cannot return to work after exhausting FMLA leave or if he/she is not eligible for FMLA," *id.* at 12(G)(6) (emphasis added).

Nowhere in the CBA does it provide that a flight attendant shall be paid in connection with any of the foregoing leaves of absence, other than to the extent the flight attendant wishes to be paid from accrued sick leave or vacation time. As for Ms. Roby, her leave was handled exactly as provided by the CBA. *See* Charge at ¶ 23 (recognizing that some of Ms. Roby's maternity leave was paid because it was "covered by accrued paid sick leave, and coverage from optional short term disability insurance"). Having bargained for this benefit in the CBA, Ms. Roby cannot now complain that the very same policies discriminate against her. *See Hardison*, 432 U.S. at 79.

Accordingly, the fact that Frontier does not pay pregnant flight attendants on a leave of absence in connection with their pregnancy or birth of a child cannot be deemed discriminatory where, as here, the company does not pay any flight attendant (male or female) on a leave of absence for non-pregnancy-related medical conditions.[7] *See Young v. UPS*, 135 S. Ct. 1338, 1343-44 (2015). This renders any assertion that Frontier must pay Ms. Roby for her time away from work for pregnancy-related medical conditions contrary to the mandates of Title VII (as amended by the PDA). *Id.* at 1343 (only requiring an employer to treat "women affected by

---

[7] Frontier does pay workers' compensation claims, as required by the CBA and the law.

Justin Moore
August 18, 2017
Page 7

pregnancy . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work") (quoting 42 U.S.C. § 2000e(k)) (emphasis added).

### 2. **Pregnancy and Lactation Are Not Disabilities Covered Under the ADA**

Next, Ms. Roby's ADA (and disability-related-CADA) claims must fail because neither pregnancy nor lactation is a disability protected under the ADA or the CADA.

It is well-established that pregnancy is not a disability under the ADA. *E.g., Genovese v. Harford Health & Fitness Club, Inc.*, No. WMN-13-217, 2013 WL 2490270, at *5 (D. Md. June 7, 2013) (collecting authorities and noting that "[w]ith near unanimity, federal courts have held that pregnancy [alone] is not a 'disability' under the ADA") (citations and internal quotations omitted); *Richards*, 173 F.3d at 1250 (affirming that "pregnancy d[oes] not qualify as a disability under the ADA"); *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 899 (10th Cir. 1997) (holding that "impairment [within the meaning of the ADA] does not include . . . pregnancy" where a pilot claimed disability discrimination on the basis of pregnancy).

Lactation is likewise not a disability under the ADA. *See Mayer v. Prof'l Ambulance, LLC*, 211 F. Supp. 3d 408, 420 (D.R.I. 2016) (in a case involving an employer's denial of lactation breaks, concluding that normal medical conditions related to "post-pregnancy do not qualify as a disability," and noting the lack of any "any cases post-2008 amendment [to the ADA] holding that normal lactation is a disability"); *Martinez v. N.B.C., Inc.*, 49 F. Supp. 2d 305, 308 (S.D.N.Y. 1999) (pregnancy and related medical conditions are not "disabilities" for purposes of the Americans with Disabilities Act, and the employer did not need to accommodate the plaintiff's desire to use a breast pump in the workplace).

Because pregnancy and post-pregnancy conditions such as lactation are not covered under the ADA, to the extent Ms. Roby's Charge asserts a violation of the ADA, her claims are without merit.

### 3. **The Dependability Policy Is Not Discriminatory**

Next, Ms. Roby alleges that Frontier's dependability policy itself is discriminatory. *See* Exhibit C (Employee Handbook) at Art. 12. Even if her claims based on her treatment under the dependability policy were not time-barred—which they are—her claims regarding the policy nevertheless are unfounded for multiple reasons.

First, as discussed above, neither pregnancy nor the need to express milk for lactation purposes is considered a "disability" under the ADA. Thus, to the extent that Ms. Roby claims that it was a violation of the ADA for Frontier to assign her dependability points for her sick days during her pregnancy, Charge at ¶¶ 24, 55(d), this claim must fail.

Second, the dependability policy is applied equally to all similarly situated employees, and Ms. Roby does not claim otherwise. Thus, the dependability policy is not discriminatory against pregnant women under Title VII (as amended by the PDA). *See Manning v. Swedish*

Justin Moore
August 18, 2017
Page 8

*Med. Ctr.*, No. C15-0949 (JLR) 2016 WL 6216364, at *8 (W.D. Wash. Sept. 30, 2016) (denying Title VII discrimination claim where "[t]here is no evidence . . . to support that [employer] treated [claimant] differently from other employees" under the "Dependability Policy"); *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002) (absentee policy that is applied equally to "pregnant or post-partum employees" and "non-pregnant employees" is permitted).

Third, to the extent that Ms. Roby argues that the dependability policy is discriminatory because points "remained on [her] record for an extended rolling period as long as [she] remain[s] on unpaid leave," Charge at ¶ 24, the policy is entirely non-discriminatory in that it expressly includes all leaves of absence, including "Military, Medical, Personal, Workers' Comp, FMLA, STD, etc." *See* Exhibit C (Employee Handbook) at 12.05.1.3. Thus, the policy in no way discriminates against pregnant or post-pregnant women; it applies equally to all employees regardless of the type of leave taken.

## 4. Expression of Breast Milk During Flight Is a Safety Hazard

Moreover, as an experienced flight attendant, Ms. Roby must know that pumping during flight in the aircraft galley (or, for that matter, the lavatory)—the main accommodation sought by Ms. Roby, *see* Charge ¶¶ 26, 28, 42, 55(a)—is not a viable option given the safety issues that inevitably arise in the performance of a flight attendant's duties. Taking extended breaks during a flight necessarily would place the welfare of Frontier's passengers as well as Ms. Roby's colleagues flying on the aircraft at risk. Indeed, airlines are for that very reason exempted from the provisions of the Fair Labor Standards Act requiring break time. *See Thibodeaux v. Exec. Jet Int'l, Inc.*, 328 F.3d 742, 754 (5th Cir. 2003) (confirming that "the FLSA exempts the company's flight attendants from its overtime requirements"); 29 U.S.C.A. § 213(b)(3) (West).

It is worth noting that Ms. Roby admits to expressing milk during flights *for over eight months* before she inquired whether she was permitted to express milk during a flight. Charge at ¶ 27 ("From April to December 2016, I attempted to pump . . . during flights"), ¶ 33 (noting that Ms. Roby, who returned to work in April 2016, did not ask to express milk during flight until December 26, 2016). To be clear, Frontier has never expressly permitted female flight attendants to pump during flight, in the aircraft lavatory, galley, or otherwise. If and when it has come to Human Resources' attention, the company has consistently informed female flight attendants that compromising flight safety in such a manner is prohibited. It is shocking that a flight attendant with Ms. Roby's experience and tenure would believe that pumping during flight in the aircraft lavatory would be a viable option given the safety issues that would inevitably arise.

As one example of the safety issues at play, on an Airbus 319 airplane, in addition to the two pilots, there are three flight attendants and approximately 150 passengers in flight. If a flight attendant is relieved of the performance of her duties for an extended period—to pump or otherwise—the other two flight attendants must deviate from their regular course of duty, which, in the event of a security incident, would allow for the passengers to more significantly outnumber the remaining crewmembers. Indeed, a flight attendant's essential job duties include a number of safety-related functions that would be rendered impossible or impracticable

Justin Moore
August 18, 2017
Page 9

if a flight attendant were permitted to pump while onboard an aircraft, including "conduct[ing] emergency evacuation of cabin if necessary," "conduct[ing] preflight safety check of cabin emergency equipment," "ensur[ing] cabin safety and security during all phases of flight, including boarding and deplaning," and "provid[ing] emergency medical assistance." *See* Exhibit A (Flight Attendant Job Description).

Accordingly, Frontier flight attendants are not permitted to pump during flight for the legitimate, non-discriminatory reason that doing so risks flight safety, something Frontier is not willing to compromise. *Young*, 135 S. Ct. at 1343-44 (finding that if an employee can articulate a prima facie case of pregnancy discrimination, which Frontier does not concede, an employer successfully meets its burden upon a showing of legitimate, non-discriminatory reasons for its decision to not grant the accommodation requested).

### 5. Frontier Has Made Available Places to Express Breast Milk At All Locations, Including Outposts

Next, any contention that Frontier has not made adequate space available for nursing flight attendants to express breast milk is inaccurate and must fail. *See* Charge at ¶ 18. Rather, Frontier provides adequate facilities at Denver International Airport ("DIA") and other outposts for Ms. Roby to express breast milk before and after arriving at her gate.

Ms. Roby alleges that when she returned to work in April 2016, she used a breast pump to express milk "in the family bathroom at [DIA]," which Ms. Roby says is "unsanitary." Charge at ¶¶ 26, 31. But Ms. Roby neglects to mention that at all relevant times since Ms. Roby's return to work in April 2016, Frontier has designated a room for flight attendants to express breast milk in Concourse A, which is in close proximity to the gates where Frontier planes depart and arrive (as a general matter, all of Frontier's planes depart from and arrive at Concourse A. Indeed, Ms. Roby admits she never even inquired about pumping accommodations at DIA until December 26, 2016, more than eight months after she returned to work and mere days before she went on a leave of absence. Charge at ¶ 33. Thus, even were her allegation that Frontier did not provide a lactation room correct (it is not), Ms. Roby's failure to utilize this accommodation was due to her own inaction in failing to timely inquire about location of the lactation room.

Ms. Roby also takes issue with the fact that the rooms designated at airport outstations "are in most cases located too far from departure/arrival gates to permit flight attendants sufficient time to access them, express milk, and return to the gate." Charge at ¶ 18. However, Frontier has made arrangements at its outposts to provide for lactation rooms, and has provided that list to Ms. Roby, as she admits. Charge at ¶ 41 (Frontier "provided a list of lactation rooms at Frontier's outstations"). It is noteworthy that securing space in these outpost airports is not the same as an employer simply setting aside a location in a store or

Justin Moore
August 18, 2017
Page 10

office complex. Frontier does not own the real estate in an airport and is beholden to locations
that are available for use by a third party entity over whom the company has no control.[8]

### 6. Ms. Roby's Claim that Frontier Did Not Offer Her Any Accommodations Are False

Ms. Roby suggests in her Charge that Frontier did not offer her any accommodations at
all in connection with her expression of breast milk. *E.g.*, Charge at ¶¶ 3, 33, 47. Not so.

First, as detailed above, Frontier approved each of Ms. Roby's requests for leave of
absence after the birth of her child.

Second, while Frontier is unwilling to compromise flight safety, it does provide nursing
mothers with the opportunity to work a reduced schedule, which is a special accommodation
that is not available to other flight attendants. Specifically, the CBA requires that "[a]t the
completion of each Bid Period each Flight Attendant must accumulate a minimum of 60 credit
hours." *See* Exhibit B (CBA) at Art. 5 § L(1). However, Frontier allows nursing mother flight
attendants the accommodation of dropping below 60 hours per month without having to restore
those hours, and only having to meet a minimum of 45 hours. This allows women returning to
work and wanting to breastfeed the opportunity to work fewer hours, be on the schedule for
fewer days, and bid for flights in a manner that allows them to be at home with their child more
often. During the relevant time period, each time a nursing flight attendant has made a request
to work a reduced schedule, Frontier has granted the accommodation requested by the flight
attendant.

Ms. Roby was offered this accommodation but has instead opted for her preferred
accommodation of remaining on medical leave—itself, of course, an accommodation provided
by Frontier. *See* Exhibit D (e-mail from Ms. Roby) (rejecting Frontier's proposed "on the job
accommodation proposed below—dropping to 45 credit hours"). Thus, Ms. Roby has rejected
perfectly reasonable and legitimate accommodations offered by Frontier. *Barber ex rel. Barber
v. Colorado, Dep't of Revenue*, No. CIV.A. 05-CV-00807RE, 2008 WL 207691, at *1 (D. Colo.
Jan. 24, 2008) ("[P]laintiffs' argument is that they were not afforded the particular
accommodation they requested. This is not the law. Defendants' duty is to offer a reasonable
accommodation, not plaintiffs' preferred accommodation."), *aff'd*, 562 F.3d 1222 (10th Cir.
2009). Indeed, Ms. Roby plainly acknowledges that Frontier provided reasonable
accommodations: after giving birth, she returned to work as a flight attendant for over eight

---

[8] In any event, Frontier's provision of lactation locations—either at DIA or at any other airport—is beyond
the scope of the EEOC's investigation, because (1) the EEOC does not have jurisdiction to investigate
WANMA; (2) even if it did have jurisdiction, WANMA has no extraterritorial application, so outstations in
airports outside of Colorado are irrelevant; and (3) under Title VII (as amended by the PDA) and the
ADA, Ms. Roby has not alleged that any similarly-situated individual (male or female) has been given
preferential accommodations in terms of locations to be used to accommodate a medical condition. *See
Peerless Inc. Co. v. Clark*, 487 P.2d 574, 575 (Colo. App. 1971) (holding it is "well settled that a statute
cannot be presumed to have any extraterritorial effect" if it lacks a provision that permits its
extraterritorial application).

Justin Moore
August 18, 2017
Page 11

months, before "reach[ing] out to Frontier to find out what <u>other accommodations</u> were available." Charge at ¶ 33 (emphasis added).

## III. LEGAL ANALYSIS

In her Charge, Ms. Roby contends she was discriminated against based on her sex in violation of Title VII (as amended by the PDA), the ADA, the CADA, and the PWFA. Since she does not offer direct evidence of discrimination to support these claims, her allegations of discrimination must be analyzed under the *McDonnell Douglas* burden-shifting framework. A plaintiff alleging that the denial of an accommodation constituted disparate treatment under the PDA establishes a *prima facie* case by showing that: (1) she is a member of a protected class; (2) she sought an accommodation and the employer did not accommodate her; and, (3) the employer did accommodate others similar in their ability or inability to work. *Young*, 135 S. Ct. at 1354. If a plaintiff can make this showing, then the "employer may then seek to justify its refusal to accommodate the plaintiff by relying on legitimate, non-discriminatory reasons for denying her accommodation." *Id.* "If the employer offers an apparently legitimate, non-discriminatory reason for its actions," the burden then sifts back to the plaintiff to "show that that employer's proffered reasons are in fact pretextual." *Id.*

For the reasons set forth above, with respect to her timely claims of discrimination, Ms. Roby cannot meet her *prima facie* case because she cannot demonstrate that she sought an accommodation that Frontier did not grant to her, but provided others similar in their ability to work or not work. For example,

- Ms. Roby complains that she was not afforded the accommodation of a paid leave of absence. Frontier does not provide a paid leave of absence to flight attendants unable to fly due to any type of medical condition. *See* Section II.C.1.

- Ms. Roby complains that the dependability policy is discriminatory, but the dependability policy applies equally to all Frontier flight attendants. *See* Section II.C.3.

- Ms. Roby also takes issue with the fact that Frontier did not permit her to express milk during a flight. But permitting flight attendants to express milk during a flight is a safety hazard, and Ms. Roby cannot establish that Frontier provided such an accommodation to any other flight attendants similar in their inability to work. *See* Section II.C.4.

- Ms. Roby complains that Frontier did not accommodate her desire to express milk. But Frontier offered a number of reasonable accommodations, and Frontier is not legally obligated to provide Ms. Roby with her "preferred" accommodation. *See* Section II.C.6.

Accordingly, Ms. Roby's discrimination claim fails as a matter of law at the outset, as she cannot even establish her *prima facie* case. Indeed, Frontier's decision to adhere to the provisions of the CBA and to treat Ms. Roby the same as all other flight attendants in their ability or inability to work is evidence that its business decisions were legitimate and non-discriminatory. Nor has Ms. Roby presented any evidence that Frontier's legitimate decisions were pretextual.

Justin Moore
August 18, 2017
Page 12

In summary, Ms. Roby's allegations are either untimely as a matter of law or without legal merit.

## III. CONCLUSION

For the reasons detailed above, Ms. Roby has not been subject to any form of discrimination. Rather, Frontier has treated her fairly and lawfully at all times. Accordingly, the company respectfully requests that Ms. Roby's Charge be dismissed with a finding of "no probable cause." Please do not hesitate to contact me if you require any further information.

Sincerely,

*Erin Webber*

Erin A. Webber

EAW/dpg

Attachments



Littler Mendelson, PC
1900 Sixteenth Street
Suite 800
Denver, CO 80202

August 18, 2017

Erin A. Webber
303.362.2851 direct
303.629.6200 main
303.362.8427 fax
ewebber@littler.com

**VIA ELECTRONIC SUBMISSION**

Justin Moore
Federal Investigator
U.S. Equal Employment Opportunity Commission
Denver Field Office
303 East 17th Avenue
Suite 410
Denver, CO 80203

Re:   Respondent's Position Statement
      *Stacy Rewitzer v. Frontier Airlines, Inc.*
      EEOC Charge No. 541-2017-01430

Dear Mr. Moore:

I am writing on behalf of Respondent Frontier Airlines, Inc. ("Frontier") in response to the Charge of Discrimination filed by Stacy Rewitzer (nee Schiller) on or about May 16, 2017. In her Charge, Ms. Rewitzer alleges to have suffered discrimination based on "pregnancy-related disabilities," sex, pregnancy, and "a condition related to [her] pregnancy and childbirth—specifically, lactation," in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA"), the Americans with Disabilities Act ("ADA"), the Colorado Antidiscrimination Act ("CADA"), and the Colorado Pregnant Workers Fairness Act ("PWFA").[1]   Ms. Rewitzer further alleges that Frontier violated the Colorado Workplace Accommodations for Nursing Mothers Act ("WANMA") by not providing adequate break time and/or space for expressing breast milk.

At the outset, as Ms. Rewitzer acknowledges in her Charge, *see* Charge at ¶ 55 n.1, the Equal Employment Opportunity Commission ("EEOC") does not have jurisdiction over WANMA claims. Accordingly, Frontier's response addresses only Ms. Rewitzer's discrimination-based claims under Title VII (as amended by the PDA), the ADA, CADA, and the PWFA.[2]   To the

---

[1] On her EEOC Form 5, Ms. Rewitzer additionally checked the box for "Retaliation" where asked to identify the basis of her Charge (in addition to "Sex" and "Disability"). Ms. Rewitzer makes no mention of retaliation in the statement of harm attached to the Form 5, however, and does not address any claim of retaliation substantively.  Frontier for that reason has not included a discussion of retaliation in this position statement.

[2] Since CADA claims (inclusive of the PWFA, which amended CADA) are analyzed under the same framework as Title VII and ADA claims, please allow the analysis in this position statement to also serve as a legal analysis of CADA pregnancy and disability discrimination claims. *St. Croix v. Univ. of Colo. Health Scis., Ctr.*, 166 P.3d 230, 236 (Colo. Ct. App. 2007) (citing *Colo. Civil Rights Comm'n v. Big O*

Justin Moore
August 18, 2017
Page 2

extent the EEOC believes it has jurisdiction to investigate the allegations referenced in the Charge regarding WANMA, Frontier respectfully requests the opportunity to supplement this position statement to address such allegations.[3]

## I.    INTRODUCTION

Frontier denies any allegation that it discriminated against Ms. Rewitzer in violation of Title VII, as amended by the PDA, the ADA, the CADA, the PWFA, or any other law.  In fact, as detailed below, Frontier treated Ms. Rewitzer, all pregnant flight attendants and those flight attendants wishing to express breast milk upon their return to work lawfully; in compliance with the collectively bargained agreement governing relevant terms and conditions of a Frontier flight attendant's employment; under its standard practices; and, most importantly, consistent with how it accommodates all flight attendants (both male and female) who are similar in their ability to work or not work.

Ms. Rewitzer's Charge demands that Frontier treat her, pregnant flight attendants, and those flight attendants seeking to express breast milk upon their return to work more favorably than all other flight attendants and as required by federal law.  For example, Ms. Rewitzer takes issue with the fact that her leave of absence in connection with her pregnancy and the birth of her child was unpaid.  But under the terms of the collective bargaining agreement Frontier entered into with the flight attendants' union—of which Ms. Rewitzer is a member—all medical leaves of absence are unpaid.  Moreover, it is indisputable that Title VII (as amended by the PDA), the FMLA, and the ADA do not require a leave of absence to be paid.  Thus, were Ms. Rewitzer paid for her medical leave related to her pregnancy, Frontier would be treating her more favorably than all other flight attendants operating under the collective bargaining agreement on leaves of absence.

Likewise, Ms. Rewitzer contends that Frontier's dependability policy is discriminatory against pregnant flight attendants and flight attendants who take medical leave after giving birth.  However, the dependability policy is applied equally to all flight attendants, whether pregnant or not, and thus it is not discriminatory.  Frontier's dependability policy fully complies with federal and Colorado state law in all respects.  Again, if Ms. Rewitzer were to be excused from its requirements, then Frontier would be treating her more favorably than all other flight attendants who are similar in their ability to work or not work.

---

*Tires, Inc.*, 940 P.2d 397, 399 (Colo. 1997) (stating Colorado courts "look to federal cases for guidance on applying" the CADA).

[3] This position statement is based on Frontier's understanding of Ms. Rewitzer's allegations to the best of its knowledge and recollection as of the date of this document.  Frontier expressly reserves the right to amend, supplement, or correct this position statement, if necessary.  In addition, this position statement and the accompanying exhibits, which contain confidential personnel, medical and business information, are subject to the exceptions to the disclosure requirements of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7).  All information provided herein, including this position statement, is provided solely in cooperation with the EEOC's fact-finding efforts.  Frontier reserves all objections to the admissibility at any hearing, trial, or other proceeding of any of the information or documents provided to the EEOC.

Justin Moore
August 18, 2017
Page 3

Ms. Rewitzer further contends that the fact she was not offered a temporary reassignment to light duty as an accommodation for her pregnancy or desire to express breast milk upon her return to work is evidence of discrimination. More specifically, Ms. Rewitzer argues that she should have been offered the opportunity to be temporarily reassigned to a job at Frontier's corporate headquarters or a ground position at the airport. Charge ¶¶ 36, 38. This argument falls flat because Frontier does not provide temporary light duty assignments at its corporate headquarters or at the airport as an accommodation to any flight attendant for a medical condition. Moreover, despite Ms. Rewitzer's unfounded allegations, Frontier has no obligation under the CBA or any other law or policy to provide this accommodation to flight attendants (male or female) who cannot fly due to: (a) an on-the-job injury; (b) a non-work related injury; or (c) any other medical condition or disability. Put another way, Frontier treated Ms. Rewitzer the same as all other flight attendants who are similar in their ability to work or not work.

Ms. Rewitzer also takes issue with the fact that Frontier informed her she may not express breast milk in the galley during flight. Charge at ¶ 39. However, it is beyond question that a flight attendant leaving her duties for a material period of time during flight—to breastfeed or for any other reason—creates a safety risk and compromises the welfare of passengers and crew members. For this reason, Frontier has not provided any flight attendant with the accommodation to stop working while on a flight for an extended period of time due to any medical condition or disability. Not only does Frontier have a legitimate, non-discriminatory reason for its decision to deny Ms. Rewitzer the opportunity to compromise flight safety, but she cannot demonstrate that Frontier provided this accommodation to other flight attendants similar in their ability or inability to work for an entire flight.

In summary, Frontier believes that this position statement and the evidence submitted herewith demonstrate that it has acted lawfully at all times. Accordingly, it respectfully requests that the EEOC issue a no probable cause finding with respect to Ms. Rewitzer's Charge.

## II.   FACTUAL BACKGROUND

### A.   General Information Relating to Ms. Rewitzer's Employment

In or about May 22, 2006, Ms. Rewitzer began her employment with Frontier as a flight attendant, a position she continues to hold as of the date of this position statement. As a Flight Attendant, Ms. Rewitzer is "essential to maintaining the well-being, safety, security and comfort of [Frontier's] passengers onboard [its] aircraft," and she must "follow established FAA and Frontier guidelines in providing for the comfort and safety of passengers and respond to inflight emergencies and/or security concerns . . . ." Exhibit A (Flight Attendant Job Description). A flight attendant's job description's emphasis on safety is consistent with the fact that, while Frontier prides itself on being an ultra-low cost carrier, the company views its primary mission as ensuring the safety of its customers and employees. Thus, while serving more than 40 cities in the United States, Mexico, and Jamaica on over 275 daily flights, Frontier never loses sight that its principal responsibility is to ensure that passengers and employees are safely delivered to their destination.

Upon her acceptance of employment as a Flight Attendant, Ms. Rewitzer voluntarily joined the Association of Flight Attendants-CWA AFL-CIO ("AFA"), the union that represents

Justin Moore
August 18, 2017
Page 4

Frontier flight attendants and is responsible for promoting the interests of its members. *See* Charge at ¶ 6. Importantly, AFA and Frontier negotiated the Frontier Airlines Flight Attendant Contract ("CBA"), which sets forth the terms of employment and working conditions for Frontier flight attendants. The CBA specifically addresses, among other things, seniority, scheduling, staffing adjustments, leaves of absence and medical standards. Exhibit B (Relevant Provisions of the CBA). Accordingly, its provisions are material to an assessment of Ms. Rewitzer's allegations.

In her Charge, Ms. Rewitzer contends she was discriminated against in violation of Title VII (as amended by the PDA) and the ADA (and, by extension, the CADA and the PWFA) in connection with her pregnancy in 2015-16 and anticipated return to work following the birth of her child. Critically, after Ms. Rewitzer had her child on May 17, 2016, in accordance with the terms of the CBA, she took twelve weeks of medical leave, *i.e.*, up to and including August 9, 2016. *Id.* at § 12(F). Since then, Ms. Rewitzer has each month requested additional medical leave time. Indeed, when Ms. Rewitzer's twelve weeks of medical leave was about to end, she "ask[ed] Frontier to extend [her] Leave as long as possible" because she "plan[ned] to breastfeed up to a year." Exhibit C (e-mail dated August 1, 2016) (emphasis added). Each month, Frontier has *granted* Ms. Rewitzer's requests for extended medical leave in accordance with her request to extend her leave as long as possible. As of the date of this position statement, Ms. Rewitzer remains employed by Frontier, on an approved leave.

## B. Ms. Rewitzer's Allegations with Respect to Discrimination During Her Pregnancy Are All Time-Barred

In order to maintain a claim under Title VII (as amended by the PDA), the CADA, and/or the PWFA, a plaintiff must file a charge of discrimination with the EEOC (or Colorado Civil Rights Division, as applicable) within 300 days of the alleged unlawful employment practice. *See* 42 U.S.C. § 2000e-5(e)(1) (Title VII, requiring charge be filed "within three hundred days after the alleged unlawful employment practice occurred"); 42 U.S.C. § 12117(a) (ADA, adopting "powers, remedies, and procedures" of § 2000e-5); *see Davidson v. America Online, Inc.*, 337 F.3d 1179, 1183 (10th Cir. 2003) ("Title VII [and] the ADA require[] an individual to file a timely administrative claim within 300 days").[4] Ms. Rewitzer filed her Charge on May 16, 2017, rendering any claim based on events transpiring on or before July 20, 2016 (300 days prior) untimely as a matter of law. Accordingly, Ms. Rewitzer's allegations regarding any purported discrimination during her pregnancy, including points accrued under Frontier's dependability policy in January of 2016, are time-barred.[5]

---

[4] The time limits for filing charges under the CADA and the PWFA, which require charges be filed within six months, are even shorter. *See* Colo. Rev. Stat. Ann. § 24-34-403 (West) ("Any charge alleging a violation of this part . . . shall be filed with the commission . . . within six months after the alleged discriminatory or unfair employment practice occurred, and if not so filed, it shall be barred.") (emphasis added). In any event, the PWFA did not become effective until August 10, 2016, rendering any conduct before that inactionable with respect to the PWFA. *See* Colo. Rev. Stat. Ann. § 24-34-402.3 (West).

[5] Likewise, Ms. Rewitzer's allegations regarding any discrimination under the CADA and the PWFA that occurred before November 16, 2016, six months before she filed her charge, are time-barred. *See* Colo. Rev. Stat. Ann. § 24-34-403 (West).

Justin Moore
August 18, 2017
Page 5

More specifically, in her Charge, Ms. Rewitzer takes issue with the fact that in 2016, when she was 28 weeks pregnant, she missed scheduled trips on January 2-6 and 10-14, 2016 and accrued three points under Frontier's dependability policy. Charge at ¶ 23. Ms. Rewitzer accrued these points nearly six months before the 300-day deadline for Ms. Rewitzer to challenge an alleged unlawful employment practice. In addition, Ms. Rewitzer alleges that in February 2016, she "suffered from extreme anxiety" and "emotional and psychological harm" "during [her] pregnancy," purportedly due to Frontier's policies and practices, for which she holds Frontier responsible. *Id.* ¶ 51. Again, though, these purported events occurred long before the July 20, 2016 deadline and are thus barred.[6]

Therefore, there can be no doubt that any allegations that occurred before the July 20, 2016 cut-off are time-barred. *See, e.g., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (finding that repeated occurrences of the same discriminatory employment action, like the failure to provide an accommodation, can be challenged only if "an act contributing to the claim occurs within the [charge] filing period"); 42 U.S.C. § 2000e-5(e)(1).

## C. Response to Ms. Rewitzer's Allegations with Respect to Her Pregnancy and Post-Pregnancy

In her Charge, with respect to her pregnancy and post-pregnancy, Ms. Rewitzer takes issue with the fact that when her pregnancy rendered her unable to fly, she was required to take an unpaid leave of absence, rather than be: (a) reassigned to a temporary light duty position until the birth of her child; or, (b) paid for her time away from work. These claims are unavailing under the law.

### 1. All Medical Leaves of Absence Provided to Flight Attendants Are Unpaid

As an initial matter, the terms and conditions of the leaves of absence policies about which Ms. Rewitzer complains are set forth in the CBA. They were collectively bargained for by AFA and on behalf of Ms. Rewitzer, who voluntarily agreed to be a part of the union. Though the Charge consistently refers to the leaves of absence policies (and other policies) to which Ms. Rewitzer is subject to as "Frontier's policies," *e.g.*, Charge ¶¶ 8-12, 47, 48, 50, 51, 53, 55 (referring to a number of policies covered under the CBA as "Frontier's policies"), this fails to inform the EEOC that Ms. Rewitzer's interests were represented by AFA and accounted for in the determination of the scope of these policies. Moreover, "[i]t is well-established that Title VII does not require an employer to violate the terms of a collective bargaining agreement," so to the extent Ms. Rewitzer asks Frontier to act in ways contrary to the CBA, these requests

---

[6] To the extent Ms. Rewitzer challenges Frontier's policy "of requiring immediate notification of pregnancy upon confirmation of the pregnancy by a doctor," Charge at ¶ 55(e), this claim is plainly time-barred. But even were this a live claim, courts have held that non-pregnancy is a valid bona fide occupational qualification in a safety context, such as here for flight attendants. *E.g., Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 204 (1991) (recognizing non-pregnancy may be BFOQ under a "safety exception"); *Richards v. City of Topeka*, 173 F.3d 1247, 1252 (10th Cir. 1999) ("Under the PDA, the City can raise a BFOQ as an affirmative defense," citing 42 U.S.C. § 2000e–2(e)(1) (allowing, under Title VII, an employer to discriminate where a BFOQ "is reasonably necessary to the normal operation of [a defendant's] particular business or enterprise")).

Justin Moore
August 18, 2017
Page 6

must fail. *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 317 (4th Cir. 2008); *see Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 79 (1977) (holding that "the duty to accommodate [does not] require[] [an employer] to take steps inconsistent with [an] otherwise valid [collective bargaining] agreement").

That aside, Ms. Rewitzer takes issue with the fact that she was not provided a paid leave of absence. Charge ¶¶ 48, 55(c). But the CBA does not provide for a paid leave of absence for flight attendants unable to fly due to any type of medical condition. Under the CBA, Frontier provides flight attendants with the following types of medical leave:

> (a)   Family Medical Leave: governed "under the Family Medical Leave Act," which does not provide for paid leave, *id.* at 12(E)(1);
>
> (b)   Maternity Leave: "Sick leave must be used, and vacation days may be used, during the maternity leave; otherwise, the leave is without pay," *id.* at 12(F)(3) (emphasis added); and,
>
> (c)   Medical Leave: "A Flight Attendant may request an unpaid leave of absence for his/her own illness or injury when he/she cannot return to work after exhausting FMLA leave or if he/she is not eligible for FMLA," *id.* at 12(G)(6) (emphasis added).

Nowhere in the CBA does it provide that a flight attendant shall be paid in connection with any of the foregoing leaves of absence, other than to the extent the flight attendant wishes to be paid from accrued sick leave or vacation time. As for Ms. Rewitzer, her leave was handled exactly as provided by the CBA. *See* Charge at ¶ 34 (recognizing that some of Ms. Rewitzer's maternity leave was paid because it was "covered by accrued paid vacation leave and coverage from optional short term disability insurance"). Having bargained for this benefit in the CBA, Ms. Rewitzer cannot now complain that the very same policies discriminate against her. *See Hardison*, 432 U.S. at 79.

Accordingly, the fact that Frontier does not pay pregnant flight attendants on a leave of absence in connection with their pregnancy or birth of a child cannot be deemed discriminatory where, as here, the company does not pay any flight attendant (male or female) on a leave of absence for non-pregnancy-related medical conditions.[7] *See Young v. UPS*, 135 S. Ct. 1338, 1343-44 (2015). This renders any assertion that Frontier must pay Ms. Rewitzer for her time away from work for pregnancy-related medical conditions contrary to the mandates of Title VII as amended by the PDA. *Id.* at 1343 (only requiring an employer to treat "women affected by pregnancy . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work") (quoting 42 U.S.C. § 2000e(k)) (emphasis added).

---

[7] Frontier does not pay workers' compensation claims, as required under the CBA and the law.

Justin Moore
August 18, 2017
Page 7

### 2.    Pregnancy and Lactation Are Not Disabilities Covered Under the ADA

Next, Ms. Rewitzer's ADA (and disability-related-CADA) claims must fail because neither pregnancy nor lactation is a disability protected under the ADA or the CADA.

It is well-established that pregnancy is not a disability under the ADA. *E.g.*, *Genovese v. Harford Health & Fitness Club, Inc.*, No. WMN-13-217, 2013 WL 2490270, at *5 (D. Md. June 7, 2013) (collecting authorities and noting that "[w]ith near unanimity, federal courts have held that pregnancy [alone] is not a 'disability' under the ADA") (citations and internal quotations omitted); *Richards*, 173 F.3d at 1250 (affirming that "pregnancy d[oes] not qualify as a disability under the ADA"); *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 899 (10th Cir. 1997) (holding that "impairment [within the meaning of the ADA] does not include . . . pregnancy" where a pilot claimed disability discrimination on the basis of pregnancy).

Lactation is likewise not a disability under the ADA. *See Mayer v. Prof'l Ambulance, LLC*, 211 F. Supp. 3d 408, 420 (D.R.I. 2016) (in a case involving an employer's denial of lactation breaks, concluding that normal medical conditions related to "post-pregnancy do not qualify as a disability," and noting the lack of any "any cases post-2008 amendment [to the ADA] holding that normal lactation is a disability"); *Martinez v. N.B.C. Inc.*, 49 F. Supp. 2d 305, 308 (S.D.N.Y. 1999) (pregnancy and related medical conditions are not "disabilities" for purposes of the Americans with Disabilities Act, and the employer did not need to accommodate the plaintiff's desire to use a breast pump in the workplace).

Because pregnancy and post-pregnancy conditions such as lactation are not covered under the ADA, to the extent Ms. Rewitzer's Charge asserts a violation of the ADA, her claims are without merit.

### 3.    The Dependability Policy Is Not Discriminatory

Next, Ms. Rewitzer alleges that Frontier's dependability policy itself is discriminatory. *See* Exhibit D (Employee Handbook) at Art. 12.   Even if her claims based on her treatment under the dependability policy were not time-barred—which they are—her claims regarding the policy nevertheless are unfounded for multiple reasons.

First, as discussed above, neither pregnancy nor the need to express milk for lactation purposes is considered a "disability" under the ADA.  Thus, to the extent that Ms. Rewitzer claims that it was a violation of the ADA for Frontier to deny her "request that 'dependability' points related to pregnancy complications be recharacterized," her claim must fail.  Charge at ¶ 55(d).

Second, the dependability policy is applied equally to all similarly situated employees, and Ms. Rewitzer does not claim otherwise.  Thus, the dependability policy is not discriminatory against pregnant women under Title VII (as amended by the PDA).  *See Manning v. Swedish Med. Ctr.*, No. C15-0949 (JLR) 2016 WL 6216364, at *8 (W.D. Wash. Sept. 30, 2016) (denying Title VII discrimination claim where "[t]here is no evidence . . . to support that [employer] treated [claimant] differently from other employees" under the "Dependability Policy"); *Stout v.*

Case 1:21-mc-00191-DDD-SKC Document 2-3 Filed 09/30/21 USDC Colorado Page 52 of 101

Justin Moore
August 18, 2017
Page 8

*Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002) (absentee policy that is applied equally to "pregnant or post-partum employees" and "non-pregnant employees" is permitted).

Third, Ms. Rewitzer does not dispute that she, in fact, "missed [her] scheduled trips on January 2-6 and January 10-14," and thus "accrued three points under the dependability policy, resulting in [Ms. Rewitzer] having a total of 7.5 dependability points." Charge at ¶ 23. Plainly, then, Ms. Rewitzer acknowledges that the majority of her points—4.5 of the 7.5 points she accrued—had nothing to do with her pregnancy. *See* Exhibit E (performance counseling record) (showing Ms. Rewitzer had called in sick with inadequate notice on February 23, 2015, months before she became pregnant); Exhibit F (Attendance Warning, dated April 13, 2015) (showing Ms. Rewitzer had accrued 7.5 points under the policy due to a number of incidents of calling in sick and tardiness).

Moreover, Ms. Rewitzer concedes that "Frontier *approved* some medical leave for a few pregnancy-related sick day absences," Charge at ¶ 22 (emphasis added), and Frontier has continued to approve her post-pregnancy-related leave of absence without any impact on her points under the dependability policy. This is all entirely consistent with the dependability policy, which provides that "some reasons for absence are appropriately excluded from being counted towards corrective action. Absences for approved leaves shall not be counted, provided proper documentation is produced and approved in advance of the event, or if unforeseeable, within the required time frame after the event." *See* Exhibit D (Employee Handbook) at Art. 12.05 p. 1. There is no inference to be made that Frontier discriminated against Ms. Rewitzer on the basis of her pregnancy when, by her own concession, Frontier approved her pregnancy-related leave requests, without assessment of attendance points, when she provided the proper documentation. Thus, if an absent employee can provide the "proper documentation" under the policy—as Ms. Rewitzer did for the multiple pregnancy-related medical leaves that she concedes Frontier approved—then no dependability points would be accrued.

Fourth, to the extent that Ms. Rewitzer argues that the dependability policy is discriminatory because "the points will remain on [her] record for as long as [she] remain[s] on unpaid leave," Charge at ¶ 33, the policy is entirely non-discriminatory in that it expressly includes *all* leaves of absence, including "Military, Medical, Personal, Workers' Comp, FMLA, STD, etc." *See* Exhibit D (Employee Handbook), at Art. 12.05.1.3. Thus, the policy in no way discriminates against pregnant or post-pregnant women; it applies equally to all employees regardless of the type of leave taken.

**4.    Frontier Does Not Provide the Temporary Light Duty Assignment that Ms. Rewitzer Sought as an Accommodation to Flight Attendants, Regardless of the Basis for the Accommodation Request**

In her Charge, Ms. Rewitzer also takes issue with the fact that Frontier declined to assign her to a temporary light duty position to accommodate her stated need to express breast milk during the first year following her child's birth. Charge ¶¶ 3, 36, 45, 50. Ms. Rewitzer's claim here fails on numerous grounds.

Page 51

Justin Moore
August 18, 2017
Page 9

First, the CBA does not require, and Frontier's policies and practices do not provide for, temporary light duty assignments (either at Frontier's corporate office or at any airport) for any flight attendant (male or female) unable to fly due to: (a) an on-the-job injury; (b) a non-work related injury; or (c) any other medical condition or disability. Ms. Rewitzer is simply wrong when she claims that Frontier "maintains a policy under which it provides for . . . 'light/modified duty' to individuals who are injured on-the-job." Charge at ¶ 12 (citing CBA Art. 12(H)(2)). Rather, Article 12, Section H(2) of the CBA only provides that "[t]he first three days of OJI may be covered by sick days, or the Flight Attendant may immediately be assigned light/modified duty," *id.* (emphasis added)—not that Frontier is required to provide these accommodations. By its own terms, the CBA does not require reassignment to light duty, and, in fact, Frontier's policy is not to grant light/modified duty to any flight attendant unable to fly due to a medical condition, regardless of the nature of the medical condition.

Second, in any event, Ms. Rewitzer's argument is unfounded that she was "caused . . . financial harm" because Frontier did not offer "temporary job reassignment for pregnant . . . flight attendants." Charge at ¶ 50. By her own admission, Ms. Rewitzer did not even seek a reassignment until August 23, 2016—months after her son was born. *See* Charge at ¶ 36. Thus, as Ms. Rewitzer never asked for any job reassignment *during* her pregnancy, Frontier certainly could not have discriminated against her for not providing this accommodation.

Given the foregoing, Ms. Rewitzer appears to demand that the EEOC insist she be treated more favorably than other flight attendants similar in their ability or inability to work. There is no support for that demand in the relevant law, including the EEOC's guidance interpreting the same. *See Adams v. Potter*, 193 F. App'x 440, 445 (6th Cir. 2006) ("accommodations are not reasonable if they would usurp the legitimate rights of other employees in a collective bargaining agreement") (citation and internal quotation omitted).

According to the EEOC's Enforcement Guidance on Pregnancy Discrimination and Related Issues, in enacting the PDA:

> Congress sought to make clear that 'pregnant women who are able to work must be permitted to work on the same conditions as other employees; and, when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working.' The PDA requires [only] that pregnant employees be treated the same as non-pregnant employees who are similar in their ability or inability to work.

Enforcement Guidance: Pregnancy Discrimination and Related Issues, 2015 WL 4162723, at *2 (EEOC Notice No. 915.003) (June 25, 2015) (emphasis added).

Further, in *Young*, the United States Supreme Court held that to succeed on a claim that the denial of an accommodation constitutes disparate treatment under the PDA, the plaintiff must show, among other things, "that she sought [an] accommodation, that the employer did not accommodate her, and that the employer did accommodate others 'similar in their ability or inability to work.'" 135 S. Ct. at 1354 (emphasis added). Here, Ms. Rewitzer cannot establish that she was denied an accommodation provided to other flight attendants and accordingly,

Case 1:21-mc-00191-DDD-SKC  Document 2-3  Filed 09/30/21  USDC Colorado  Page 54 of 101

Justin Moore
August 18, 2017
Page 10

cannot set forth a *prima facie* case of discrimination. *See Wade v. Brennan*, 647 F. App'x 412, 417 (5th Cir. 2016) (denying Title VII claim where complainant "failed to show [temporary reassignment position] was an existing position, so reassignment there would necessarily require [employer] to create a new position for her, which is not a reasonable accommodation").

### 5.  Expression of Breast Milk During Flight Is a Safety Hazard

Moreover, as an experienced flight attendant, Ms. Rewitzer must know that pumping during flight in the aircraft galley (or, for that matter, the lavatory) is not a viable option given the safety issues that inevitably arise in the performance of a flight attendant's duties. Taking extended breaks during a flight necessarily would place the welfare of Frontier's passengers as well as Ms. Rewitzer's colleagues flying on the aircraft at risk. Indeed, airlines are for that very reason exempted from the provisions of the Fair Labor Standards Act requiring break time. *See Thibodeaux v. Exec. Jet Int'l, Inc.*, 328 F.3d 742, 754 (5th Cir. 2003) (confirming that "the FLSA exempts the company's flight attendants from its overtime requirements"); 29 U.S.C.A. § 213(b)(3) (West).

As one example of the safety issues at play, on an Airbus 319 airplane, in addition to the two pilots, there are three flight attendants and approximately 150 passengers in flight. If a flight attendant is relieved of the performance of her duties for an extended period—to pump or otherwise—the other two flight attendants must deviate from their regular course of duty, which, in the event of a security incident, would allow for the passengers to more significantly outnumber the remaining crewmembers. Indeed, a flight attendant's essential job duties include a number of safety-related functions that would be rendered impossible or impracticable if a flight attendant were permitted to pump while onboard an aircraft, including "conduct[ing] emergency evacuation of cabin if necessary," "conduct[ing] preflight safety check of cabin emergency equipment," "ensur[ing] cabin safety and security during all phases of flight, including boarding and deplaning," and "provid[ing] emergency medical assistance." *See* Exhibit A (Flight Attendant Job Description).

Accordingly, Frontier flight attendants are not permitted to pump during flight for the legitimate, non-discriminatory reason that doing so risks flight safety, something Frontier is not willing to compromise. *Young*, 135 S. Ct. at 1343-44 (finding that if an employee can articulate a *prima facie* case of pregnancy discrimination, which Frontier does not concede, an employer successfully meets its burden upon a showing of legitimate, non-discriminatory reasons for its decision to not grant the accommodation requested).

### 6.  Ms. Rewitzer's Claims that Frontier Did Not Offer Her Any Accommodations Are False

Lastly, Ms. Rewitzer suggests in her Charge that Frontier did not offer her any accommodations at all in connection with her expression of breast milk. *E.g.*, Charge ¶¶ 3, 37, 52. Not so.

First, as detailed above, Frontier approved each of Ms. Rewitzer's requests for leave of absence after the birth of her child.

Page 53

Justin Moore
August 18, 2017
Page 11

Second, while Frontier is unwilling to compromise flight safety, it does provide nursing mothers with the opportunity to work a reduced schedule, which is a special accommodation that is not available to other flight attendants. Specifically, the CBA requires that "[a]t the completion of each Bid Period each Flight Attendant must accumulate a minimum of 60 credit hours." *See* Exhibit B (CBA) at Art. 5 § L(1). However, Frontier allows nursing mother flight attendants the accommodation of dropping below 60 hours per month without having to restore those hours, and only having to meet a minimum of 45 hours. This allows women returning to work and wanting to breastfeed the opportunity to work fewer hours, be on the schedule for fewer days, and bid for flights in a manner that allows them to be at home with their child more often. During the relevant time period, each time a nursing flight attendant has made a request to work a reduced schedule, Frontier has granted the accommodation requested by the flight attendant.

Ms. Rewitzer was offered this accommodation but has instead opted for her preferred accommodation of remaining on medical leave—itself, of course, an accommodation provided by Frontier. *See* Exhibit G (July 27, 2017 e-mail) (rejecting "[t]he proposed reduced schedule of 45 hours per month"). Thus, Ms. Rewitzer has rejected perfectly reasonable and legitimate accommodations offered by Frontier. *Barber ex rel. Barber v. Colorado, Dep't of Revenue*, No. CIV.A. 05-CV-00807RE, 2008 WL 207691, at *1 (D. Colo. Jan. 24, 2008) ("[P]laintiffs' argument is that they were not afforded the particular accommodation they requested. This is not the law. Defendants' duty is to offer a reasonable accommodation, not plaintiffs' preferred accommodation."), *aff'd*, 562 F.3d 1222 (10th Cir. 2009).

## III.   LEGAL ANALYSIS

In her Charge, Ms. Rewitzer contends she was discriminated against based on her sex in violation of Title VII (as amended by the PDA), the ADA, the CADA, and the PWFA. Since she does not offer direct evidence of discrimination to support these claims, her allegations of discrimination must be analyzed under the *McDonnell Douglas* burden-shifting framework. A plaintiff alleging that the denial of an accommodation constituted disparate treatment under the PDA establishes a *prima facie* case by showing that:  (1) she is a member of a protected class; (2) she sought an accommodation and the employer did not accommodate her; and, (3) the employer did accommodate others similar in their ability or inability to work. *Young*, 135 S. Ct. at 1354. If a plaintiff can make this showing, then the "employer may then seek to justify its refusal to accommodate the plaintiff by relying on legitimate, non-discriminatory reasons for denying her accommodation." *Id.* "If the employer offers an apparently legitimate, non-discriminatory reason for its actions," the burden then sifts back to the plaintiff to "show that that employer's proffered reasons are in fact pretextual." *Id.*

For the reasons set forth above, with respect to her timely claims of discrimination, Ms. Rewitzer cannot meet her *prima facie* case because she cannot demonstrate that she sought an accommodation that Frontier did not grant to her, but provided others similar in their ability to work or not work. For example,

- Ms. Rewitzer complains that she was not afforded the accommodation of a paid leave of absence. Frontier does not provide a paid leave of absence to flight attendants unable to fly due to any type of medical condition. *See* Section II.C.1.

Justin Moore
August 18, 2017
Page 12

- Ms. Rewitzer complains that the dependability policy is discriminatory, but the dependability policy applies equally to all Frontier flight attendants. *See* Section II.C.3.

- Ms. Rewitzer also takes issue with the fact that Frontier failed to provide her with a reassignment to a temporary light duty position at Frontier's corporate office or at the Denver airport to accommodate her inability to fly. Frontier does not provide temporary light duty assignments as an accommodation to any flight attendant on the basis of a medical condition, regardless of the nature of that medical condition (*e.g.*, on the job injury, off the job injury, any medical condition or disability). *See* Section II.C.4.

- Ms. Rewitzer takes issue with the fact that Frontier has not excused essential functions of her flight attendant position as an accommodation to allow her to express breast milk during flights. Ms. Rewitzer cannot establish that Frontier provided such an accommodation to any other flight attendant similar in their ability or inability to work. *See* Section II.C.5.

- Ms. Rewitzer complains that Frontier did not accommodate her desire to express milk. But Frontier offered a number of reasonable accommodations, and Frontier is not legally obligated to provide Ms. Rewitzer with her "preferred" accommodation. *See* Section II.C.6.

Accordingly, Ms. Rewitzer's discrimination claim fails as a matter of law at the outset, as she cannot even establish her *prima facie* case. Indeed, Frontier's decision to adhere to the provisions of the CBA and to treat Ms. Rewitzer the same as all other flight attendants in their ability or inability to work is evidence that its business decisions were legitimate and non-discriminatory. Nor has Ms. Rewitzer presented any evidence that Frontier's legitimate decisions were pretextual.

In summary, Ms. Rewitzer's allegations are either untimely as a matter of law or without legal merit.

## IV. CONCLUSION

For the reasons detailed above, Ms. Rewitzer has not been subject to any form of discrimination. Rather, Frontier has treated her fairly and lawfully at all times. Accordingly, the company respectfully requests that Ms. Rewitzer's Charge be dismissed with a finding of "no probable cause." Please do not hesitate to contact me if you require any further information.

Sincerely,

*Erin Webber*

Erin A. Webber

EAW/dpg

Enclosures



Littler Mendelson, PC
1900 Sixteenth Street
Suite 800
Denver, CO 80202

Erin A. Webber
303.362.2851 direct
303.629.6200 main
303.362.8427 fax
ewebber@littler.com

December 8, 2017

## VIA ELECTRONIC SUBMISSION

Justin Moore
Federal Investigator
U.S. Equal Employment Opportunity Commission
Denver Field Office
303 East 17th Avenue
Suite 410
Denver, CO 80203

Re:     Respondent's Position Statement
        *Renee Schwartzkopf v. Frontier Airlines, Inc.*
        EEOC Charge No. 541-2018-00055

Dear Mr. Moore:

I am writing on behalf of Respondent Frontier Airlines, Inc. ("Frontier") in response to the Charge of Discrimination filed by Renee Schwartzkopf on or about October 5, 2017. In her Charge, Ms. Schwartzkopf alleges to have suffered discrimination based on "sex, pregnancy, childbirth. . .disability," and "pregnancy-related disability" and a "condition related to my pregnancy and childbirth – specifically, lactation" in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA"), the Americans with Disabilities Act ("ADA"), the Colorado Antidiscrimination Act ("CADA"), and the Colorado Pregnant Workers Fairness Act ("PWFA").[1]   Ms. Schwartzkopf further alleges that Frontier violated the Colorado Workplace Accommodations for Nursing Mothers Act ("WANMA") by not providing adequate break time and/or space for expressing breast milk.

At the outset, as Ms. Schwartzkopf acknowledges in her Charge, *see* Charge at ¶ 36 n.1, the Equal Employment Opportunity Commission ("EEOC") does not have jurisdiction over WANMA claims. Accordingly, Frontier's response addresses only Ms. Schwartzkopf's discrimination-based claims under Title VII (as amended by the PDA), the ADA, CADA, and the

---

[1] On her EEOC Form 5, Ms. Schwartzkopf additionally checked the box for "Retaliation" where asked to identify the basis of her Charge (in addition to "Sex" and "Disability"). Ms. Schwartzkopf makes no mention of retaliation in the statement of harm attached to the Form 5, however, and does not address any claim of retaliation substantively. Frontier for that reason has not included a discussion of retaliation in this position statement.

PWFA.[2] To the extent the EEOC believes it has jurisdiction to investigate the allegations referenced in the Charge regarding WANMA, Frontier respectfully requests the opportunity to supplement this position statement to address such allegations.[3]

## I. INTRODUCTION

Frontier denies any allegation that it discriminated against Ms. Schwartzkopf in violation of Title VII, as amended by the PDA, the ADA, the CADA, the PWFA, or any other law. In fact, as detailed below, Frontier treated Ms. Schwartzkopf, all pregnant flight attendants, and those flight attendants wishing to express breast milk upon their return to work lawfully; in compliance with applicable law; with the collectively bargained agreement governing relevant terms and conditions of a Frontier flight attendant's employment; under its standard practices; and, most importantly, consistent with how it accommodates all flight attendants (both male and female) who are similar in their ability to work or not work.

Ms. Schwartzkopf's Charge demands that Frontier treat pregnant flight attendants, and those flight attendants seeking to express breast milk upon their return to work more favorably than all other flight attendants and as required by federal law. For example, Ms. Schwartzkopf seeks paid leave as one accommodation for flight attendants who are pregnant or breastfeeding. Charge at ¶ 36(c). But under the terms of the collective bargaining agreement Frontier entered into with the flight attendants' union—of which Ms. Schwartzkopf is a member—all medical leaves of absence are unpaid. Moreover, Title VII as amended by the PDA, the FMLA, and the ADA does not require a leave of absence to be paid. Thus, were Frontier to pay flight attendants for medical leave related to their pregnancy (beyond use of accrued paid leave), Frontier would be treating them more favorably than all other flight attendants operating under the collective bargaining agreement on leaves of absence.

Likewise, Ms. Schwartzkopf contends that Frontier's dependability policy is discriminatory against pregnant flight attendants and flight attendants who take medical leave after giving birth. *Id.* at ¶ 36(d). However, the dependability policy is applied equally to all flight attendants, whether pregnant or not, and thus it is not discriminatory. Frontier's dependability

---

[2] Since CADA claims (inclusive of the PWFA, which amended CADA) are analyzed under the same framework as Title VII and ADA claims, please allow the analysis in this position statement to also serve as a legal analysis of CADA pregnancy and disability discrimination claims. *St. Croix v. Univ. of Colo. Health Scis., Ctr.*, 166 P.3d 230, 236 (Colo. Ct. App. 2007) (citing *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399 (Colo. 1997) (stating Colorado courts "look to federal cases for guidance on applying" the CADA).

[3] This position statement is based on Frontier's understanding of Ms. Schwartzkopf's allegations to the best of its knowledge and recollection as of the date of this document. Frontier expressly reserves the right to amend, supplement, or correct this position statement, if necessary. In addition, this position statement and the accompanying exhibits, which contain confidential personnel, medical and business information, are subject to the exceptions to the disclosure requirements of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7). All information provided herein, including this position statement, is provided solely in cooperation with the EEOC's fact-finding efforts. Frontier reserves all objections to the admissibility at any hearing, trial, or other proceeding of any of the information or documents provided to the EEOC.

policy fully complies with federal and Colorado state law in all respects. Again, if Ms. Schwartzkopf were to be excused from its requirements, then Frontier would be treating her more favorably than all other flight attendants who are similar in their ability to work or not work.

Ms. Schwartzkopf further contends that the fact that she was not offered a temporary reassignment to "light or modified duty" as an accommodation for her pregnancy or desire to express breast milk upon her return to work is evidence of discrimination – but without alleging in her Charge that she ever requested a temporary reassignment. [4] Charge ¶¶ 36(b)-(c). This argument falls flat because Frontier does not provide temporary light duty assignments at as an accommodation to <u>any</u> flight attendant for a medical condition. Moreover, despite Ms. Schwartzkopf's unfounded allegations, Frontier has no obligation under the CBA or any other law or policy to provide this accommodation to flight attendants (male or female) who cannot fly due to: (a) an on-the-job injury; (b) a non-work related injury; or (c) any other medical condition or disability. Put another way, Frontier treats Ms. Schwartzkopf the same as all other flight attendants who are similar in their ability to work or not work.

Ms. Schwartzkopf also takes issue with the fact that Frontier has allegedly informed other flight attendants they could not express breast milk in the galley during flight. Charge at ¶¶ 14, 36(f)-(g), (i). However, it is beyond question that a flight attendant leaving her duties for a material period of time during flight—to breastfeed or for any other reason—creates a safety risk and compromises the welfare of passengers and crew members. For this reason, Frontier has not provided any flight attendant with the accommodation to stop working while on a flight for an extended period of time due to any medical condition or disability. Not only does Frontier have a legitimate, non-discriminatory reason for its safety decisions in this regard, but Ms. Schwartzkopf cannot demonstrate that Frontier provided this accommodation to other flight attendants similar in their ability or inability to work for an entire flight.

In summary, Frontier believes that this position statement and the evidence submitted herewith demonstrate that it has acted lawfully at all times. Accordingly, it respectfully requests that the EEOC issue a no probable cause finding with respect to Ms. Schwartzkopf's Charge.

---

[4] Notably, Ms. Schwartzkopf admits that she did not in fact request any accommodations after her return to flight duties, other than her successful bid for reduced hours. Charge at ¶¶ 25-27. Instead, she bases her Charge on assumptions regarding what her allegations are based on her apparent third-hand beliefs relating to what Frontier might or might not have granted in terms accommodations. With respect to her Charge allegations, then, it is unlikely that she has standing to bring claims for failure to provide such accommodations.

Although Ms. Schwartzkopf claims that "Frontier never informed me one way or the other what I was supposed to do when I needed to express breast milk. . ." (Charge at ¶ 28) it is not the employer's responsibility to anticipate an employee's needs and affirmatively offer an accommodation when the employee has not requested one. *See, e.g. Koessel v. Sublette Cty. Sheriff's Dep't*, 717 F.3d 736, 745 (10th Cir. 2013). Nevertheless, in the interest of completeness, Frontier will address the merits of Ms. Schwartzkopf's claims, *infra*. *See Davoll v. Webb*, 194 F.3d 1116, 1133 (10th Cir. 1999).

## II. FACTUAL BACKGROUND

### A. General Information Relating to Ms. Schwartzkopf's Employment

In or about March, 2006, Ms. Schwartzkopf began her employment with Frontier as a flight attendant, a position she continues to hold as of the date of this position statement. As a Flight Attendant, Ms. Schwartzkopf is "essential to maintaining the well-being, safety, security and comfort of [Frontier's] passengers onboard [its] aircraft," and she must "follow established FAA and Frontier guidelines in providing for the comfort and safety of passengers and respond to inflight emergencies and/or security concerns . . . ." Exhibit A (Flight Attendant Job Description). A flight attendant's job description's emphasis on safety is consistent with the fact that, while Frontier prides itself on being an ultra-low cost carrier, the company views its primary mission as ensuring the safety of its customers and employees. Thus, while serving more than 40 cities in the United States, Mexico, and the Caribbean on over 275 daily flights, Frontier never loses sight that its principal responsibility is to ensure that passengers and employees are safely delivered to their destination.

Upon her acceptance of employment as a Flight Attendant, Ms. Schwartzkopf voluntarily joined the Association of Flight Attendants-CWA AFL-CIO ("AFA"), the union that represents Frontier flight attendants and is responsible for promoting the interests of its members. *See* Charge at ¶ 7. Importantly, AFA and Frontier negotiated the Frontier Airlines Flight Attendant Contract ("CBA"), which sets forth the terms of employment and working conditions for Frontier flight attendants. The CBA specifically addresses, among other things, seniority, scheduling, staffing adjustments, leaves of absence and medical standards. Exhibit B (Relevant Provisions of the CBA). Accordingly, its provisions are material to an assessment of Ms. Schwartzkopf's allegations.

In her Charge, Ms. Schwartzkopf contends she was discriminated against in violation of Title VII (as amended by the PDA) and the ADA (and, by extension, the CADA and the PWFA) in connection with her pregnancy in 2016-17 and return to work following the birth of her child. After Ms. Schwartzkopf had her child on January 30, 2017, in accordance with the terms of the CBA, she took nearly twelve weeks of medical leave, *i.e.,* up to and including April 21, 2017. *Id.* at § 12(F); Charge at ¶ 23. In May 2017, Ms. Schwartzkopf bid for and was awarded a Job Share (part time hours) according to Frontier policies, and returned to a regular schedule in July 2017. Charge at ¶ 27.

### B. Ms. Schwartzkopf's Allegations with Respect to Discrimination During Her Pregnancy Are Partly Time-Barred

In order to maintain a claim under Title VII (as amended by the PDA), the CADA, and/or the PWFA, a plaintiff must file a charge of discrimination with the EEOC (or Colorado Civil Rights Division, as applicable) within 300 days of the alleged unlawful employment practice. *See* 42 U.S.C. § 2000e-5(e)(1) (Title VII, requiring charge be filed "within three hundred days after the alleged unlawful employment practice occurred"); 42 U.S.C. § 12117(a) (ADA, adopting "powers, remedies, and procedures" of § 2000e-5); *see Davidson v. America Online, Inc.,* 337

Justin Moore
December 8, 2017
Page 5

F.3d 1179, 1183 (10th Cir. 2003) ("Title VII [and] the ADA require[] an individual to file a timely administrative claim within 300 days").[5] Ms. Schwartzkopf filed her Charge on October 5, 2017, rendering any claim based on events transpiring before December 9, 2016 (300 days prior) untimely as a matter of law. Ms. Schwartzkopf alleges she became pregnant in May 2016 and gave birth to her child on January 30, 2017. Charge at ¶¶ 21-22. Accordingly, Ms. Schwartzkopf's allegations regarding any purported discrimination that occurred during approximately the first six months of her pregnancy, up until December 9, 2016, are untimely.[6, 7]

There can be no doubt that any allegations that occurred before December 9, 2016, including those relating to notification of pregnancy, and accommodations during pregnancy up to the final two months of the gestation period, are time-barred, and should be dismissed. *See, e.g., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (finding that repeated occurrences of the same discriminatory employment action, like the failure to provide an accommodation, can be challenged only if "an act contributing to the claim occurs within the [charge] filing period"); 42 U.S.C. § 2000e-5(e)(1).[8]

## C. Response to Ms. Schwartzkopf's Allegations with Respect to Her Pregnancy and Post-Pregnancy

In her Charge, with respect to pregnancy and post-pregnancy, Ms. Schwartzkopf takes issue with the fact that Frontier does not provide "workplace accommodations related to pregnancy and breastfeeding," including "paid leave, temporary job assignments, schedule modifications, medically necessary breaks, or private, sanitary, and accessible facilities to express breast milk." Charge at ¶ 36(c). She also takes issue with Frontier's dependability

---

[5] The time limits for filing charges under the CADA and the PWFA, which require charges be filed within six months, are even shorter. *See* Colo. Rev. Stat. Ann. § 24-34-403 (West) ("Any charge alleging a violation of this part . . . shall be filed with the commission . . . within six months after the alleged discriminatory or unfair employment practice occurred, and if not so filed, it shall be barred.").

[6] Likewise, Ms. Schwartzkopf's allegations regarding any discrimination under the CADA and the PWFA that occurred before April 5, 2017, six months before she filed her charge, are time-barred. *See* Colo. Rev. Stat. Ann. § 24-34-403.

[7] To the extent Ms. Schwartzkopf challenges Frontier's policy "of requiring immediate notification of pregnancy upon confirmation of the pregnancy by a doctor," Charge at ¶¶ 9, 36(c), this claim is plainly time-barred. But even were this a live claim, courts have held that non-pregnancy is a valid bona fide occupational qualification in a safety context, such as here for flight attendants. *E.g., Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 204 (1991) (recognizing a BFOQ based on safety); *Richards v. City of Topeka*, 173 F.3d 1247, 1252 (10th Cir. 1999) ("Under the PDA, the City can raise a BFOQ as an affirmative defense," citing 42 U.S.C. § 2000e–2(e)(1)).

[8] On the face of the Charge, the injunctive claims also appear to be moot. Ms. Schwartzkopf alleges that it is important to her that her child be fed breast milk "during the first six months of his life." Charge at ¶ 18. Since the child was born on January 30, 2017, the referenced period of time encompasses January 30, 2017 to July 31, 2017.

Justin Moore
December 8, 2017
Page 6

policy as it applies points to pregnancy-related sick days, and the policy requiring immediate notification of pregnancy. *Id.* at ¶¶ 36(d)-(e). These claims are unavailing under the law.

## 1. Pregnancy and Lactation Are Not Disabilities Covered Under the ADA

Next, Ms. Schwartzkopf's ADA (and disability-related-CADA) claims must fail because neither pregnancy nor lactation is a disability protected under the ADA or the CADA.

It is well-established that pregnancy is not a disability under the ADA. *E.g.*, *Genovese v. Harford Health & Fitness Club, Inc.*, No. WMN-13-217, 2013 WL 2490270, at *5 (D. Md. June 7, 2013) (collecting authorities and noting that "[w]ith near unanimity, federal courts have held that pregnancy [alone] is not a 'disability' under the ADA") (citations and internal quotations omitted); *Richards*, 173 F.3d at 1250 (affirming that "pregnancy d[oes] not qualify as a disability under the ADA"); *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 899 (10th Cir. 1997) (holding that "impairment [within the meaning of the ADA] does not include . . . pregnancy" where a pilot claimed disability discrimination on the basis of pregnancy).

Lactation is likewise not a disability under the ADA. *See Mayer v. Prof'l Ambulance, LLC*, 211 F. Supp. 3d 408, 420 (D.R.I. 2016) (in a case involving an employer's denial of lactation breaks, concluding that normal medical conditions related to "post-pregnancy do not qualify as a disability," and noting the lack of any "any cases post-2008 amendment [to the ADA] holding that normal lactation is a disability"); *Martinez v. N.B.C. Inc.*, 49 F. Supp. 2d 305, 308 (S.D.N.Y. 1999) (pregnancy and related medical conditions are not "disabilities" for purposes of the Americans with Disabilities Act, and the employer did not need to accommodate the plaintiff's desire to use a breast pump in the workplace). Ms. Schwartzkopf seems to agree, as she claims that at the time she was lactating, she "did not have a disability under the ADA." Charge at ¶ 24.

Because pregnancy and post-pregnancy conditions such as lactation are not covered under the ADA, to the extent Ms. Schwartzkopf's Charge asserts a violation of the ADA, Charge at ¶¶ 13, 36, 38, her claims are without merit.

## 2. All Medical Leaves of Absence Provided to Flight Attendants Are Unpaid

The terms and conditions of the leaves of absence policies about which Ms. Schwartzkopf complains are set forth in the CBA. They were collectively bargained for by AFA and on behalf of Ms. Schwartzkopf, who voluntarily agreed to be a part of the union. Though the Charge consistently refers to the leaves of absence policies (and other policies) to which Ms. Schwartzkopf is subject to as "Frontier's policies," *e.g.*, Charge ¶¶ 1, 33, 34, 36, 38 (referring to a number of policies covered under the CBA as "Frontier's policies"), this fails to inform the EEOC that Ms. Schwartzkopf's interests were represented by AFA and accounted for in the determination of the scope of these policies. Moreover, "[i]t is well-established that Title VII does not require an employer to violate the terms of a collective bargaining agreement," so to the extent Ms. Schwartzkopf asks Frontier to act in ways contrary to the CBA, these requests must fail. *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 317 (4th Cir. 2008); *see Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 79 (1977) (holding that "the duty to accommodate

[does not] require[] [an employer] to take steps inconsistent with [an] otherwise valid [collective bargaining] agreement").

That aside, Ms. Schwartzkopf cites "paid leave" as one of the accommodations Frontier allegedly could provide pregnant and breastfeeding flight attendants. Charge ¶ 36(c). But the CBA does not provide for a paid leave of absence for flight attendants unable to fly due to any type of medical condition. Under the CBA, Frontier provides flight attendants with the following types of medical leave:

> (a) Family Medical Leave: governed "under the Family Medical Leave Act," which does not provide for paid leave, *id.* at 12(E)(1);
>
> (b) Maternity Leave: "Sick leave must be used, and vacation days may be used, during the maternity leave; otherwise, the leave is without pay," *id.* at 12(F)(3) (emphasis added); and,
>
> (c) Medical Leave: "A Flight Attendant may request an unpaid leave of absence for his/her own illness or injury when he/she cannot return to work after exhausting FMLA leave or if he/she is not eligible for FMLA," *id.* at 12(G)(6) (emphasis added).

Nowhere in the CBA does it provide that a flight attendant shall be paid in connection with any of the foregoing leaves of absence, other than to the extent the flight attendant wishes to be paid from accrued sick leave or vacation time. As for Ms. Schwartzkopf, her leave was handled exactly as provided by the CBA. *See* Charge at ¶ 21 (recognizing that some of Ms. Schwartzkopf's maternity leave was paid because it was "covered by accrued paid vacation"). Having bargained for this benefit in the CBA, Ms. Schwartzkopf cannot now complain that the very same policies discriminate against her. *See Hardison*, 432 U.S. at 79.

Accordingly, the fact that Frontier does not pay flight attendants on a leave of absence in connection with their pregnancy or birth of a child cannot be deemed discriminatory where, as here, the company does not pay any flight attendant (male or female) on a leave of absence for non-pregnancy-related medical conditions. *See Young v. UPS*, 135 S. Ct. 1338, 1343-44 (2015).

## 3. The Dependability Policy Is Not Discriminatory

Ms. Schwartzkopf further alleges that Frontier's dependability policy itself is discriminatory. Charge at ¶ 36(d); *See* Exhibit C (Employee Handbook) at Art. 12. This claim is unfounded for multiple reasons.

First, as discussed above, neither pregnancy nor the need to express milk for lactation purposes is considered a "disability" under the ADA. Thus, to the extent that Ms. Schwartzkopf claims that it was a violation of the ADA for Frontier to apply dependability points to pregnancy-related sick days, her claim must fail. Charge at ¶ 36(d).

Second, the dependability policy is applied equally to all similarly situated employees, and Ms. Schwartzkopf does not claim otherwise. Thus, the dependability policy is not

Justin Moore
December 8, 2017
Page 8

discriminatory against pregnant women under Title VII (as amended by the PDA). *See Manning v. Swedish Med. Ctr.*, No. C15-0949 (JLR) 2016 WL 6216364, at \*8 (W.D. Wash. Sept. 30, 2016) (denying Title VII discrimination claim where "[t]here is no evidence . . . to support that [employer] treated [claimant] differently from other employees" under the "Dependability Policy"); *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002) (absentee policy that is applied equally to "pregnant or post-partum employees" and "non-pregnant employees" is permitted).

Third, to the extent that Ms. Schwartzkopf argues that the dependability policy is discriminatory because pregnancy-related leaves of absence "freeze the twelve-month clock for purposes of permitting points to 'roll off,'" Charge at ¶ 10, the policy is entirely non-discriminatory in that it expressly includes all leaves of absence, including "Military, Medical, Personal, Workers' Comp, FMLA, STD, etc." *See* Exhibit C (Employee Handbook), at Art. 12.05.1.3. Thus, the policy in no way discriminates against pregnant or post-pregnant women; it applies equally to all employees regardless of the type of leave taken.

### 4. Frontier Does Not Provide the Temporary Light Duty Assignment as an Accommodation to Flight Attendants, Regardless of the Basis for the Accommodation Request

In her Charge, Ms. Schwartzkopf takes issue with the fact that Frontier does not assign flight attendants to a temporary light duty position to accommodate their stated need to express breast milk. Charge ¶¶ 13, 36(b)-(c), 38(d). Ms. Schwartzkopf's claim here also fails.

As an initial matter, the CBA does not require, and Frontier's policies and practices do not provide for, temporary light duty assignments (either at Frontier's corporate office or at any airport) for any flight attendant (male or female) unable to fly due to: (a) an on-the-job injury; (b) a non-work related injury; or (c) any other medical condition or disability. Ms. Schwartzkopf is simply wrong when she claims that Frontier provides "'light/modified duty' to individuals who are injured on the job. . . ." Charge at ¶ 13 (citing CBA Art. 12(H)(2)). Rather, Article 12, Section H(2) of the CBA only provides that "[t]he first three days of OJI may be covered by sick days, or the Flight Attendant may immediately be assigned light/modified duty," *id.* (emphasis added)—not that Frontier is required to provide these accommodations. By its own terms, the CBA does not require reassignment to light duty, and, in fact, Frontier's policy is not to grant light/modified duty to any flight attendant unable to fly due to a medical condition, regardless of the nature of the medical condition.

Ms. Schwartzkopf appears to demand that the EEOC treat pregnant flight attendants and flight attendants seeking to express breast milk more favorably than other flight attendants similar in their ability or inability to work. There is no support for that demand in the relevant law, including the EEOC's guidance interpreting the same. *See Adams v. Potter*, 193 F. App'x 440, 445 (6th Cir. 2006) ("accommodations are not reasonable if they would usurp the legitimate rights of other employees in a collective bargaining agreement") (citation and internal quotation omitted).

According to the EEOC's Enforcement Guidance on Pregnancy Discrimination and Related Issues, in enacting the PDA:

Page 63

Case 1:21-mc-00191-DDD-SKC Document 2-3 Filed 09/30/21 USDC Colorado Page 65 of 101

Justin Moore
December 8, 2017
Page 9

> Congress sought to make clear that 'pregnant women who are able to work must be permitted to work on the same conditions as other employees; and, when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working.' The PDA requires [only] that pregnant employees be treated the same as non-pregnant employees who are similar in their ability or inability to work.

Enforcement Guidance: Pregnancy Discrimination and Related Issues, 2015 WL 4162723, at *2 (EEOC Notice No. 915.003) (June 25, 2015) (emphasis added).

Further, in *Young*, the United States Supreme Court held that to succeed on a claim that the denial of an accommodation constitutes disparate treatment under the PDA, the plaintiff must show, among other things, "that she sought [an] accommodation, that the employer did not accommodate her, and that the employer did accommodate others 'similar in their ability or inability to work.'" 135 S. Ct. at 1354. Here, as discussed, Ms. Schwartzkopf cannot establish that she was denied an accommodation at all. However even if she had been denied a temporary duty assignment, she cannot show such an accommodation has been provided to other flight attendants. Accordingly, she cannot set forth a *prima facie* case of discrimination. *See Wade v. Brennan*, 647 F. App'x 412, 417 (5th Cir. 2016) (denying Title VII claim where complainant "failed to show [temporary reassignment position] was an existing position, so reassignment there would necessarily require [employer] to create a new position for her, which is not a reasonable accommodation").

## 5. Expression of Breast Milk During Flight Is a Safety Hazard

As an experienced flight attendant, Ms. Schwartzkopf must know that expressing breast express milk during flight in the aircraft galley or the lavatory is not a viable option given the safety issues that inevitably arise in the performance of a flight attendant's duties. Taking extended breaks during a flight necessarily would place the welfare of Frontier's passengers as well as Ms. Schwartzkopf's colleagues flying on the aircraft at risk. Indeed, airlines are for that very reason exempted from the provisions of the Fair Labor Standards Act requiring break time. *See Thibodeaux v. Exec. Jet Int'l, Inc.*, 328 F.3d 742, 754 (5th Cir. 2003) (confirming that "the FLSA exempts the company's flight attendants from its overtime requirements"); 29 U.S.C.A. § 213(b)(3) (West).

As one example of the safety issues at play, on an Airbus 319 airplane, in addition to the two pilots, there are three flight attendants and approximately 150 passengers in flight. If a flight attendant is relieved of the performance of her duties for an extended period—to express breastmilk or otherwise—the other two flight attendants must deviate from their regular course of duty, which, in the event of a security incident, would allow for the passengers to more significantly outnumber the remaining crewmembers. Indeed, a flight attendant's essential job duties include a number of safety-related functions that would be rendered impossible or impracticable if a flight attendant were permitted to express breast milk while onboard an aircraft, including "conduct[ing] emergency evacuation of cabin if necessary," "conduct[ing] preflight safety check of cabin emergency equipment," "ensur[ing] cabin safety and security

Page 64

during all phases of flight, including boarding and deplaning," and "provid[ing] emergency medical assistance." *See* Exhibit A (Flight Attendant Job Description).

Accordingly, Frontier flight attendants are not permitted to express breast milk during flight for the legitimate, non-discriminatory reason that doing so risks flight safety, something Frontier is not willing to compromise. *Young*, 135 S. Ct. at 1343-44 (finding that if an employee can articulate a *prima facie* case of pregnancy discrimination, which Frontier does not concede, an employer successfully meets its burden upon a showing of legitimate, non-discriminatory reasons for its decision to not grant the accommodation requested).

### 6. Ms. Schwartzkopf's Claims that Frontier Did Not Offer Her Any Accommodations Are False

Lastly, Ms. Schwartzkopf suggests in her Charge that Frontier did not offer her any accommodations at all in connection with her expression of breast milk, which is contradicted by her own admission that she went on a reduced schedule while lactating.

While Frontier is unwilling to compromise flight safety, it does provide flight attendants who are breastfeeding their newborn child with the opportunity to work a reduced schedule, which is a special accommodation that is not available to other flight attendants. Specifically, the CBA requires that "[a]t the completion of each Bid Period each Flight Attendant must accumulate a minimum of 60 credit hours." *See* Exhibit B (CBA) at Art. 5 § L(1). However, Frontier allows flight attendants who are lactating the accommodation of dropping below 60 hours per month without having to restore those hours, and only having to meet a minimum of 45 hours. This allows lactating women returning to work the opportunity to work fewer hours, be on the schedule for fewer days, and bid for flights in a manner that allows them to be at home with their child more often. During the relevant time period, each time a flight attendant has made a request to work a reduced schedule to accommodate breastfeeding, Frontier has granted the accommodation requested by the flight attendant. Indeed, by her own admission, Ms. Schwartzkopf requested and was granted this accommodation. Charge at ¶ 27. This was the only accommodation she requested relating to her flight duties. *Id.* at ¶ 26.

## III. LEGAL ANALYSIS

In her Charge, Ms. Schwartzkopf contends she was discriminated against based on her sex in violation of Title VII (as amended by the PDA), the ADA, the CADA, and the PWFA. Since she does not offer direct evidence of discrimination to support these claims, her allegations of discrimination must be analyzed under the *McDonnell Douglas* burden-shifting framework. A plaintiff alleging that the denial of an accommodation constituted disparate treatment under the PDA establishes a *prima facie* case by showing that: (1) she is a member of a protected class; (2) she sought an accommodation and the employer did not accommodate her; and, (3) the employer did accommodate others similar in their ability or inability to work. *Young*, 135 S. Ct. at 1354. If a plaintiff can make this showing, then the "employer may then seek to justify its refusal to accommodate the plaintiff by relying on legitimate, non-discriminatory reasons for denying her accommodation." *Id.* "If the employer offers an apparently legitimate, non-discriminatory reason for its actions," the burden then shifts back to the plaintiff to "show that that employer's proffered reasons are in fact pretextual." *Id.*

Justin Moore
December 8, 2017
Page 11

For the reasons set forth above, with respect to her timely claims of discrimination, Ms. Schwartzkopf cannot meet her *prima facie* case because she cannot demonstrate that she sought an accommodation that Frontier did not grant to her, but provided others similar in their ability to work or not work. Indeed, by her own admission, Frontier approved her one and only request for accommodation relating to her flight duties: it approved her request to work reduced hours during May and June, 2017. Charge at ¶ 27. As to the other potential accommodations referenced by Ms. Schwartzkopf, she cannot show that Frontier provides such accommodations to any other flight attendant; in fact, it does not.

Accordingly, Ms. Schwartzkopf's discrimination claim fails as a matter of law at the outset, as she cannot even establish her *prima facie* case. What's more, Ms. Schwartzkopf herself was never denied a request for accommodation. As to the potential accommodations Ms. Schwartzkopf alleges Frontier denies to other flight attendants, Frontier's decision to adhere to the provisions of the CBA and to treat all flight attendants similar in their ability or inability to work the same is evidence that its business decisions are legitimate and non-discriminatory.

In summary, Ms. Schwartzkopf's allegations are without legal merit.

## IV. CONCLUSION

For the reasons detailed above, Ms. Schwartzkopf has not been subject to any form of discrimination. Rather, Frontier has treated her fairly and lawfully at all times. Accordingly, the company respectfully requests that Ms. Schwartzkopf's Charge be dismissed with a finding of "no probable cause." Please do not hesitate to contact me if you require any further information.

Sincerely,

*s/Erin A. Webber*
Erin A. Webber

EAW/dpg

Enclosures



Littler Mendelson, PC
1900 Sixteenth Street
Suite 800
Denver, CO 80202

Erin A. Webber
303.362.2851 direct
303.629.6200 main
303.362.8427 fax
ewebber@littler.com

December 8, 2017

## VIA ELECTRONIC SUBMISSION

Justin Moore
Federal Investigator
U.S. Equal Employment Opportunity Commission
Denver Field Office
303 East 17th Avenue
Suite 410
Denver, CO 80203

Re: Respondent's Position Statement
*Melissa Hodgkins v. Frontier Airlines, Inc.*
EEOC Charge No. 541-2018-00056

Dear Mr. Moore:

I am writing on behalf of Respondent Frontier Airlines, Inc. ("Frontier") in response to the Charge of Discrimination filed by Melissa Hodgkins on or about October 5, 2017. In her Charge, Ms. Hodgkins alleges to have suffered discrimination based on "sex, pregnancy, childbirth. . .disability," "pregnancy-related disability," and a "condition related to my pregnancy and childbirth – specifically, lactation" in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA"), the Americans with Disabilities Act ("ADA"), the Colorado Antidiscrimination Act ("CADA"), and the Colorado Pregnant Workers Fairness Act ("PWFA").[1]  Ms. Hodgkins further alleges that Frontier violated the Colorado Workplace Accommodations for Nursing Mothers Act ("WANMA") by not providing adequate break time and/or space for expressing breast milk.

At the outset, as Ms. Hodgkins acknowledges in her Charge, *see* Charge at ¶ 36 n.1, the Equal Employment Opportunity Commission ("EEOC") does not have jurisdiction over WANMA claims. Accordingly, Frontier's response addresses only Ms. Hodgkins' discrimination-based claims under Title VII (as amended by the PDA), the ADA, CADA, and the PWFA.[2]  To the

_____

[1] On her EEOC Form 5, Ms. Hodgkins additionally checked the box for "Retaliation" where asked to identify the basis of her Charge (in addition to "Sex" and "Disability"). Ms. Hodgkins makes no mention of retaliation in the statement of harm attached to the Form 5, however, and does not address any claim of retaliation substantively.  Frontier for that reason has not included a discussion of retaliation in this position statement.

[2] Since CADA claims (inclusive of the PWFA, which amended CADA) are analyzed under the same framework as Title VII and ADA claims, please allow the analysis in this position statement to also serve as a legal analysis of CADA pregnancy and disability discrimination claims. *St. Croix v. Univ. of Colo.*

Page 67

Justin Moore
December 8, 2017
Page 2

extent the EEOC believes it has jurisdiction to investigate the allegations referenced in the Charge regarding WANMA, Frontier respectfully requests the opportunity to supplement this position statement to address such allegations.[3]

## I.   INTRODUCTION

Frontier denies any allegation that it discriminated against Ms. Hodgkins in violation of Title VII, as amended by the PDA, the ADA, the CADA, the PWFA, or any other law. In fact, as detailed below, Frontier treated Ms. Hodgkins, all pregnant flight attendants, and those flight attendants wishing to express breast milk upon their return to work lawfully; in compliance with applicable law; in compliance with the collectively bargained agreement governing relevant terms and conditions of a Frontier flight attendant's employment; in accordance with its standard practices; and, most importantly, consistently with how it accommodates all flight attendants (both male and female) who are similar in their ability to work or not work.

Ms. Hodgkins' Charge demands that Frontier treat pregnant flight attendants and those flight attendants seeking to express breast milk upon their return to work <u>more favorably</u> than all other flight attendants and as required by federal and state law. For example, Ms. Hodgkins seeks paid leave as one accommodation for flight attendants who are pregnant or lactating. Charge at ¶ 36(c). But under the terms of the collective bargaining agreement Frontier entered into with the flight attendants' union—of which Ms. Hodgkins is a member—all medical leaves of absence are unpaid. Moreover, Title VII as amended by the PDA, the Family and Medical Leave Act (FMLA), and the ADA do not require a leave of absence to be paid, nor does any Colorado state law. Thus, were Frontier to pay flight attendants for medical leave related to their pregnancy (beyond use of accrued paid leave), Frontier would be treating them more favorably than all other flight attendants operating under the collective bargaining agreement on leaves of absence.

Likewise, Ms. Hodgkins contends that Frontier's dependability policy is discriminatory against pregnant flight attendants and flight attendants who take medical leave after giving birth.  *Id.* at ¶ 36(d).  However, the dependability policy is applied equally to all flight attendants, whether pregnant or not, and thus it is not discriminatory. Frontier's dependability policy fully complies with federal and Colorado state law in all respects. Again, if Ms. Hodgkins were to be excused from its requirements, then Frontier would be treating her more favorably than all other flight attendants who are similar in their ability to work or not work.

---

*Health Scis., Ctr.*, 166 P.3d 230, 236 (Colo. Ct. App. 2007) (citing *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399 (Colo. 1997) (stating Colorado courts "look to federal cases for guidance on applying" the CADA).

[3] This position statement is based on Frontier's understanding of Ms. Hodgkins' allegations to the best of its knowledge and recollection as of the date of this document. Frontier expressly reserves the right to amend, supplement, or correct this position statement, if necessary. In addition, this position statement and the accompanying exhibits, which contain confidential personnel, medical and business information, are subject to the exceptions to the disclosure requirements of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7). All information provided herein, including this position statement, is provided solely in cooperation with the EEOC's fact-finding efforts. Frontier reserves all objections to the admissibility at any hearing, trial, or other proceeding of any of the information or documents provided to the EEOC.

Justin Moore
December 8, 2017
Page 3

Ms. Hodgkins further contends that the fact that she was not offered a temporary reassignment to "light or modified duty" as an accommodation for her pregnancy or desire to express breast milk upon her return to work is evidence of discrimination — but without alleging in her Charge that she ever requested a temporary reassignment.[4]  Charge ¶¶ 36(b)-(c).  In any event, this argument falls flat because Frontier does not provide temporary light duty assignments as an accommodation to any flight attendant for a medical condition.  Moreover, despite Ms. Hodgkins' unfounded allegations, Frontier has no obligation under the CBA or any other law or policy to provide this accommodation to flight attendants (male or female) who cannot fly due to: (a) an on-the-job injury; (b) a non-work related injury; or (c) any other medical condition or disability.  Put another way, Frontier treats Ms. Hodgkins the same as all other flight attendants who are similar in their ability to work or not work.

Ms. Hodgkins also takes issue with the fact that Frontier has allegedly informed other flight attendants they could not express breast milk in the galley during flight.  Charge at ¶ 16.  Ms. Hodgkins' focus on lactation is premature on its face and not ripe for review, as she is currently still pregnant.  However, as to the merits of this allegation, it is beyond question that a flight attendant leaving her duties for a material period of time during flight—to express breast milk or for any other reason—creates a safety risk and compromises the welfare of passengers and crew members.  For this reason, Frontier has not provided any flight attendant with the accommodation to stop working while on a flight for an extended period of time due to any medical condition or disability.  Not only does Frontier have a legitimate, non-discriminatory reason for its safety decisions in this regard, but Ms. Hodgkins cannot demonstrate that Frontier provided this accommodation to other flight attendants similar in their ability or inability to work for an entire flight.

In summary, Frontier believes that this position statement and the evidence submitted herewith demonstrate that it has acted lawfully at all times.  Accordingly, it respectfully requests that the EEOC issue a no probable cause finding with respect to Ms. Hodgkins' Charge.

## II.  FACTUAL BACKGROUND

### A.  General Information Relating to Ms. Hodgkins' Employment

In or about May 2007, Ms. Hodgkins began her employment with Frontier as a flight attendant, a position she continues to hold as of the date of this position statement.  As a Flight Attendant, Ms. Hodgkins is "essential to maintaining the well-being, safety, security and comfort of [Frontier's] passengers onboard [its] aircraft," and she must "follow established FAA and Frontier guidelines in providing for the comfort and safety of passengers and respond to inflight

---

[4] Notably, Ms. Hodgkins admits that she did not in fact, as of the date of her Charge, request any accommodations relating to her pregnancy or impending return to work, other than her request for fourteen weeks of extended leave beyond FMLA leave.  Charge at ¶¶ 25, 29.  Instead, she bases her Charge on assumptions regarding what Frontier might or might not have granted in terms of accommodations.  With respect to her Charge allegations, then, it is unlikely that she has standing to bring claims for failure to provide such accommodations.  Nevertheless, in the interest of completeness, Frontier will address the merits of Ms. Hodgkins' claims in full.

emergencies and/or security concerns . . . ." Exhibit A (Flight Attendant Job Description). A
flight attendant's job description's emphasis on safety is consistent with the fact that, while
Frontier prides itself on being an ultra-low cost carrier, the company views its primary mission
as ensuring the safety of its customers and employees. Thus, while serving more than 40 cities
in the United States, Mexico, and the Caribbean on over 275 daily flights, Frontier never loses
sight that its principal responsibility is to ensure that passengers and employees are safely
delivered to their destination.

Upon her acceptance of employment as a Flight Attendant, Ms. Hodgkins voluntarily
joined the Association of Flight Attendants-CWA AFL-CIO ("AFA"), the union that represents
Frontier flight attendants and is responsible for promoting the interests of its members. *See*
Charge at ¶ 7. Importantly, AFA and Frontier negotiated the Frontier Airlines Flight Attendant
Contract ("CBA"), which sets forth the terms of employment and working conditions for Frontier
flight attendants. The CBA specifically addresses, among other things, seniority, scheduling,
staffing adjustments, leaves of absence and medical standards. Exhibit B (Relevant Provisions
of the CBA). Accordingly, its provisions are material to an assessment of Ms. Hodgkins'
allegations.

In her Charge, Ms. Hodgkins contends she was discriminated against in violation of Title
VII (as amended by the PDA) and the ADA (and, by extension, the CADA and the PWFA) in
connection with her pregnancy in 2017. Although not yet ripe for review, Ms. Hodgkins also
complains of Frontier's practices as they relate to flight attendants who are lactating. As of the
filing of her charge on October 5, 2017, Ms. Hodgkins was scheduled for a Cesarean Section on
December 14, 2017, to be followed by medical leave through January 31, 2018, which would
represent the remaining FMLA leave Ms. Hodgkins had available to her at the time. *Id.* at §
12(F); Charge at ¶ 4.

## B. Response to Ms. Hodgkins' Allegations with Respect to Her Pregnancy and Post-Pregnancy

In her Charge, with respect to pregnancy and post-pregnancy, Ms. Hodgkins takes issue
with the fact that Frontier does not provide "workplace accommodations related to pregnancy
and breastfeeding," including "paid leave, temporary job assignments, schedule modifications,
medically necessary breaks, or private, sanitary, and accessible facilities to express breast milk."
Charge at ¶ 36(c). She also takes issue with Frontier's dependability policy concerning
attendance, and Frontier's policy requiring immediate notification of pregnancy. *Id.* at ¶¶
36(d)-(e). These claims are unavailing under the law.

### 1. Pregnancy and Lactation Are Not Disabilities Covered Under the ADA

Ms. Hodgkins' ADA (and disability-related-CADA) claims must fail because neither
pregnancy nor lactation is a disability protected under the ADA or the CADA.

It is well-established that pregnancy is not a disability under the ADA. *E.g., Genovese v.
Harford Health & Fitness Club, Inc.*, No. WMN-13-217, 2013 WL 2490270, at *5 (D. Md. June 7,
2013) (collecting authorities and noting that "[w]ith near unanimity, federal courts have held
that pregnancy [alone] is not a 'disability' under the ADA") (citations and internal quotations

omitted); *Richards*, 173 F.3d at 1250 (affirming that "pregnancy d[oes] not qualify as a disability under the ADA"); *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 899 (10th Cir. 1997) (holding that "impairment [within the meaning of the ADA] does not include . . . pregnancy" where a pilot claimed disability discrimination on the basis of pregnancy).

Lactation is likewise not a disability under the ADA. *See Mayer v. Prof'l Ambulance, LLC*, 211 F. Supp. 3d 408, 420 (D.R.I. 2016) (in a case involving an employer's denial of lactation breaks, concluding that normal medical conditions related to "post-pregnancy do not qualify as a disability," and noting the lack of any "any cases post-2008 amendment [to the ADA] holding that normal lactation is a disability"); *Martinez v. N.B.C. Inc.*, 49 F. Supp. 2d 305, 308 (S.D.N.Y. 1999) (pregnancy and related medical conditions are not "disabilities" for purposes of the Americans with Disabilities Act, and the employer did not need to accommodate the plaintiff's desire to use a breast pump in the workplace).

Because pregnancy and post-pregnancy conditions such as lactation are not covered under the ADA, to the extent Ms. Hodgkins' Charge asserts a violation of the ADA, Charge at ¶¶ 36, 39, her claims are without merit.

### 2. All Medical Leaves of Absence Provided to Flight Attendants Are Unpaid

The terms and conditions of the leaves of absence policies about which Ms. Hodgkins complains are set forth in the CBA. They were collectively bargained for by AFA and on behalf of Ms. Hodgkins, who voluntarily agreed to be a part of the union. Though the Charge consistently refers to the leaves of absence policies (and other policies) to which Ms. Hodgkins is subject to as "Frontier's policies," *e.g.*, Charge ¶¶ 1, 34, 36, 38, 39 (referring to a number of policies covered under the CBA as "Frontier's policies"), this fails to inform the EEOC that Ms. Hodgkins' interests were represented by AFA and accounted for in the determination of the scope of these policies. Moreover, "[i]t is well-established that Title VII does not require an employer to violate the terms of a collective bargaining agreement," so to the extent Ms. Hodgkins asks Frontier to act in ways contrary to the CBA, these requests must fail. *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 317 (4th Cir. 2008); *see Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 79 (1977) (holding that "the duty to accommodate [does not] require[] [an employer] to take steps inconsistent with [an] otherwise valid [collective bargaining] agreement").

That aside, Ms. Hodgkins cites "paid leave" as one of the accommodations Frontier allegedly could provide pregnant and lactating flight attendants. Charge ¶ 36(c). But the CBA does not provide for a paid leave of absence for flight attendants unable to fly due to any type of medical condition. Under the CBA, Frontier provides flight attendants with the following types of medical leave:

Justin Moore
December 8, 2017
Page 6

        (a)     <u>Family Medical Leave</u>: governed "under the Family Medical Leave Act," which does not provide for paid leave, *id.* at 12(E)(1);

        (b)     <u>Maternity Leave</u>: "Sick leave must be used, and vacation days may be used, during the maternity leave; otherwise, <u>the leave is without pay</u>," *id.* at 12(F)(3) (emphasis added); and,

        (c)     <u>Medical Leave</u>: "A Flight Attendant may request an <u>unpaid</u> leave of absence for his/her own illness or injury when he/she cannot return to work after exhausting FMLA leave or if he/she is not eligible for FMLA," *id.* at 12(G)(6) (emphasis added).

Nowhere in the CBA does it provide that a flight attendant shall be paid in connection with any of the foregoing leaves of absence, other than to the extent the flight attendant wishes to be paid from accrued sick leave or vacation time. As for Ms. Hodgkins, her leave is being handled exactly as provided by the CBA. Having bargained for this benefit in the CBA, Ms. Hodgkins cannot now complain that the very same policies discriminate against her. *See Hardison*, 432 U.S. at 79.

Accordingly, the fact that Frontier does not pay flight attendants on a leave in connection with their pregnancy or birth of a child cannot be deemed discriminatory where, as here, the company does not pay any flight attendant (male or female) on a leave of absence for non-pregnancy-related medical conditions. *See Young v. UPS*, 135 S. Ct. 1338, 1343-44 (2015).

### 3. The Dependability Policy Is Not Discriminatory

Ms. Hodgkins further alleges that Frontier's dependability policy itself is discriminatory. Charge at ¶ 36(d); *See* <u>Exhibit C</u> (Employee Handbook) at Art. 12. This claim is unfounded for multiple reasons.

First, as discussed above, neither pregnancy nor the need to express milk for lactation purposes is considered a "disability" under the ADA. Thus, to the extent that Ms. Hodgkins claims that Frontier's application of its dependability policy was a violation of the ADA, her claim must fail. Charge at ¶ 36(d).

Second, the dependability policy is applied equally to all similarly situated employees, and Ms. Hodgkins does not claim otherwise. Thus, the dependability policy is not discriminatory against pregnant women under Title VII (as amended by the PDA). *See Manning v. Swedish Med. Ctr.*, No. C15-0949 (JLR) 2016 WL 6216364, at *8 (W.D. Wash. Sept. 30, 2016) (denying Title VII discrimination claim where "[t]here is no evidence . . . to support that [employer] treated [claimant] differently from other employees" under the "Dependability Policy"); *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002) (absentee policy that is applied equally to "pregnant or post-partum employees" and "non-pregnant employees" is permitted).

Third, to the extent that Ms. Hodgkins argues that the dependability policy is discriminatory because pregnancy-related leaves of absence "freeze the twelve-month clock for purposes of permitting points to 'roll off,'" Charge at ¶ 12, the policy is entirely non-

discriminatory in that it expressly includes all leaves of absence, including "Military, Medical, Personal, Workers' Comp, FMLA, STD, etc." *See* Exhibit C (Employee Handbook), at Art. 12.05.1.3. Thus, the policy in no way discriminates against pregnant or post-pregnant women; it applies equally to all employees regardless of the type of leave taken.

### 4. Frontier Does Not Provide Temporary Light Duty Assignments as an Accommodation to Flight Attendants, Regardless of the Basis for the Accommodation Request

In her Charge, Ms. Hodgkins takes issue with the fact that Frontier does not assign flight attendants to a temporary light duty position to accommodate their stated need to express breast milk. Charge ¶¶ 15, 34, 36(b)-(c), 38(d). Ms. Hodgkins' claim here also fails.

As an initial matter, the CBA does not require, and Frontier's policies and practices do not provide for, temporary light duty assignments (either at Frontier's corporate office or at any airport) for any flight attendant (male or female) unable to fly due to: (a) an on-the-job injury; (b) a non-work related injury; or (c) any other medical condition or disability. Ms. Hodgkins is simply wrong when she claims that Frontier provides "'light/modified duty' to individuals who are injured on the job. . . ." Charge at ¶¶ 13 (citing CBA Art. 12(H)(2)). Rather, Article 12, Section H(2) of the CBA only provides that "[t]he first three days of OJI may be covered by sick days, or the Flight Attendant may immediately be assigned light/modified duty," *id.* (emphasis added)—not that Frontier is required to provide these accommodations. By its own terms, the CBA does not require reassignment to light duty, and, in fact, Frontier's policy is not to grant light/modified duty to any flight attendant unable to fly due to a medical condition, regardless of the nature of the medical condition.

Ms. Hodgkins appears to demand that the EEOC treat pregnant flight attendants and flight attendants seeking to express breast milk more favorably than other flight attendants similar in their ability or inability to work. There is no support for that demand in the relevant law, including the EEOC's guidance interpreting the same. *See Adams v. Potter*, 193 F. App'x 440, 445 (6th Cir. 2006) ("accommodations are not reasonable if they would usurp the legitimate rights of other employees in a collective bargaining agreement") (citation and internal quotation omitted).

According to the EEOC's Enforcement Guidance on Pregnancy Discrimination and Related Issues, in enacting the PDA:

> Congress sought to make clear that 'pregnant women who are able to work must be permitted to work on the same conditions as other employees; and, when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working.' The PDA requires [only] that pregnant employees be treated the same as non-pregnant employees who are similar in their ability or inability to work.

Enforcement Guidance: Pregnancy Discrimination and Related Issues, 2015 WL 4162723, at *2 (EEOC Notice No. 915.003) (June 25, 2015) (emphasis added).

Further, in *Young*, the United States Supreme Court held that to succeed on a claim that the denial of an accommodation constitutes disparate treatment under the PDA, the plaintiff must show, among other things, "that she sought [an] accommodation, that the employer did not accommodate her, and that the employer did accommodate others 'similar in their ability or inability to work.'" 135 S. Ct. at 1354. Here, as discussed, Ms. Hodgkins cannot establish that she was denied an accommodation at all. However even if she had been denied a temporary light duty assignment, she cannot show such an accommodation has been provided to other flight attendants. Accordingly, she cannot set forth a *prima facie* case of discrimination. *See Wade v. Brennan*, 647 F. App'x 412, 417 (5th Cir. 2016) (denying Title VII claim where complainant "failed to show [temporary reassignment position] was an existing position, so reassignment there would necessarily require [employer] to create a new position for her, which is not a reasonable accommodation").

## 5. Expression of Breast Milk During Flight Is a Safety Hazard

As an experienced flight attendant, Ms. Hodgkins must know that expressing breast milk during flight in the aircraft galley or the lavatory is not a viable option given the safety issues that inevitably arise in the performance of a flight attendant's duties. Taking extended breaks during a flight necessarily would place the welfare of Frontier's passengers as well as Ms. Hodgkins' colleagues flying on the aircraft at risk. Indeed, airlines are for that very reason exempted from the provisions of the Fair Labor Standards Act requiring break time. *See Thibodeaux v. Exec. Jet Int'l, Inc.*, 328 F.3d 742, 754 (5th Cir. 2003) (confirming that "the FLSA exempts the company's flight attendants from its overtime requirements"); 29 U.S.C.A. § 213(b)(3) (West).

As one example of the safety issues at play, on an Airbus 319 airplane, in addition to the two pilots, there are three flight attendants and approximately 150 passengers in flight. If a flight attendant is relieved of the performance of her duties for an extended period—to express breastmilk or otherwise—the other two flight attendants must deviate from their regular course of duty, which, in the event of a security incident, would allow for the passengers to more significantly outnumber the remaining crewmembers. Indeed, a flight attendant's essential job duties include a number of safety-related functions that would be rendered impossible or impracticable if a flight attendant were permitted to express breast milk while onboard an aircraft, including "conduct[ing] emergency evacuation of cabin if necessary," "conduct[ing] preflight safety check of cabin emergency equipment," "ensur[ing] cabin safety and security during all phases of flight, including boarding and deplaning," and "provid[ing] emergency medical assistance." *See* Exhibit A (Flight Attendant Job Description).

Accordingly, Frontier flight attendants are not permitted to express breast milk during flight for the legitimate, non-discriminatory reason that doing so risks flight safety, something Frontier is not willing to compromise. *Young*, 135 S. Ct. at 1343-44 (finding that if an employee can articulate a *prima facie* case of pregnancy discrimination, which Frontier does not concede, an employer successfully meets its burden upon a showing of legitimate, non-discriminatory reasons for its decision to not grant the accommodation requested).

Justin Moore
December 8, 2017
Page 9

## III.  LEGAL ANALYSIS

In her Charge, Ms. Hodgkins contends she was discriminated against based on her sex in violation of Title VII (as amended by the PDA), the ADA, the CADA, and the PWFA. Since she does not offer direct evidence of discrimination to support these claims, her allegations of discrimination must be analyzed under the *McDonnell Douglas* burden-shifting framework.  A plaintiff alleging that the denial of an accommodation constituted disparate treatment under the PDA establishes a *prima facie* case by showing that:  (1) she is a member of a protected class; (2) she sought an accommodation and the employer did not accommodate her; and, (3) the employer did accommodate others similar in their ability or inability to work.  *Young*, 135 S. Ct. at 1354.  If a plaintiff can make this showing, then the "employer may then seek to justify its refusal to accommodate the plaintiff by relying on legitimate, non-discriminatory reasons for denying her accommodation."  *Id.*  "If the employer offers an apparently legitimate, non-discriminatory reason for its actions," the burden then shifts back to the plaintiff to "show that that employer's proffered reasons are in fact pretextual."  *Id.*

For the reasons set forth above, with respect to her claims of discrimination, Ms. Hodgkins cannot meet her *prima facie* case because she cannot demonstrate that she sought an accommodation that Frontier did not grant to her, but provided others similar in their ability to work or not work.  With respect to leave, Ms. Hodgkins acknowledges that Frontier granted her 10 weeks of her remaining FMLA leave, through January 31, 2018.   Charge at ¶ 29.  She asserts, however, that Frontier somehow implicitly denied her medical provider's request for additional leave.  *Id.*  Not so.  Ms. Hodgkins may apply for additional Medical Leave under the terms of the CBA, and will be granted such leave in accordance with the CBA with the proper medical certification that she has a pregnancy-related need for the leave.

Accordingly, Ms. Hodgkins' discrimination claim fails as a matter of law at the outset, as she cannot even establish her *prima facie* case.  What's more, Frontier's decision to adhere to the provisions of the CBA and to treat all flight attendants in their ability or inability to work the same is evidence that its business decisions were legitimate and non-discriminatory.

In summary, Ms. Hodgkins' allegations are without legal merit.

## IV.  CONCLUSION

For the reasons detailed above, Ms. Hodgkins has not been subject to any form of discrimination.  Rather, Frontier has treated her fairly and lawfully at all times.  Accordingly, the company respectfully requests that Ms. Hodgkins' Charge be dismissed with a finding of "no probable cause."  Please do not hesitate to contact me if you require any further information.

Sincerely,

*s/Erin A. Webber*
Erin A. Webber

EAW/dpg

Enclosures



**Littler Mendelson, P.C.**
1900 Sixteenth Street
Suite 800
Denver, CO  80202

Danielle L. Kitson
303.362.2872 direct
303.629.6200 main
dkitson@littler.com

August 21, 2018

**VIA ELECTRONIC SUBMISSION**

Justin Moore
Federal Investigator
U.S. Equal Employment Opportunity Commission
Denver Field Office
303 East 17th Avenue
Suite 410
Denver, CO 80203

Re:     Respondent's Position Statement
         *Heather Crowe v. Frontier Airlines, Inc.*
         EEOC Charge No. 541-2018-02436

Dear Mr. Moore:

Please accept the following letter and the attachments hereto as the Position Statement of Respondent Frontier Airlines, Inc. ("Frontier" or the "Company") in response to the above-referenced Charge of Discrimination ("Charge") filed by Heather Crowe on or about June 15, 2018.[1]   We are providing this information to the Equal Employment Opportunity Commission

---

[1] This Position Statement is based on Frontier's understanding of Ms. Crowe's allegations to the best of its knowledge and recollection as of the date of this document.   The information and supporting documentation contained herein are based upon Frontier's understanding of the facts and the information reviewed thus far.   Frontier expressly reserves the right to amend, supplement, or correct this position statement, if necessary.   Although there has not been an opportunity for formal discovery or a complete formal investigation, this response is submitted for the purpose of aiding the Commission in its investigation, and facilitating the informal resolution of these matters.   This response, while believed to be accurate, does not constitute an affidavit or a binding statement of Frontier's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with the allegations.   Frontier reserves all objections to the admissibility at any hearing, trial, or other proceeding of any of the information or documents provided to the EEOC.   All information provided herein, including this Position Statement, is provided solely in cooperation with the EEOC's fact-finding efforts.   Since additional facts likely would be uncovered through discovery or following a full investigation, Frontier in no way waives its right to present new or additional information at a later date, for substance or clarification.   Moreover, by responding to this Charge, Frontier does not waive, and hereby preserves, any and all substantive and procedural defenses that may exist to the Charge and Ms. Crowe's allegations.   In addition, this position statement and the accompanying exhibits, which contain confidential personnel, medical and business information, are subject to the exceptions to the

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Justin Moore
August 21, 2018
Page 2

("EEOC" or the "Commission") in accordance with F.R.E. 408 and C.R.E. 408 to assist the Commission in effecting a dismissal of the Charge, and it should not be considered for any other purpose. Also, Frontier provides this response based on the information currently available to it, and reserves the right to revise, withdraw, or add to this response in the future.

In her Charge, Ms. Crowe alleges to have suffered discrimination based on "pregnancy," "pregnancy-related disabilities," her "sex," and "a condition related to [her] pregnancy and childbirth – specifically, lactation" in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"),[2] the Colorado Antidiscrimination Act ("CADA"), and the Colorado Pregnant Workers Fairness Act ("PWFA").[3]   Ms. Crowe further alleges that Frontier violated the Colorado Workplace Accommodations for Nursing Mothers Act ("WANMA") by not providing adequate break time and/or space for expressing breast milk.

At the outset, Ms. Crowe acknowledges in her Charge that the EEOC does not have jurisdiction over WANMA claims.  *See* Charge at n.1.  Accordingly, Frontier's response addresses only Ms. Crowe's discrimination-based claims under Title VII (as amended by the PDA), the ADA, CADA, and the PWFA.[4]  To the extent the EEOC believes it has jurisdiction to investigate the allegations referenced in the Charge regarding WANMA, Frontier respectfully requests the opportunity to supplement this position statement to address such allegations.

## I.   INTRODUCTION

Frontier denies any allegation that it discriminated against Ms. Crowe in violation of Title VII, as amended by the PDA, the ADA, the CADA, the PWFA, or any other law.  In fact, as detailed below, Frontier treated Ms. Crowe, all pregnant flight attendants, and those flight

---

disclosure requirements of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7).  Frontier also requests that any efforts to contact its current managers be directed through its counsel.

[2] While Ms. Crowe references the ADA, and discusses "pregnancy-related disabilities" in the statement of harm attached to her EEOC Form 5, Ms. Crowe did not allege that she suffered disability discrimination on her EEOC Form 5.  Nonetheless, as demonstrated in this Position Statement, any claim for disability discrimination would necessarily fail.

[3] On her EEOC Form 5, Ms. Crowe additionally checked the box for "Retaliation" where asked to identify the basis of her Charge (in addition to "Sex").  Ms. Crowe makes no mention of retaliation in the statement of harm attached to the Form 5, however, and does not address any claim of retaliation substantively.  Frontier for that reason has not included a discussion of retaliation in this Position Statement.

[4] Since CADA claims (inclusive of the PWFA, which amended CADA) are analyzed under the same framework as Title VII and ADA claims, please allow the analysis in this position statement to also serve as a legal analysis of CADA pregnancy and disability discrimination claims.  *St. Croix v. Univ. of Colo. Health Scis., Ctr.*, 166 P.3d 230, 236 (Colo. Ct. App. 2007) (citing *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399 (Colo. 1997) (stating Colorado courts "look to federal cases for guidance on applying" the CADA).

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Justin Moore
August 21, 2018
Page 3

attendants wishing to express breast milk upon their return to work lawfully; in compliance with the collectively bargained agreement governing relevant terms and conditions of a Frontier flight attendant's employment; in accordance with its standard practices; and, most importantly, consistent with how it accommodates all flight attendants (both male and female) who are similar in their ability to work or not work.

Ms. Crowe's Charge demands that Frontier treat her, pregnant flight attendants, and those flight attendants seeking to express breast milk upon their return to work more favorably than all other flight attendants and as required by federal and state law.  For example, Ms. Crowe takes issue with the fact that her leave of absence in connection with her pregnancy and the birth of her child was unpaid.  But under the terms of the collective bargaining agreement Frontier entered into with the flight attendants' union—of which Ms. Crowe is a member—all medical leaves of absence are unpaid.  Moreover, it is indisputable that Title VII (as amended by the PDA), the FMLA, and the ADA do not require a leave of absence to be paid, nor does any Colorado state law.  Thus, were Ms. Crowe paid for her medical leave related to her pregnancy, Frontier would be treating her more favorably than all other flight attendants operating under the collective bargaining agreement on leaves of absence.

Likewise, Ms. Crowe contends that Frontier's dependability policy is discriminatory against pregnant flight attendants and flight attendants who take medical leave after giving birth.  However, the dependability policy is applied equally to all flight attendants, whether pregnant or not, and thus it is not discriminatory.  Frontier's dependability policy fully complies with federal and Colorado state law in all respects.  Again, if Ms. Crowe were to be excused from its requirements, then Frontier would be treating her more favorably than all other flight attendants who are similar in their ability to work or not work.

Ms. Crowe further contends that the fact she was not offered a temporary reassignment to "light or modified duty" as an accommodation for her pregnancy or desire to express breast milk upon her return to work is evidence of discrimination – but without alleging in her Charge that she ever requested a temporary reassignment.[5]  *See* Charge at ¶ 40.  Ms. Crowe states that she would like to have the option to seek a temporarily ground position.  *See id.* at ¶ 43.  This argument falls flat because Frontier does not provide temporary light duty assignments at the airport as an accommodation to any flight attendant for a medical condition.  Moreover, Frontier has no obligation under the CBA or any other law or policy to provide this accommodation to flight attendants (male or female) who cannot fly due to: (a) an on-the-job

---

[5]  Notably, Ms. Crowe admits that she did not in fact, as of the date of her Charge, request any accommodations relating to her pregnancy or impending return to work, other than her request for extended leave beyond FMLA leave, which was approved.  Instead, she bases her Charge on assumptions regarding what Frontier might or might not have granted in terms of accommodations.  With respect to her Charge allegations, then, it is unlikely that she has standing to bring claims for failure to provide such accommodations.  Nevertheless, in the interest of completeness, Frontier will address the merits of Ms. Crowe's claims in full.

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Justin Moore
August 21, 2018
Page 4

injury; (b) a non-work related injury; or (c) any other medical condition or disability.   Put another way, Frontier treats Ms. Crowe the same as all other flight attendants who are similar in their ability to work or not work.

Ms. Crowe also takes issue with the fact that Frontier has allegedly informed other flight attendants they could not express breast milk in the lavatory during flight.   Charge at ¶ 10. Expressing breast milk in the airplane lavatory <u>during</u> flight is not an approved accommodation.[6] Frontier does not permit flight attendants to express breast milk <u>during</u> flight.   It is beyond question that a flight attendant leaving her duties for a material period of time during flight—to breastfeed or for any other reason—creates a safety risk and compromises the welfare of passengers and crew members.   For this reason, Frontier has not provided any flight attendant with the accommodation to stop working while on a flight for an extended period of time due to any medical condition or disability.   Not only does Frontier have a legitimate, non-discriminatory reason for its decision to deny Ms. Crowe the opportunity to compromise flight safety, but she cannot demonstrate that Frontier provided this accommodation to other flight attendants similar in their ability or inability to work for an entire flight.

In summary, Frontier believes that this Position Statement and the evidence submitted herewith demonstrate that it has acted lawfully at all times.   Accordingly, it respectfully requests that the EEOC issue a no probable cause finding with respect to Ms. Crowe's Charge.

**II.   FACTUAL BACKGROUND**

   **A.   General Information Relating to Ms. Crowe's Employment**

In or about June, 2002, Ms. Crowe began her employment with Frontier as a flight attendant, a position she continues to hold as of the date of this Position Statement.   As a Flight Attendant, Ms. Crowe is "essential to maintaining the well-being, safety, security and comfort of [Frontier's] passengers onboard [its] aircraft," and she must "follow established FAA and Frontier guidelines in providing for the comfort and safety of passengers and respond to inflight

---

[6] Ms. Crowe claims that "Frontier never informed [her] of any policy regarding pumping in flight" and that Frontier "never provided [her] a list of approved locations to express milk or offered [her] any other accommodations."   Charge at ¶ 19.   However, it is not the employer's responsibility to anticipate an employee's needs and affirmatively offer an accommodation when the employee has not requested one. *See, e.g. Koessel v. Sublette Cty. Sheriff's Dep't*, 717 F.3d 736, 745 (10th Cir. 2013).   Not taking extended breaks and being available during flight is an essential function of a flight attendant's job. Flight attendants hold safety sensitive positions.   The law does not permit flight attendants to unilaterally alter an essential function of their jobs without obtaining approval from Frontier.   *Barber ex rel. Barber v. Colorado, Dep't of Revenue*, No. CIV.A. 05-CV-00807RE, 2008 WL 207691, at *1 (D. Colo. Jan. 24, 2008) ("[P]laintiffs' argument is that they were not afforded the particular accommodation they requested.   This is not the law.   Defendants' duty is to offer a reasonable accommodation, not plaintiffs' preferred accommodation."), *aff'd*, 562 F.3d 1222 (10th Cir. 2009); *see Adair v. City of Muskogee*, 823 F.3d 1297, 1311 (10th Cir. 2016).

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Justin Moore
August 21, 2018
Page 5

emergencies and/or security concerns . . . ."  Exhibit A (Flight Attendant Job Description).  A flight attendant's job description's emphasis on safety is consistent with the fact that, while Frontier prides itself on being an ultra-low cost carrier, the Company views its primary mission as ensuring the safety of its customers and employees.  Thus, while serving nearly 100 cities in the United States, Mexico, Canada, and the Dominican Republic on over 300 daily flights, Frontier never loses sight that its principal responsibility is to ensure that passengers and employees are safely delivered to their destination.

Upon her acceptance of employment as a Flight Attendant, Ms. Crowe voluntarily joined the Association of Flight Attendants-CWA AFL-CIO ("AFA"), the union that represents Frontier flight attendants and is responsible for promoting the interests of its members.  Importantly, AFA and Frontier negotiated the Frontier Airlines Flight Attendant Contract ("CBA"), which sets forth the terms of employment and working conditions for Frontier flight attendants.  The CBA specifically addresses, among other things, seniority, scheduling, staffing adjustments, leaves of absence and medical standards.  Exhibit B (Relevant Provisions of the CBA).  Accordingly, its provisions are material to an assessment of Ms. Crowe's allegations.

In her Charge, Ms. Crowe contends she was discriminated against in violation of Title VII (as amended by the PDA) and the ADA (and, by extension, the CADA and the PWFA) in connection with her first pregnancy in 2013 and her return to work following the birth of her child, her second pregnancy in 2015-16 and her return to work following the birth of her child, and her third pregnancy in 2017-18.  Critically, after Ms. Crowe had first her child in 2013, in accordance with the terms of the CBA, she took 90 days of FMLA leave.  Charge at ¶¶ 17-18.  For her second pregnancy, Ms. Crowe utilized 10-15 days of FMLA leave during her pregnancy.  *Id.* at ¶ 29.  For the birth of her second child, who was born on May 6, 2016, Ms. Crowe took FMLA leave from April 11, 2016 to June 16, 2016 and Non-FMLA leave until August 31, 2016.  *Id.* at ¶¶ 31, 32, 35.  For the birth of her third child, Ms. Crowe is currently on FMLA leave.  *Id.* at ¶ 42.  As of the date of this Position Statement, Ms. Crowe remains employed by Frontier, on an approved leave.

### B.    Ms. Crowe's Allegations with Respect to Her First and Second Pregnancies and Subsequent Returns to Work Are Time-Barred

In order to maintain a claim under Title VII (as amended by the PDA), the CADA, and/or the PWFA, a plaintiff must file a charge of discrimination with the EEOC (or Colorado Civil Rights Division, as applicable) within 300 days of the alleged unlawful employment practice.  *See* 42 U.S.C. § 2000e-5(e)(1) (Title VII, requiring charge be filed "within three hundred days after the alleged unlawful employment practice occurred"); 42 U.S.C. § 12117(a) (ADA, adopting "powers, remedies, and procedures" of § 2000e-5); *see Davidson v. America Online, Inc.*, 337 F.3d 1179, 1183 (10th Cir. 2003) ("Title VII [and] the ADA require[] an individual to file a

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Justin Moore
August 21, 2018
Page 6

timely administrative claim within 300 days").[7]  Ms. Crowe filed her Charge on June 15, 2018, rendering any claim based on events transpiring on or before August 19, 2017 (300 days prior) untimely as a matter of law.  Accordingly, Ms. Crowe's allegations regarding any purported discrimination during her first or second pregnancy and related returns to work are time-barred.[8]  The only timely allegations are those related to events that allegedly occurred after August 19, 2017 – i.e., Ms. Crowe's third pregnancy and related leave of absence.

### C.    Response to Ms. Crowe's Allegations with Respect to Her Pregnancy and Post-Pregnancy

In her Charge, with respect to her third pregnancy and post-pregnancy, Ms. Crowe takes issue with the fact that Frontier does not provide "workplace accommodations related to pregnancy and breastfeeding," including "paid leave, temporary job assignments, schedule modifications, medically necessary breaks, or private, sanitary, and accessible facilities to express breast milk."  Charge at ¶ 46(c).  She also takes issue with Frontier's dependability policy concerning attendance, and Frontier's policy requiring immediate notification of pregnancy.  *Id.* at ¶¶ 36(d)-(e).  These claims are unavailing under the law.

### 1.    Pregnancy and Lactation Are Not Disabilities Covered Under the ADA

Any ADA (and disability-related-CADA) claims brought by Ms. Crowe will fail because neither pregnancy nor lactation is a disability protected under the ADA or the CADA.

It is well-established that pregnancy is not a disability under the ADA.  *E.g.*, *Genovese v. Harford Health & Fitness Club, Inc.*, No. WMN-13-217, 2013 WL 2490270, at *5 (D. Md. June 7, 2013) (collecting authorities and noting that "[w]ith near unanimity, federal courts have held that pregnancy [alone] is not a 'disability' under the ADA") (citations and internal quotations omitted); *Richards*, 173 F.3d at 1250 (affirming that "pregnancy d[oes] not qualify as a disability under the ADA"); *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 899 (10th Cir. 1997) (holding that "impairment [within the meaning of the ADA] does not include . . . pregnancy" where a pilot claimed disability discrimination on the basis of pregnancy).

---

[7] The time limits for filing charges under the CADA and the PWFA, which require charges be filed within six months, are even shorter.  *See* Colo. Rev. Stat. Ann. § 24-34-403 (West) ("Any charge alleging a violation of this part . . . shall be filed with the commission . . . <u>within six months</u> after the alleged discriminatory or unfair employment practice occurred, and if not so filed, it shall be barred.") (emphasis added).  In any event, the PWFA did not become effective until August 10, 2016, rendering any conduct before that inactionable with respect to the PWFA.  *See* Colo. Rev. Stat. Ann. § 24-34-402.3 (West).

[8] Likewise, Ms. Crowe's allegations regarding any discrimination under the CADA and the PWFA that occurred before December 15, 2017, six months before she filed her charge, are time-barred.  *See* Colo. Rev. Stat. Ann. § 24-34-403 (West).

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Justin Moore
August 21, 2018
Page 7

Lactation is likewise not a disability under the ADA. *See Mayer v. Prof'l Ambulance, LLC*, 211 F. Supp. 3d 408, 420 (D.R.I. 2016) (in a case involving an employer's denial of lactation breaks, concluding that normal medical conditions related to "post-pregnancy do not qualify as a disability," and noting the lack of any "any cases post-2008 amendment [to the ADA] holding that normal lactation is a disability"); *Martinez v. N.B.C. Inc.*, 49 F. Supp. 2d 305, 308 (S.D.N.Y. 1999) (pregnancy and related medical conditions are not "disabilities" for purposes of the Americans with Disabilities Act, and the employer did not need to accommodate the plaintiff's desire to use a breast pump in the workplace).

Because pregnancy and post-pregnancy conditions such as lactation are not covered under the ADA, to the extent Ms. Crowe's Charge asserts a violation of the ADA, her claims are without merit.

## 2. All Medical Leaves of Absence Provided to Flight Attendants Are Unpaid

The terms and conditions of the leaves of absence policies about which Ms. Crowe complains are set forth in the CBA. They were collectively bargained for by AFA and on behalf of Ms. Crowe, who voluntarily agreed to be a part of the union. Though the Charge consistently refers to the leaves of absence policies (and other policies) to which Ms. Crowe is subject to as "Frontier's policies," *e.g.*, Charge ¶¶ 5, 7, 46, 48 (referring to a number of policies covered under the CBA as "Frontier's policies"), this fails to inform the EEOC that Ms. Crowe's interests were represented by AFA and accounted for in the determination of the scope of these policies. Moreover, "[i]t is well-established that Title VII does not require an employer to violate the terms of a collective bargaining agreement," so to the extent Ms. Crowe asks Frontier to act in ways contrary to the CBA, these requests must fail. *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 317 (4th Cir. 2008); *see Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 79 (1977) (holding that "the duty to accommodate [does not] require[] [an employer] to take steps inconsistent with [an] otherwise valid [collective bargaining] agreement").

That aside, Ms. Crowe cites "paid leave" as one of the accommodations Frontier allegedly could provide pregnant and lactating flight attendants. Charge ¶ 46(c). But the CBA does not provide for a paid leave of absence for flight attendants unable to fly due to any type of medical condition. Under the CBA, Frontier provides flight attendants with the following types of medical leave:

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Justin Moore
August 21, 2018
Page 8

(a)   <u>Family Medical Leave</u>: governed "under the Family Medical Leave Act," which does not provide for paid leave, *id.* at 12(E)(1);

(b)   <u>Maternity Leave</u>: "Sick leave must be used, and vacation days may be used, during the maternity leave; otherwise, <u>the leave is without pay</u>," *id.* at 12(F)(3) (emphasis added); and,

(c)   <u>Medical Leave</u>: "A Flight Attendant may request an <u>unpaid</u> leave of absence for his/her own illness or injury when he/she cannot return to work after exhausting FMLA leave or if he/she is not eligible for FMLA," *id.* at 12(G)(6) (emphasis added).

Nowhere in the CBA does it provide that a flight attendant shall be paid in connection with any of the foregoing leaves of absence, other than to the extent the flight attendant wishes to be paid from accrued sick leave or vacation time.  As for Ms. Crowe, her leave was handled exactly as provided by the CBA.  *See* Charge at ¶ 28 (recognizing that some of Ms. Crowe's maternity leave was paid because it was "covered by accrued paid vacation" leave).  Having bargained for this benefit in the CBA, Ms. Crowe cannot now complain that the very same policies discriminate against her.  *See Hardison*, 432 U.S. at 79.

Accordingly, the fact that Frontier does not pay pregnant flight attendants on a leave of absence in connection with their pregnancy or birth of a child cannot be deemed discriminatory where, as here, the Company does not pay <u>any</u> flight attendant (male or female) on a leave of absence for non-pregnancy-related medical conditions.[9]  *See Young v. UPS*, 135 S. Ct. 1338, 1343-44 (2015).  This renders any assertion that Frontier must pay Ms. Crowe for her time away from work for pregnancy-related medical conditions contrary to the mandates of Title VII as amended by the PDA.  *Id.* at 1343 (only requiring an employer to treat "women affected by pregnancy . . . the <u>same</u> for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work") (quoting 42 U.S.C. § 2000e(k)) (emphasis added).

## 3.   The Dependability Policy Is Not Discriminatory

Next, Ms. Crowe alleges that Frontier's dependability policy itself is discriminatory.  Charge at ¶ 46(d); *see* <u>Exhibit C</u> (Employee Handbook) at Article 12.  This claim is unfounded for multiple reasons.

First, as discussed above, neither pregnancy nor the need to express milk for lactation purposes is considered a "disability" under the ADA.  Thus, to the extent that Ms. Crowe claims that Frontier's application of its dependability policy was a violation of the ADA, her claim must fail.  Charge at ¶¶ 43, 46(d).

---

[9] Frontier does not pay workers' compensation claims, as required under the CBA and the law.

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Justin Moore
August 21, 2018
Page 9

Second, the dependability policy is applied equally to all similarly situated employees, and Ms. Crowe does not claim otherwise.  Any flight attendant unable to fly due to a sinus infection, regardless of the cause of the sinus infection, would be treated similarly in regards to dependability points.  Thus, the dependability policy is not discriminatory against pregnant women under Title VII (as amended by the PDA).  *See Manning v. Swedish Med. Ctr.*, No. C15-0949 (JLR) 2016 WL 6216364, at *8 (W.D. Wash. Sept. 30, 2016) (denying Title VII discrimination claim where "[t]here is no evidence . . . to support that [employer] treated [claimant] differently from other employees" under the "Dependability Policy"); *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002) (absentee policy that is applied equally to "pregnant or post-partum employees" and "non-pregnant employees" is permitted).

Third, to the extent that Ms. Crowe argues that the dependability policy is discriminatory because pregnancy-related leaves of absence "freeze the twelve-month clock for purposes of permitting points to 'roll off,'" Charge at ¶ 6, the policy is entirely non-discriminatory in that it expressly includes <u>all</u> leaves of absence, including "Military, Medical, Personal, Workers' Comp, FMLA, STD, etc."  *See* <u>Exhibit C</u> (Employee Handbook), at Article 12.05.1.3.  Thus, the policy in no way discriminates against pregnant or post-pregnant women; it applies equally to all employees regardless of the type of leave taken.

### 4. Frontier Does Not Provide Temporary Light Duty Assignments as an Accommodation to Flight Attendants, Regardless of the Basis for the Accommodation Request

In her Charge, Ms. Crowe takes issue with the fact that Frontier does not assign flight attendants to a temporary light duty position to accommodate their stated need to express breast milk.  Charge ¶¶ 9, 44, 45, 48.  Ms. Crowe's claim fails on numerous grounds.

First, the CBA does not require, and Frontier's policies and practices do not provide for, temporary light duty assignments (either at Frontier's corporate office or at any airport) for any flight attendant (male or female) unable to fly due to:  (a) an on-the-job injury; (b) a non-work related injury; or (c) any other medical condition or disability.  Ms. Crowe is simply wrong when she claims that Frontier "maintains a policy under which it provides for . . . 'light/modified duty' to individuals who are injured on-the-job."  Charge at ¶ 9 (citing CBA Art. 12(H)(2)).  Rather, Article 12, Section H(2) of the CBA only provides that "[t]he first three days of OJI <u>may</u> be covered by sick days, or the Flight Attendant <u>may</u> immediately be assigned light/modified duty," *id.* (emphasis added)—not that Frontier is <u>required</u> to provide these accommodations.  By its own terms, the CBA does not require reassignment to light duty, and, in fact, Frontier's policy is not to grant light/modified duty to <u>any</u> flight attendant unable to fly due to a medical condition, regardless of the nature of the medical condition.

Second, in any event, Ms. Crowe's argument is unfounded that she was "caused . . . financial harm" because Frontier did not offer "temporary job reassignment for reasons related to pregnancy or breast feeding."  Charge at ¶¶ 46, 47.  By her own admission, Ms. Crowe has

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Justin Moore
August 21, 2018
Page 10

not sought a reassignment.  *See* Charge at ¶ 44.  Thus, as Ms. Crowe never asked for any job reassignment *during* her pregnancy, Frontier certainly could not have discriminated against her for not providing this accommodation.

Given the foregoing, Ms. Crowe appears to demand that the EEOC insist she be treated <u>more</u> favorably than other flight attendants similar in their ability or inability to work.  There is no support for that demand in the relevant law, including the EEOC's guidance interpreting the same.  *See Adams v. Potter*, 193 F. App'x 440, 445 (6th Cir. 2006) ("accommodations are not reasonable if they would usurp the legitimate rights of other employees in a collective bargaining agreement") (citation and internal quotation omitted).

According to the EEOC's Enforcement Guidance on Pregnancy Discrimination and Related Issues, in enacting the PDA:

> Congress sought to make clear that 'pregnant women who are able to work must be permitted to work on the same conditions as other employees; and, when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working.'  <u>The PDA requires [only] that pregnant employees be treated the same as non-pregnant employees</u> who are similar in their ability or inability to work.

Enforcement Guidance: Pregnancy Discrimination and Related Issues, 2015 WL 4162723, at *2 (EEOC Notice No. 915.003) (June 25, 2015) (emphasis added).

Further, in *Young*, the United States Supreme Court held that to succeed on a claim that the denial of an accommodation constitutes disparate treatment under the PDA, the plaintiff must show, among other things, "that she sought [an] accommodation, that the employer did not accommodate her, and that the employer <u>did</u> accommodate others 'similar in their ability or inability to work.'"  135 S. Ct. at 1354 (emphasis added).  Here, Ms. Crowe cannot establish that she was denied an accommodation provided to other flight attendants and accordingly, cannot set forth a *prima facie* case of discrimination.  *See Wade v. Brennan*, 647 F. App'x 412, 417 (5th Cir. 2016) (denying Title VII claim where complainant "failed to show [temporary reassignment position] was an existing position, so reassignment there would necessarily require [employer] to create a new position for her, which is not a reasonable accommodation").

### 5.      Expression of Breast Milk During Flight Is a Safety Hazard

Ms. Crowe acknowledges that on two separate instances, passengers had medical emergencies while she was in the lavatory expressing breastmilk.  *See* Charge at ¶ 26.  She must know that pumping during flight in the aircraft lavatory is not a viable option given the

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Justin Moore
August 21, 2018
Page 11

safety issues that inevitably arise in the performance of a flight attendant's duties.  Taking extended breaks during a flight necessarily would place the welfare of Frontier's passengers as well as Ms. Crowe's colleagues flying on the aircraft at risk.  Indeed, airlines are for that very reason exempted from the provisions of the Fair Labor Standards Act requiring break time.  *See Thibodeaux v. Exec. Jet Int'l, Inc.*, 328 F.3d 742, 754 (5th Cir. 2003) (confirming that "the FLSA exempts the company's flight attendants from its overtime requirements"); 29 U.S.C.A. § 213(b)(3) (West).

As one example of the safety issues at play, on an Airbus 319 airplane, in addition to the two pilots, there are three flight attendants and approximately 150 passengers in flight.  If a flight attendant is relieved of the performance of her duties for an extended period—to pump or otherwise—the other two flight attendants must deviate from their regular course of duty, which, in the event of a security incident, would allow for the passengers to more significantly outnumber the remaining crewmembers.  Indeed, a flight attendant's essential job duties include a number of safety-related functions that would be rendered impossible or impracticable if a flight attendant were permitted to pump while onboard an aircraft, including "conduct[ing] emergency evacuation of cabin if necessary," "conduct[ing] preflight safety check of cabin emergency equipment," "ensur[ing] cabin safety and security during all phases of flight, including boarding and deplaning," and "provid[ing] emergency medical assistance."  *See* Exhibit A (Flight Attendant Job Description).

Accordingly, Frontier flight attendants are not permitted to pump during flight for the legitimate, non-discriminatory reason that doing so risks flight safety, something Frontier is not willing to compromise.  *Young*, 135 S. Ct. at 1343-44 (finding that if an employee can articulate a *prima facie* case of pregnancy discrimination, which Frontier does not concede, an employer successfully meets its burden upon a showing of legitimate, non-discriminatory reasons for its decision to not grant the accommodation requested).

**6.     Ms. Crowe's Claims that Frontier Did Not Offer Her Any Accommodations Are False**

Lastly, Ms. Crowe suggests in her Charge that Frontier did not offer her any accommodations at all in connection with her expression of breast milk.  This is not correct.

First, as detailed above, Frontier approved each of Ms. Crowe's requests for leave of absence after the births of her children.

Second, while Frontier is unwilling to compromise flight safety, it does provide nursing mothers with the opportunity to work a reduced schedule, which is a special accommodation that is not available to other flight attendants.  Specifically, the CBA requires that "[a]t the completion of each Bid Period each Flight Attendant must accumulate a minimum of 60 credit hours."  *See* Exhibit B (CBA) at Article 5 § L(1).  However, Frontier allows nursing mother flight attendants the accommodation of dropping below 60 hours per month without having to restore

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Justin Moore
August 21, 2018
Page 12

those hours, and only having to meet a minimum of 45 hours.  This allows women returning to work and wanting to breastfeed the opportunity to work fewer hours, be on the schedule for fewer days, and bid for flights in a manner that allows them to be at home with their child more often.  During the relevant time period, each time a nursing flight attendant has made a request to work a reduced schedule, Frontier has <u>granted</u> the accommodation requested by the flight attendant.

## III.   LEGAL ANALYSIS

In her Charge, Ms. Crowe contends she was discriminated against based on her sex in violation of Title VII (as amended by the PDA), the ADA, the CADA, and the PWFA.  Since she does not offer direct evidence of discrimination to support these claims, her allegations of discrimination must be analyzed under the *McDonnell Douglas* burden-shifting framework.  A plaintiff alleging that the denial of an accommodation constituted disparate treatment under the PDA establishes a *prima facie* case by showing that:  (1) she is a member of a protected class; (2) she sought an accommodation and the employer did not accommodate her; and, (3) the employer did accommodate others similar in their ability or inability to work.  *Young*, 135 S. Ct. at 1354.  If a plaintiff can make this showing, then the "employer may then seek to justify its refusal to accommodate the plaintiff by relying on legitimate, non-discriminatory reasons for denying her accommodation."  *Id.*  "If the employer offers an apparently legitimate, non-discriminatory reason for its actions," the burden then sifts back to the plaintiff to "show that that employer's proffered reasons are in fact pretextual."  *Id.*

For the reasons set forth above, with respect to her claims of discrimination, Ms. Crowe cannot meet her *prima facie* case because she cannot demonstrate that she sought an accommodation that Frontier did not grant to her, but provided others similar in their ability to work or not work.  With respect to leave, Ms. Crowe acknowledges that Frontier granted her FMLA and non-FMLA leaves.  For her current pregnancy, Ms. Crowe may apply for additional Medical Leave under the terms of the CBA, and will be granted such leave in accordance with the CBA with the proper medical certification that she has a pregnancy-related need for the leave.

Accordingly, Ms. Crowe's discrimination claim fails as a matter of law at the outset, as she cannot even establish her *prima facie* case.  Indeed, Frontier's decision to adhere to the provisions of the CBA and to treat Ms. Crowe the same as all other flight attendants in their ability or inability to work is evidence that its business decisions were legitimate and non-discriminatory.  Ms. Crowe has not presented any evidence that Frontier's legitimate decisions were pretextual.

In summary, Ms. Crowe's allegations are either untimely as a matter of law or without legal merit.

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Justin Moore
August 21, 2018
Page 13

## IV.   CONCLUSION

For the reasons detailed above, Ms. Crowe has not been subject to any form of discrimination.  Rather, Frontier has treated her fairly and lawfully at all times.  Accordingly, the Company respectfully requests that Ms. Crowe's Charge be dismissed with a finding of "no probable cause."  Please do not hesitate to contact me if you require any further information.

Sincerely,

Danielle L. Kitson

DLK/SG

Firmwide:156596128.1 057446.1009



**Littler Mendelson, P.C.**
1900 Sixteenth Street
Suite 800
Denver, CO 80202

Danielle L. Kitson
303.362.2872 direct
303.629.6200 main
dkitson@littler.com

August 21, 2018

**VIA ELECTRONIC SUBMISSION**

Todd Chavez
Federal Investigator
U.S. Equal Employment Opportunity Commission
Denver Field Office
303 East 17th Avenue
Suite 410
Denver, CO 80203

Re:     Respondent's Position Statement
        Trisha Hughes-Draughn v. Frontier Airlines, Inc.
        EEOC Charge No. 541-2018-02426

Dear Mr. Chavez:

Please accept the following letter and the attachments hereto as the Position Statement of Respondent Frontier Airlines, Inc. ("Frontier" or the "Company") in response to the above-referenced Charge of Discrimination ("Charge") filed by Trisha Hughes-Draughn on or about June 15, 2018.[1]   We are providing this information to the Equal Employment Opportunity

---

[1] This Position Statement is based on Frontier's understanding of Ms. Hughes-Draughn's allegations to the best of its knowledge and recollection as of the date of this document.  The information and supporting documentation contained herein are based upon Frontier's understanding of the facts and the information reviewed thus far.  Frontier expressly reserves the right to amend, supplement, or correct this Position Statement, if necessary.  Although there has not been an opportunity for formal discovery or a complete formal investigation, this response is submitted for the purpose of aiding the Commission in its investigation, and facilitating the informal resolution of these matters.  This response, while believed to be accurate, does not constitute an affidavit or a binding statement of Frontier's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with the allegations.  Frontier reserves all objections to the admissibility at any hearing, trial, or other proceeding of any of the information or documents provided to the EEOC.  All information provided herein, including this Position Statement, is provided solely in cooperation with the EEOC's fact-finding efforts.   Since additional facts likely would be uncovered through discovery or following a full investigation, Frontier in no way waives its right to present new or additional information at a later date, for substance or clarification.  Moreover, by responding to this Charge, Frontier does not waive, and hereby preserves, any and all substantive and procedural defenses that may exist to the Charge and Ms. Hughes-Draughn's allegations.  In addition, this Position Statement and the accompanying exhibits, which contain confidential personnel, medical and business information, are subject to the exceptions to

littler.com

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Todd Chavez
August 21, 2018
Page 2

Commission ("EEOC" or the "Commission") in accordance with F.R.E. 408 and C.R.E. 408 to assist the Commission in effecting a dismissal of the Charge, and it should not be considered for any other purpose.  Also, Frontier provides this response based on the information currently available to it, and reserves the right to revise, withdraw, or add to this response in the future.

In her Charge, Ms. Hughes-Draughn alleges to have suffered discrimination based on her "sex and because of a conditional related to [her] pregnancy (lactation)" in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA").[2]  Frontier also acknowledges that Ms. Hughes-Draughn contends the Company violated the Nevada Fair Employment Practices Act, the Colorado Fair Employment Practices Act, the Nevada Pregnant Workers Fairness Act ("NV-PWFA"), the Colorado Pregnant Workers Fairness Act ("CO-PWFA"), the Nevada law on the Rights of a Private Employee Who Is Mother of Child Under 1 Year of Age ("NV-Nursing Mothers Law"), and the Colorado Workplace Accommodations for Nursing Mothers Act ("WANMA").

At the outset, Ms. Hughes-Draughn acknowledges in her Charge that the EEOC does not have jurisdiction over WANMA and Nevada Nursing Mothers Law.  *See* Charge at n.1.  Accordingly, Frontier has refined its response to address Ms. Hughes-Draughn's federal law claim under Title VII (as amended by the PDA), CADA, and the PWFA.[3]  To the extent the EEOC believes it has jurisdiction to investigate the state law allegations referenced in the Charge, particularly with respect to the WANMA, Frontier respectfully requests the opportunity to supplement this Position Statement to address these matters.

I.    INTRODUCTION

Frontier denies any allegation that it discriminated against Ms. Hughes-Draughn in violation of Title VII, as amended by the PDA, the CADA, the PWFA, or any other law.  In fact, as detailed below, Frontier treated Ms. Hughes-Draughn, all pregnant pilots, and those pilots

---

the disclosure requirements of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7).  Frontier also requests that any efforts to contact its current managers be directed through its counsel.

[2] On her EEOC Form 5, Ms. Hughes-Draughn additionally checked the box for "Retaliation" where asked to identify the basis of her Charge (in addition to "Sex").  Ms. Hughes-Draughn makes no mention of retaliation in the statement of harm attached to the Form 5, however, and does not address any claim of retaliation substantively.  Frontier for that reason has not included a discussion of retaliation in this Position Statement.

[3] In this Position Statement, CO-PWFA and NV-PWFA are collectively referred to as PWFA.  Since Colorado Antidiscrimination Act ("CADA") claims (inclusive of the PWFA, which amended CADA) are analyzed under the same framework as Title VII, please allow the analysis in this Position Statement to also serve as a legal analysis of the CADA pregnancy discrimination claim.  *St. Croix v. Univ. of Colo. Health Scis., Ctr.*, 166 P.3d 230, 236 (Colo. Ct. App. 2007) (citing *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399 (Colo. 1997) (stating Colorado courts "look to federal cases for guidance on applying" the CADA).

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Todd Chavez
August 21, 2018
Page 3

wishing to express breast milk upon their return to work: lawfully; in compliance with the collectively bargained agreement governing relevant terms and conditions of a Frontier pilot's employment; in accordance with its standard practices; and, most importantly, consistent with the manner in which it accommodates all pilots (both male and female) who are similar in their ability to work or not work.

Indeed, upon close scrutiny of the Charge, it becomes clear that Ms. Hughes-Draughn demands that Frontier treat her, pregnant pilots, and those pilots seeking to express breast milk upon their return to flight <u>more favorably</u> than all other pilots and federal law.  For example, Ms. Hughes-Draughn takes issue with the fact that her leaves of absence in connection with her pregnancies and the birth of her children were unpaid.  Under the terms of the Frontier Airline Pilots Association's ("FAPA") Collective Bargaining Agreement ("CBA"), <u>all</u> medical leaves of absence are unpaid.  Moreover, it is indisputable that Title VII, the Family and Medical Leave Act ("FMLA"), and Americans with Disabilities Act ("ADA") do <u>not</u> require a leave of absence to be paid, nor does any Colorado or Nevada state law.  Thus, were Ms. Hughes-Draughn paid for her medical leave related to her pregnancy, Frontier would be treating her <u>more favorably</u> than all other pilots operating under the collective bargaining agreement on leaves of absence.

Similarly, Ms. Hughes-Draughn suggests that Frontier should not require pregnant pilots, or those pilots seeking to express breast milk, to submit medical certifications before extending their leaves of absence beyond the 120 day maternity leave provided for in the CBA.  Frontier requires all pilots in need of a leave of absence to submit medical certification.  Then length of maternity leave was a negotiated term in the CBA.  Frontier accommodates pilots that need an extended leave of absence by approving such leaves upon submission of a medical certification.

In her Charge, Ms. Hughes-Draughn further contends that the fact she was not offered a temporary reassignment to light duty as an accommodation for her pregnancy or desire to express breast milk upon her return to work is further evidence of discrimination.  Ms. Hughes-Draughn suggests that she should have been offered the opportunity to be temporarily reassigned during her pregnancy and the time she desired to breastfeed.  This argument falls flat because Frontier does <u>*not*</u> provide temporary light duty assignment at its corporate headquarters or at the airport as an accommodation to <u>*any*</u> pilot unable to fly for medical reasons.  Any allegation that the Company has done so in the past has no basis in fact.  To be clear, Frontier has <u>no obligation</u> under the CBA to provide this type of accommodation to pilots (male or female) who are unable to fly due to: (a) an on-the-job injury; (b) a non-work related injury; or, (c) any other medical condition or disability.  Put another way, Frontier treated Ms. Hughes-Draughn the same as all other pilots.

Ms. Hughes-Draughn also takes issue with the fact that she could be disciplined for expressing breast milk in the lavatory during flight.  Charge at ¶ 28.  Expressing breast milk in

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Todd Chavez
August 21, 2018
Page 4

the airplane lavatory <u>during</u> flight is not an approved accommodation.[4]  Frontier does not permit pilots to express breast milk <u>during</u> flight.  It is beyond question that a pilot leaving his or her duties for a material period of time during flight—to breastfeed or for any other reason—creates a safety risk and compromises the welfare of passengers and crew members.  For this reason, Frontier has not provided any pilot with the accommodation to stop working while on a flight for an extended period of time due to any medical condition or disability.  Not only does Frontier have a legitimate, non-discriminatory reason for its decision to deny Ms. Hughes-Draughn the opportunity to compromise flight safety, but she cannot demonstrate that Frontier provided this accommodation to other pilots similar in their ability or inability to work for an entire flight.

Finally, Ms. Hughes-Draughn's allegations are further undermined by the fact that in early 2017, Frontier granted her the very accommodation she requested: an extended leave of absence until April 17, 2018, i.e., <u>more than 16 months after the birth of her second child</u>.

In summary, Frontier believes that this Position Statement and the evidence submitted herewith demonstrate that it has acted lawfully at all times.  Accordingly, it respectfully requests that the EEOC issue a no probable cause finding with respect to Ms. Hughes-Draughn's Charge.

## II.    FACTUAL BACKGROUND

### A.    General Information Relating To Ms. Hughes-Draughn's Employment

On or about August 5, 2015, Ms. Hughes-Draughn began her employment with Frontier as a pilot in the position of First Officer, in which she remains as of the date of this Position Statement.  As a First Officer, Ms. Hughes-Draughn is generally "responsible for ensuring safe and timely flight operations in accordance with all Company policies and Federal Aviation Regulations (FAR)."  <u>Exhibit A</u> (First Officer Job Description).  The job description's emphasis on safety is consistent with the fact that while Frontier prides itself on being an ultra-low cost carrier, the Company views its primary mission to be ensuring the safety of its customers and

---

[4] Ms. Hughes-Draughn claims that "Frontier never informed [her] of any policy or guidelines regarding pilots who need to express breast milk, and never warned [her] of any safety risks or precautions. Frontier never offered me any accommodations . . ." Charge at ¶ 30.  However, it is not the employer's responsibility to anticipate an employee's needs and affirmatively offer an accommodation when the employee has not requested one.  *See, e.g. Koessel v. Sublette Cty. Sheriff's Dep't*, 717 F.3d 736, 745 (10th Cir. 2013).  Not taking extended breaks and being available during flight is an essential function of a pilot's job.  Pilots hold safety sensitive positions.  The law does not permit pilots to unilaterally alter an essential function of their jobs, without obtaining approval from Frontier, even if Frontier does not explicitly inform pilots that certain conduct is a violation of policy.  *Barber ex rel. Barber v. Colorado, Dep't of Revenue*, No. CIV.A. 05-CV-00807RE, 2008 WL 207691, at *1 (D. Colo. Jan. 24, 2008) ("[P]laintiffs' argument is that they were not afforded the particular accommodation they requested.  This is not the law.  Defendants' duty is to offer a reasonable accommodation, not plaintiffs' preferred accommodation."), *aff'd*, 562 F.3d 1222 (10th Cir. 2009); *see Adair v. City of Muskogee*, 823 F.3d 1297, 1311 (10th Cir. 2016).

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Todd Chavez
August 21, 2018
Page 5

employees.  Thus, while serving nearly 100 cities in the United States, Mexico, Canada, and the Dominican Republic on over 300 daily flights, Frontier never loses sight that its principal responsibility is to ensure that passengers and employees are safely delivered to their destination.

Upon her acceptance of employment as a First Officer, Ms. Hughes-Draughn voluntarily joined FAPA, the union that represents Frontier pilots and is responsible for promoting the interests of its members.  Importantly, FAPA and Frontier negotiated a CBA, which is the contract that sets forth the terms of employment and working conditions for Frontier pilots.  The CBA specifically addresses, among other things, seniority, scheduling, staffing adjustments, leaves of absence, and medical standards.  <u>Exhibit B</u> (Relevant Provisions of FAPA CBA).  Accordingly, its provisions are material to an assessment of Ms. Hughes-Draughn's allegations.

In her Charge, Ms. Hughes-Draughn contends she was discriminated against in connection with three separate, discrete time periods: (a) her desire to breastfeed her first child in 2015-17; (b) her pregnancy from approximately March to December 2016; and (c) her leave of absence following the birth of her second child from December 2016 to April 2018.  Critically, after Ms. Hughes-Draughn had her second child on December 16, 2016, in accordance with the terms of the CBA, she was provided a 120 day leave of absence from the birth of her child, i.e., up to and including April 15, 2017.  *Id.* at §9.H.4.  Before returning to work, Ms. Hughes-Draughn requested an extension of her leave until April 17, 2018 to allow her to breast feed her child.  Charge ¶ 36.  As of the date of this Position Statement, Ms. Hughes-Draughn remains employed by Frontier.

**B.    Ms. Hughes-Draughn's Allegations With Respect To Her Breastfeeding Her First Child, Her Pregnancy, And Her Maternity Leave Are Time Barred**

In order to maintain a claim under Title VII (as amended by the PDA), the CADA, and/or the PWFA, a plaintiff must file a charge of discrimination with the EEOC (or Colorado Civil Rights Division, as applicable) within 300 days of the alleged unlawful employment practice.  *See* 42 U.S.C. § 2000e-5(e)(1) (Title VII, requiring charge be filed "within three hundred days after the alleged unlawful employment practice occurred"); *see Davidson v. America Online, Inc.*, 337 F.3d 1179, 1183 (10th Cir. 2003) ("Title VII [and] the ADA require[] an individual to file a timely administrative claim within 300 days").[5]  Ms. Hughes-Draughn filed her Charge on

---

[5] The time limits for filing charges under the CADA and the PWFA, which require charges be filed within six months, are even shorter.  *See* Colo. Rev. Stat. Ann. § 24-34-403 (West) ("Any charge alleging a violation of this part . . . shall be filed with the commission . . . <u>within six months</u> after the alleged discriminatory or unfair employment practice occurred, and if not so filed, it shall be barred.") (emphasis added).  In any event, the PWFA did not become effective until August 10, 2016, rendering any conduct before that inactionable with respect to the PWFA.  *See* Colo. Rev. Stat. Ann. § 24-34-402.3 (West).

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Todd Chavez
August 21, 2018
Page 6

June 15, 2018, rendering any claim based on events transpiring on or before August 19, 2017 (300 days prior) untimely as a matter of law.

In her Charge, Ms. Hughes-Draughn raises issue related to breastfeeding her first child, her pregnancy with her second child, her maternity leave, and her extended leave of absence. Charge at ¶¶ 17-18. While employed at Frontier, Ms. Hughes-Draughn breastfed her first child from August 5, 2015 through May 2016. *Id.* at ¶¶ 17, 33. Ms. Hughes-Draughn was pregnant with her second child from March 2016 through December 16, 2016. *Id.* at ¶¶ 34, 36. She was on Maternity Leave from October 14, 2016 through April 15, 2017. *Id.* Ms. Hughes-Draughn then took an extended leave of absence until April 17, 2018. *Id.* at 36.

There can be no doubt that most of the allegations in the Charge are time-barred, as they are well before the August 19, 2017 cut-off imposed by Title VII and enforced by the EEOC. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (finding that repeated occurrences of the same discriminatory employment action, like the failure to provide an accommodation, can be challenged <u>only</u> if "an act contributing to the claim occurs within the [charge] filing period"). Accordingly, Ms. Hughes-Draughn's allegations regarding any purported discrimination during the time she was breastfeeding her first child (August 2015 – May 2016), during her second pregnancy (March 2016 – December 2016), during her Maternity Leave (December 2016 – April 2017), and during the first part of her extended leave of absence (April 2017 – August 2017) are time-barred.[6]

In summary, it is clear that Ms. Hughes-Draughn's allegations with respect to breastfeeding her first child, her pregnancy, her maternity leave, and the first part of her extended leave are untimely as a matter of law. The only timely allegations are those that occurred after August 19, 2017 – i.e., the last half of Ms. Hughes-Draughn's extended leave.[7]

## C.  Ms. Hughes-Draughn's Allegations With Respect To Her Leave Of Absence Lack Factual And Legal Merit

In her Charge, with respect to her extended leave of absence, Ms. Hughes-Draughn takes issue with the fact that she was required to take an unpaid leave of absence, rather than be: (a) reassigned to a temporary light duty position until she was done breastfeeding; or, (b) paid for her time away from work. She also raises concerns about Frontier's requirement that she submit medical certification.

---

[6] Likewise, Ms. Hughes-Draughn's allegations regarding any discrimination under the CADA and the PWFA that occurred before December 15, 2017, six months before she filed her charge, are time-barred. *See* Colo. Rev. Stat. Ann. § 24-34-403 (West).

[7] The Charge does not contain any allegations related to Ms. Hughes-Draughn's return to work following her extended leave of absence.

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Todd Chavez
August 21, 2018
Page 7

### 1.    All Medical Leaves Of Absence Provided To Pilots Are <u>Unpaid</u>

As an initial matter, the terms and conditions of the leaves of absence policies about which Ms. Hughes-Draughn complains are set forth in the CBA.  That is, they were collectively bargained for by FAPA and on behalf of Ms. Hughes-Draughn, who voluntarily agreed to be a part of the union.  This cannot be lost, as the Charge consistently refers to the leaves of absence policies to which Ms. Hughes-Draughn is subject to as "Frontier's policies." *See e.g.* Charge at ¶¶ 6, 7, 9, 35, 42, 44, 47 (referring to "Frontier's policies").  This is misleading because it fails to inform the EEOC that Ms. Hughes-Draughn's interests were represented by FAPA and accounted for in the determination of the scope of these policies.

That aside, Ms. Hughes-Draughn takes issue with the fact that she was not provided a paid leave of absence.  The CBA does <u>not</u> provide for a paid leave of absence for pilots unable to fly due to <u>any type</u> medical condition.  *See generally* Exhibit B (CBA).  As set forth in the CBA, Frontier provides pilots with the following types of medical leave: (a) Family and Medical Leave of Absence; (b) Maternity Leave of Absence; and, (c) Medical Leave of Absence.  *See* Exhibit B at Section 9 (Leaves of Absence).[8]   Nowhere in the CBA does it provide that a pilot shall be paid in connection with any of the foregoing leaves of absence, other than to the extent the pilot wishes to be paid from accrued sick leave or vacation time.  Accordingly, the fact Frontier does not pay pregnant pilots on a leave of absence in connection with their pregnancy or birth of a child cannot be deemed discriminatory where, as here, the Company does not pay any pilot (male or female) on a leave of absence for non-pregnancy related medical conditions.  *See Young v. UPS*, 135 S. Ct. 1338, 1343-44 (2015).  In summary, this renders any assertion that Frontier pay Ms. Hughes-Draughn for her time away from work for pregnancy-related medical conditions contrary to the mandates of Title VII.  *Id.* (only requiring an employer to treat "women affected by pregnancy … the <u>same</u> for all employment-related purposes … as other persons not so affected but similar in their ability or inability to work") (quoting 42 U.S.C. § 2000e(k)) (emphasis added).

### 2.    Frontier Does <u>Not</u> Provide Temporary Light Duty Assignments as an Accommodation to Pilots, Regardless of the Basis for the Accommodation Request

In her Charge, Ms. Hughes-Draughn takes issue with the fact that Frontier does not assign pilots to a temporary light duty position to accommodate their stated need to express breast milk.[9]  Ms. Hughes-Draughn's claim fails on numerous grounds.

---

[8] Notably, Frontier pilots are eligible for workers' compensation, as well as long term and short term disability benefits in connection with qualifying conditions.

[9] While not in the relevant time period, Ms. Hughes-Draughn also takes issue with the fact that Frontier failed to provide her with the opportunity to be reassigned to a temporary light duty position to accommodate her inability to fly in the third trimester of her 2016 pregnancy.  *See* Charge at ¶¶ 6, 7, 34, 35.  Under the Maternity Leave of Absence policy set forth in the CBA, "[a]fter the 32nd week of

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Todd Chavez
August 21, 2018
Page 8

First, the CBA does not require, and Frontier's standard policies and practices do not provide for, temporary light duty assignments for any pilot (male or female) unable to fly due to: (a) an on-the-job injury; (b) a non-work related injury; or, (c) any other medical condition or disability. Ms. Hughes-Draughn is simply wrong when she claims that "under Frontier's policies, other employees are permitted to seek temporary alternative assignments if they can demonstrate medical necessity or disability." Charge at ¶ 7. During the relevant time period, Frontier did <u>not</u> provide a temporary light duty assignment to any pilot unable to fly for any reason.

Second, in any event, Ms. Hughes-Draughn's argument is unfounded that she "suffered financial harm" because Frontier did not offer "temporary job reassignment for pregnant and breastfeeding pilots." Charge at ¶37. By her own admission, Ms. Hughes-Draughn did not seek a reassignment during the time she was on her extended leave of absence due to breastfeeding. *Id.* at ¶¶ 38, 39. Thus, as Ms. Hughes-Draughn never asked for any job reassignment during the time she was breastfeeding, Frontier certainly could not have discriminated against her for not providing this accommodation.

Given the foregoing, the only conclusion that can be reached is that Ms. Hughes-Draughn demands that the EEOC insist she be treated more favorably than other pilots. There is no support in the relevant law, including the EEOC's guidance interpreting the same. *See Adams v. Potter*, 193 F. App'x 440, 445 (6th Cir. 2006) ("accommodations are not reasonable if they would usurp the legitimate rights of other employees in a collective bargaining agreement") (citation and internal quotation omitted).

According to the EEOC Enforcement Guidance on Pregnancy Discrimination and Related Issues, in enacting the PDA:

> Congress sought to make clear that 'pregnant women who are able to work must be permitted to work on the <u>same</u> conditions as

---

pregnancy, or whenever such Pilot's doctor will not provide the required medical authorization, whichever comes first, the Pilot will request Maternity Leave." Exhibit B at Section 9.H. Notably, in her Charge, Ms. Hughes-Draughn does not claim that she should have been permitted to fly after her 32nd week of pregnancy or even that she wanted to continue working in any capacity, but instead, simply claims she "did not have an option" to request a temporary reassignment. Charge at ¶ 35. In fact, Ms. Hughes-Draughn went on Maternity Leave earlier than required by the CBA. *Id.* at ¶ 34 (She went on leave in the "30th week" of her pregnancy).

The Federal Aviation Administration's regulations prohibit a person who holds a current medical certificate from acting as a pilot when she knows or has reason to know of any medical condition that would make the person unable to meet the requirements for the medical certificate necessary for the pilot operation. 14 C.F.R. § 61.53. Given the medical risks associated with flying during pregnancy, including premature labor, and the inherent risk to the safety of flight operations in the event of a medical emergency to a pilot, the CBA identifies that a pregnant pilot will no longer be eligible to fly a plane at 32 weeks of pregnancy. In her Charge, Ms. Hughes-Draughn does not dispute the legitimate business and safety reasons behind this decision, which was collectively bargained for and agreed to by her union.

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Todd Chavez
August 21, 2018
Page 9

> other employees; and, when they are not able to work for medical reasons, they must be accorded the <u>same</u> rights, leave privileges and other benefits, as other workers who are disabled from working.'  The PDA requires [only] that pregnant employees be treated the <u>same</u> as non-pregnant employees who are similar in their ability or inability to work.

Enforcement Guidance: Pregnancy Discrimination and Related Issues, 2015 WL 4162723, at *2 (EEOC Notice No. 915.003) (June 25, 2015) (emphasis added).  Pursuant to the foregoing, because Frontier does not provide temporary light duty assignment to pilots, the fact that Frontier did not provide Ms. Hughes-Draughn this accommodation is not evidence of discrimination under the PDA.

Further, in *Young v. UPS*, the United States Supreme Court held that to succeed on a claim that the denial of an accommodation constitutes disparate treatment under the PDA, the plaintiff must show, among other things, "that she sought [an] accommodation, that the employer did not accommodate her, and that the employer <u>did</u> accommodate others 'similar in their ability or inability to work.'"  135 S. Ct. at 1354 (emphasis added).  Here, Ms. Hughes-Draughn cannot establish that she was denied an accommodation provided to other pilots and accordingly, cannot set forth a *prima facie* case of discrimination.  *See Wade v. Brennan*, 647 F. App'x 412, 417 (5th Cir. 2016) (denying Title VII claim where complainant "failed to show [temporary reassignment position] was an existing position, so reassignment there would necessarily require [employer] to create a new position for her, which is not a reasonable accommodation").

In summary, when Frontier did not offer Ms. Hughes-Draughn the option of a temporary light duty assignment, it treated her the <u>same</u> as non-pregnant pilots who are similar in their ability to work or not work.  Therefore, the Company met and is meeting the letter and spirit of the law.

### 3.  Frontier Requires All Pilots Taking Leaves of Absence To Submit Medical Certification

Finally, Ms. Hughes-Draughn appears to take issue with the fact that before extending her leave Frontier needed a certification from a health care provider identifying the medical condition that precluded her return to work.  *See* Charge at ¶ 40.  Frontier requires <u>all</u> pilots requesting medical leaves of absence to submit medical certifications identifying the basis for their need for the leave.  This is consistent with the terms of the CBA.

- Under the Maternity Leave of Absence policy, "[i]f a Pilot is unable to return to Active Service within 120 days after the pregnancy ends <u>because of a *certified* medical incapacitation</u>, she shall be entitled to receive a Medical Leave of Absence under the provisions of this Section."

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Todd Chavez
August 21, 2018
Page 10

- Under the Medical Leave of Absence policy, Frontier has the right to "require a Pilot who requests a Medical Leave of Absence to <u>first present a reasonably sufficient report from the Pilot's health care provider *certifying* the Pilot's need for Medical Leave</u>."

Exhibit B at Sections 9.H.15.a, 9.I.2 (emphasis added).  In short, Ms. Hughes-Draughn's belief that pilots should be able to take extended leaves of absence without input from a health care provider is misguided.  Frontier requires all pilots to submit certification from a health care provider before taking leaves of absence.  Again, Ms. Hughes-Draughn appears to be suggesting that pregnant and breastfeeding pilots should receive preferential treatment.  As described above, the law does not support this notion.

### D.     Frontier's Provision Of An Extended Leave Of Absence To Ms. Hughes-Draughn Undercuts The Remaining Allegations In Her Charge

Ms. Hughes-Draughn contends that the Maternity Leave of Absence policy allows for up to 120 days of unpaid maternity leave, but that after "120 days, employees are required to return to work as soon as they are deemed medically fit for duty, regardless of their specific needs or desire to extend the period of unpaid leave."  Charge at ¶ 8.  She also claims that "Frontier has been inconsistent in making medical leave available for pilots for reasons related to breastfeeding."

As a preliminary matter, Frontier does allow employees to take extended leaves of absence following the birth of a child.  Ms. Hughes-Draughn herself took over 1 year of leave (16 months) after the birth of her second child.  Charge at ¶36.

Furthermore, there is no federal law that requires Frontier to provide a <u>paid</u> maternity leave of absence or even that it administer a Maternity Leave of Absence policy.  Rather, Frontier is required <u>only</u> to follow the FMLA, which is to say it must ensure eligible employees are allowed "to take job-protected, unpaid leave for up to a total of 12 workweeks within any 12 months."  29 C.F.R. § 825.100(a).  Frontier more than met this federal mandate. Specifically, the CBA has a separate leave of absence policy addressing the FMLA.  Exhibit B at Section 9.F.  Thus, the fact that the Maternity Leave of Absence policy exists and affords Ms. Hughes-Draughn more than 17 weeks of leave after the birth of her child demonstrates just the opposite of unlawful treatment against female pilots.  Put another way, the Maternity Leave of Absence policy provides for coverage far in excess of what is required by federal law and demonstrates a good faith attempt to accommodate working mothers.

### III.   LEGAL ANALYSIS

In her Charge, Ms. Hughes-Draughn contends she was discriminated against based on her sex in violation of Title VII (as amended by the PDA), the CADA, and the PWFA.  Since she does not offer direct evidence of discrimination on this claim, this allegation of discrimination must be analyzed under the *McDonnell Douglas* burden-shifting framework.  A plaintiff alleging

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Todd Chavez
August 21, 2018
Page 11

that the denial of an accommodation constituted disparate treatment under the PDA establishes a *prima facie* case by showing that: (1) she is a member of a protected class; (2) she sought an accommodation and the employer did not accommodate her; and, (3) the employer did accommodate others similar in their ability or inability to work. *Young*, 135 S. Ct. at 1354. If a plaintiff can make this showing, then the "employer may then seek to justify its refusal to accommodate the plaintiff by relying on legitimate, non-discriminatory reasons for denying her accommodation." *Id.* "If the employer offers an apparently legitimate, non-discriminatory reason for its actions," the burden then shifts back to the plaintiff to "show that that employer's proffered reasons are in fact pretextual." *Id.*

For the reasons set forth above, with respect to her timely claim of discrimination (and even those that are untimely), Ms. Hughes-Draughn cannot meet her *prima facie* case because she cannot demonstrate that she sought an accommodation that Frontier did not grant to her, but provided others similar in their ability to work or not work. For example:

- Ms. Hughes-Draughn complains that she was not afforded the accommodation of a paid leave of absence. Frontier does not provide a paid leave of absence to pilots unable to fly due to any type medical condition.

- Ms. Hughes-Draughn protests the requirement that she submit medical certifications during her extended leave of absence. Frontier requires all pilots requesting leaves of absence to submit documentation certifying their need for a leave of absence.

- Ms. Hughes-Draughn also takes issue with the fact that Frontier failed to provide her with the opportunity to be reassigned to a temporary light duty position to accommodate her inability or desire not to fly. Frontier does not provide temporary light duty assignment to any pilot unable to fly for any reason (e.g., on the job injury, off the job injury, any medical condition or disability).

Accordingly, Ms. Hughes-Draughn's discrimination claim fails at the outset, as she cannot even make it past her *prima facie* case. Indeed, Frontier's decision to adhere to the provisions of the CBA and to treat Ms. Hughes-Draughn the same as all other pilots in their ability or inability to work is evidence that its business decisions were legitimate and non-discriminatory. Accordingly, Ms. Hughes-Draughn also cannot establish Frontier's decisions were pretextual.

In summary, Ms. Hughes-Draughn's allegations are either untimely as a matter of law or without legal merit.

FOR SETTLEMENT PURPOSES ONLY PURSUANT TO CRE 408 / FRE 408

Todd Chavez
August 21, 2018
Page 12

## IV.  CONCLUSION

For the reasons detailed above, Ms. Hughes-Draughn has not been subject to any form of discrimination.  Rather, Frontier has treated her fairly and lawfully at all times.  Accordingly, the Company respectfully requests that Ms. Hughes-Draughn's Charge be dismissed with a finding of "no probable cause."  Please do not hesitate to contact me if you require any further information.

Sincerely,

Danielle L. Kitson

DLK/SG

Firmwide:156595439.1 057446.1009